UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, *Attorney General of the State of
New York*,

No. 23-CV-4832 (KMK)

Plaintiff,

OPINION & ORDER

v.

RED ROSE RESCUE, *et al.*,

Defendants.

<u>Appearances</u>:

Heather McKay, Esq.
Julia K. Toce, Esq.
Sandra E. Pullman, Esq.
Zoe Ridolfi-Starr, Esq.
Office of the New York Attorney General
New York, Rochester, and Watertown, NY
*Counsel for Plaintiff*

Christopher A. Ferrara, Esq.
Thomas More Society
Whitestone, NY
*Counsel for Defendants Red Rose Rescue, Christopher Moscinski, Matthew Connolly, William
Goodman, Laura Gies, and John Hinshaw*

Dennis J. Ring, Esq.
Law Office of Dennis J. Ring
Whitestone, NY
*Counsel for Defendant Christopher Moscinski*

Catherine Short, Esq.
Life Legal Defense Foundation
Ojai, CA
*Counsel for Defendant Laura Gies*

John P. Margand, Esq.
Law Offices of John P. Margand, P.C.
Yonkers, NY
*Counsel for Defendant Laura Gies*

Amanda M. Lee, Esq.
U.S. Attorney's Office for the Southern District of New York
New York, NY
*Counsel for Interested Party the United States of America*

KENNETH M. KARAS, United States District Judge:

The Office of the New York State Attorney General (the "OAG" or "Plaintiff") brings

this Action against Red Rose Rescue ("Red Rose"), Christopher Moscinski ("Moscinski"),

Matthew Connolly ("Connolly"), William Goodman ("Goodman"), Laura Gies ("Gies"), John

Hinshaw ("Hinshaw"), and "John and Jane Does" (together, "Defendants").  (*See generally*

Compl. (Dkt. No. 1).)[1]  The OAG alleges that Defendants engaged in "coordinated and repeated

illegal conduct, ranging from criminal trespass to barricading clinic entrances in order to block

access to abortion services in New York" and therefore seeks injunctive relief and damages

pursuant to the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 (the "FACE Act"),

and the New York Clinic Access Act, N.Y. Civ. Rights Law § 79-m (the "NYSCAA").  (Compl.

¶¶ 1, 3, 101–10.)  Before the Court is the OAG's Proposed Order to Show Cause for a

Preliminary Injunction ("PI Motion"), which seeks an order "enjoining [] Defendants during the

pendency of this [A]ction from being present in an area extending thirty feet from any

reproductive health facility in [New York State]."  (Proposed Order to Show Cause ("Proposed

---

[1] Defendants Moscinski, Connolly, Goodman, Gies, and Hinshaw are referred to herein as the "Individual Defendants."

In general, the Court cites to the ECF-stamped page number in the upper righthand corner of each page.  However, insofar as it cites to various court transcripts, the Court cites to the internal page and line numbers reflected in those exhibits.  Additionally, citations to video evidence are to the relevant timestamps in those videos.

OSC") 1 (Dkt. No. 24); *see also* Pl.'s Mem. of Law in Supp. of Mot. for PI ("Pl. Mem.") (Dkt.

No. 25); Decl. of Sandra E. Pullman in Supp. of Mot. for PI ("Pullman Decl.") (Dkt. No. 26).)

This Opinion and Order constitutes the Court's findings of fact and conclusions of law as

to the OAG's PI Motion.[2] *See* Fed. R. Civ. P. 52(a)(2) ("In granting or refusing an interlocutory

injunction, the court must [] state the findings and conclusions that support its action."); *see also*

*id.* 65(d)(1)(A) ("Every order granting an injunction . . . must[] . . . state the reasons why it

issued[.]").[3] As explained below, the OAG's PI Motion is granted in part.

## I.  Background[4]

### A.  Red Rescues Generally

Since as early as 2017, anti-abortion advocates—including the Individual Defendants in

this Action—have participated in so-called Red Rose Rescues ("RRRs"), during which

---

[2] The findings of fact below are for purposes of the PI Motion only, and do not subsequently bind the Court.  *See, e.g.*, *RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*, 467 F. Supp. 2d 285, 291 (E.D.N.Y. 2006) ("[F]indings of fact . . . made by a court granting a preliminary injunction are not binding at trial on the merits [because] . . . a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." (alterations in original) (citation omitted)), *aff'd sub nom. Dep't of Health & Hum. Servs., U.S. Food & Drug Admin. v. RxUSA Wholesale, Inc.*, 285 F. App'x 809 (2d Cir. 2008); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 559 (S.D.N.Y. 2006) ("A finding of fact on a motion for a preliminary injunction is not binding at trial."), *aff'd*, 246 F. App'x 73 (2d Cir. 2007).

[3] For the avoidance of any doubt, a preliminary injunction *is* an interlocutory injunction. *See Injunction*, Black's Law Dictionary (11th ed. 2019) (defining "interlocutory injunction" by reference to "preliminary injunction").

[4] The following facts are drawn from the Parties' declarations and accompanying exhibits filed in connection with the PI Motion.  *See Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." (citation omitted)); *accord Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, — F. Supp. 3d —, 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023) (considering, inter alia, the plaintiff's complaint in connection with the court's findings of fact); *see also Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[H]earsay evidence may be considered by a district court in

participants seek to enter a clinic where abortions are performed, sit in the clinic's waiting room, and "speak with women who have already arrived for their abortion procedures." (Decl. of Monica Migliorino Miller in Opp'n to Mot. for PI ("Miller Decl.") ¶¶ 1, 4 (Dkt. No. 40).). According to Monica Migliorino Miller ("Miller"), who has previously self-identified as the "founding member of Red Rose Rescue[,]" (Pullman Decl. Ex. B at 1), RRR participants' "goal is to persuade [these] women to change their minds and leave the abortion facility[] [by] offering practical help, words of encouragement, [and] information on fetal development and the humanity of the unborn child[,]" (Miller Decl. ¶ 5; *see also* Pullman Decl. Ex. A at 1 (stating, in the RRR Mission Statement, that RRR participants "peacefully talk to women scheduled for abortion, with the goal of persuading them to choose life").) Additionally, RRR participants "hand out pamphlets . . . with information on abortion, facts of fetal development with photos of unborn children in-utero, and resources for practical help[,]" as well as roses with attached cards that both encourage women to choose not to get an abortion and provide contact information for local pregnancy help centers. (Miller Decl. ¶ 6; *id.* Exs. A–B (examples of roses and attached cards that RRR participants use); *see also* Pullman Decl. Ex. A at 1 (explaining that RRR participants offer women "red roses as a sign of life, peace[,] and love").)

According to the Red Rose Mission Statement and Miller herself, if RRR participants are unable to convince the women in the clinic that they should not get an abortion, the participants remain inside the clinic "in solidarity with their abandoned brothers and sisters performing a non-violent act of defense through their continued presence inside the killing centers[,] remaining with them for as long as they can[.] . . . The [participants] will not leave the unwanted,

---

determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.").

but must be 'taken away.'"  (Pullman Decl. Ex. A at 1; *see also* Miller Decl. ¶¶ 9–10.)  As Miller

notes, "[t]his activity may involve a [criminal] charge [for] trespass."  (Miller Decl. ¶ 10.)[5]

Indeed, the Red Rose Code of Conduct states, inter alia, that: "[i]f possible, [RRR participants]

will not walk out of an open [clinic,] but will remain in solidarity with the innocent unborn

scheduled for execution[]"; "[i]f possible, [RRR participants] will not actively assist with unjust

arrests, but not directly resist [arrest] either[]"; and "[i]f and when placed on trial, [RRR

participants] will not plead guilty."  (Pullman Decl. Ex. A at 2.)[6]

    B.  RRRs Conducted Outside of New York State

    Miller has claimed that there have been "over thirty [RRRs] since . . . September of

2017."  (Pullman Decl. Ex. C at 10:06–:12.)  In addition to three incidents at clinics in New York

State, which are discussed *infra*, the Complaint lists twenty-eight other purported RRRs that

occurred elsewhere between September 2017 and April 2022, in locations including Virginia,

Michigan, New Mexico, Washington D.C., New Jersey, Louisiana, Ohio, and Pennsylvania.

(*See* Compl. ¶¶ 64–89.)  As alleged, Moscinski participated in eleven of these RRRs, (*see id.*

¶¶ 64, 70, 72–74, 77–78, 81, 84, 87, 89), Connolly participated in seven of these RRRs, (*see id.*

¶¶ 69, 73–74, 76, 78, 86, 89), Goodman participated in thirteen of these RRRs, (*see id.* ¶¶ 69,

---

[5] On a related note, Moscinski has claimed that he had been arrested in connection with his activities in and around abortion clinics approximately thirty times, and "at least nine times with the Red Rose Rescue."  (Pullman Decl. Ex. D at 9:59–10:21.)

[6] The RRR Code of Conduct further provides that "[i]f possible[,]" RRR participants "will avoid pleading 'no contest[]'" and that they "do not pay fines or do community service, nor agree with the conditions of probation unless there is a very serious personal reason for doing so."  (Pullman Decl. Ex. A at 2.)  The Code of Conduct concludes as follows:  "Unjust imprisonment is a spiritual extension of the rescue and an opportunity to continue to witness to the unborn whom [RRR participants] sought to defend.  In jail, the [RRR participants] will pray, fast, serve fellow inmates, and offer reparation for the sin of abortion."  (*Id.*)

71–74, 76–79, 81, 83, 85–86), Gies participated in three of these RRRs, (*see id.* ¶¶ 84, 86, 89),

and Hinshaw participated in two of these RRRs, (*see id.* ¶¶ 83, 87).

### C.  RRR at All Women's Care Clinic in Manhasset, NY

On April 24, 2021, Defendants Moscinski, Gies, and Hinshaw participated in an RRR at

All Women's Care clinic.  (Pullman Decl. Ex. G at 374:7–11, 375:12–18.)[7]  All Women's Care

is located in Manhasset, NY, and, in addition to abortions, provides a variety of healthcare

services, including "well women exams[] and PAP smears."  (Pullman Decl. Ex. G at 219:21–

220:7; *see also* Ferrara Decl. Ex. 2 at 237:2–8 (explaining that All Women's Care provides

"yearly [gynecological] followups [sic] and checkups for women[,]" and that abortions are

performed there as well).)  As of April 2021, the clinic had COVID-19 restrictions in place

pursuant to which individuals without appointments, including patients' relatives and other

visitors, were not allowed to be in the clinic.  (*See* Pullman Decl. Ex. G at 220:16–221:7,

224:22–25.)

Notwithstanding these restrictions, Moscinski, Gies, and Hinshaw were able to gain entry

into All Women's Care with the assistance of a woman who had made an appointment.  (*See id.*

at 366:7–368:9.)[8]  When Moscinski—who is an ordained Catholic priest, (*see* Ferrara Decl. Ex. 2

---

[7] Defendant Connolly appears to have participated in this RRR as well.  (*See generally* Decl. of Christopher A. Ferrara in Opp'n to Mot. for PI ("Ferrara Decl.") Ex. 2 (Dkt. No. 38) (trial transcript identifying Connolly as among the defendants in the criminal case stemming from the RRR in Manhasset); *see also id.* at 209:16–210:2 (the prosecution's opening statement explaining that Connolly was locked out of the clinic itself and ultimately found in a bathroom within the same building "loudly singing Amazing Grace").)  However, the OAG does not identify Connolly as being involved in this RRR and does not argue that his apparent involvement in this RRR supports the imposition of a preliminary injunction against him.

[8] Although the OAG contends that this woman had made a "fake" appointment, (*see* Pl. Mem. 12; *see also* Compl. ¶ 22), the record is not entirely clear on this point, (*see* Pullman Decl. Ex. G at 366:7–368:9 (testimony of Moscinski during which he refuses to concede that anyone made a "fake" appointment at All Women's Care)).

at 358:17–20)—entered, he was wearing street clothes and carrying his "monk robe" in a duffle

bag because he believed that he would be denied entry into the clinic if he was seen in such a

robe, (*see* Pullman Decl. Ex. G at 368:10–369:5). Once inside the clinic waiting room, clinic

staff members asked Moscinski, Gies, and Hinshaw to leave numerous times, but they refused to

do so. (*See id.* at 369:20–371:3.) As a result, actual clinic patients were asked to wait in their

vehicles, rather than being allowed to wait within the clinic. (*See id.* at 253:12–18 ("[W]e had

[patients] go ahead on outside to their cars and we would call them if we could.").)

Additionally, in light of Moscinski, Gies, and Hinshaw's refusal to leave the clinic, clinic

staff members called 911. (*See, e.g.*, Ferrara Decl. Ex. 2 at 229:1–2.) Thereafter, police officers

arrived at the clinic and asked Moscinski, Gies, and Hinshaw to leave, but they refused. (*See*

Pullman Decl. Ex. G at 371:4–372:6.) Ultimately, Moscinski, Gies, and Hinshaw knelt to the

ground and—upon their arrest for refusing to leave the clinic—police officers had to use

equipment to pick them up and carry them out of the building. (*See id.* at 372:7–373:7; Decl. of

Sandra E. Pullman in Further Supp. of Mot. for PI ("Pullman Reply Decl.") Ex. 6 at 1:21 (Dkt.

No. 43-1) (video of Gies kneeling in an All Women's Care hallway); *id.* Ex. 9 (image of police

officers taking Moscinski out of All Women's Care).) All told, this RRR lasted for

approximately two hours. (*See, e.g.*, Pullman Decl. Ex. G at 253:8–11; Ferrara Decl. Ex. 2 at

259:9–10.)

Following their arrests, Moscinski, Gies, and Hinshaw were tried and convicted of

criminal trespass and second-degree obstruction of governmental administration. (*See* Pullman

Decl. Ex. G at 484:2–491:6.)[9] At the criminal trial, Moscinski testified that "I was willing to

---

[9] According to a June 13, 2023 news article, although she had recently finished serving a nearly two-month term of imprisonment, Gies had shared that her "pro-life work is undeterred—even when just released from prison—'because they're still dismembering children every day in

7

walk out the [clinic] door if all the other staff members who were practicing the butchering of children through abortion would leave." (*Id* at 372:18–20.)  Gies testified that "as far as I was concerned, as long as I [could] stay in there to help stop abortion for the day, that was my goal." (*Id.* at 355:20–22; *see also* Ferrara Decl. Ex. 2 at 345:24–25 ("As long as I [Gies] was there I was hoping that there would be less abortions or no abortions[.]").)  Finally, Hinshaw testified that he refused to leave the clinic unless the police officers would "do their job protecting innocent human life" and stop clinic staff from performing abortions.  (*Id.* at 382:10–383:7.)

> ### D.  RRR at All Women's Medical Office Based Surgery, PLLC in White Plains, NY

Following the RRR at All Women's Care, Defendants Moscinski, Connolly, and Goodman, as well as several other individuals, participated in an RRR at All Women's Medical Office Based Surgery, PLLC ("All Women's Medical") in White Plains, NY on November 27, 2021.  (*See* Pullman Decl. Ex. H at 137:16–138:25 (Goodman testimony concerning his and Moscinski's involvement); Ferrara Decl. Ex. 1 at 66:10–67:14 (discussing Connolly's involvement); *see also* Pullman Decl. Ex. I ("Considine Decl.") ¶¶ 10–11, 15, 18.)  All Women's Medical "provides full gynecological services, including providing family planning services, routine yearly physicals, sonography, out-patient surgeries[,] and abortion services."  (Considine Decl. ¶ 6.)

---

the United States of America.'"  (Pullman Decl. Ex. F at 2.)  That article also states:  "Although she plans to remain outside abortion facilities for the time being to be able to welcome her first grandchild at the end of June [2023], Gies said that Red Rose Rescues are an 'effective' course of action because 'the majority of the time, you're able to occupy the staff and the police so long that you keep them from actually committing abortions for the entire day.'"  (*Id.* at 3.)

In her opposition, Gies argues that the OAG overstates the import of her comments in this article.  (Gies Mem. of Law in Opp'n to Mot. for PI ("Gies Opp'n") 8–9 (Dkt. No. 36).)  However, contrary to Gies' suggestion that her quoted statements were limited to her interest in continuing to conduct general sidewalk counseling, (*see id.*), it is fair to infer from those statement that Gies, at minimum, continues to support the tactics associated with RRRs.

Much like the RRR in Manhasset, Moscinski, Connolly, and Goodman accompanied female RRR participants—at least one of whom had an appointment—to All Women's Medical. (Pullman Decl. Ex. H at 137:16–138:6; Ferrara Decl. Ex. 1 at 89:13–17; Considine Decl. ¶ 16.)[10] Once inside the clinic, Moscinski and Goodman went upstairs to the waiting room in order to persuade patients not to seek abortions.  (*See* Considine Decl. ¶ 15; Pullman Reply Decl. Ex. 5.) Meanwhile, Connolly kneeled in front of an interior clinic doorway, adjacent to the open door. (*See* Pullman Reply Decl. Ex. 1; Considine Decl. ¶ 18.)  Other RRR participants engaged All Women's Medical patients just outside the clinic's exterior doorway, as they were seeking to enter the facility.  (*See, e.g.*, Pullman Reply Decl. Ex. 3 at 2:00–2:27; *id.* Ex 4 at 4:31–4:58.)

During this RRR, which lasted for around two hours total, (*see* Pullman Decl. Ex. H at 155:6–10),[11] Moscinski, Connolly, and Goodman refused multiple requests from clinic staff that they leave, (*see* Considine Decl. ¶¶ 11, 19; Pullman Decl. Ex. H at 155:11–156:2).[12]  As a result of Moscinski, Connolly, Goodman, and their fellow RRR participants' actions, clinic staff directed patients who were already in the waiting room to leave and wait in their cars.  (*See* Considine Decl. ¶ 17.)  Clinic staff also called patients who had not yet arrived "to tell them not to come in until further notice."  (*Id.*)  The day after this RRR occurred, an anti-abortion website

---

[10] Again, the OAG asserts that an unnamed female RRR participant "misrepresented" herself as a patient.  (*See* Pl. Mem. 14; *see also* Compl. ¶ 37; Considine Decl. ¶¶ 11, 16 (stating that "[a]pparently, someone had posed as a patient to make an appointment with our office, and upon entering the facility, this person opened the door to the patient entrance on Maple Avenue and let in other people[,]" and that "[t]wo women who were not actual patients" were among the RRR participants in the clinic).)

[11] All Women's Medical's Chief Administrator, Constance Considine ("Considine"), has stated that the clinic "was unable to provide any reproductive healthcare services during the entirety of this [RRR.]"  (Considine Decl. ¶ 20.)

[12] In fact, Goodman testified at his criminal trial that we would have been willing to leave the clinic if the clinic stopped performing abortions.  (*See* Pullman Decl. Ex. H at 156:5–157:11.)

reported that "[w]hile this [RRR] was going on it appeared that only a couple of women entered. Others appeared to turn up and then leave." (Pullman Reply Decl. Ex. 10 at 1; *see also id.* at 7 ("[After Moscinski, Connolly, and Goodman were arrested, a] discussion ensued with the police; would they close the 'clinic' for the rest of the day? '[N]o.' However[,] we believe no one else entered.").)

While Moscinski, Connolly, and Goodman were at the clinic, clinic staff members called the police, and police officers arrived on the scene. (*See* Ferrara Decl. Ex. 1 at 35:5–7; Considine Decl. ¶¶ 12, 14.) "When the police ultimately attempted to remove them, they laid down on the floor refusing to move and had to be physically carried out by law enforcement [personnel]." (Considine Decl. ¶ 19; *see also* Pullman Reply Decl. Ex. 10 at 6 (photographs showing police officers carrying Moscinski and Goodman out of All Women's Medical).) After they were arrested, Moscinski, Connolly, and Goodman were eventually tried and convicted of criminal trespass in the third degree, (Considine Decl. ¶ 22), and sentenced to three months' imprisonment, (Pullman Decl. Ex. H at 29:18–20).

### E. Incident at Planned Parenthood Clinic in Hempstead, NY

Apart from the RRRs discussed above, Moscinski also barricaded the entrance of a Planned Parenthood clinic in Hempstead, NY on July 7, 2022. (*See* Pullman Decl. Ex. M at 89:23–90:24; *id.* Ex. N ¶¶ 3–9.) The Planned Parenthood clinic provides a variety of reproductive healthcare services, including "abortions, contraception, and diagnosis [of] and treatment for sexually transmitted diseases." (Pullman Decl. Ex. M at 90:6–9.)

After arriving at the Planned Parenthood clinic, Moscinski placed five to six heavy-duty locks on the clinic's front gates, which "secured chains that held the gates shut." (*Id.* Ex. N ¶¶ 5–6; *see also id.* Ex. M at 89:23–90:1; *id.* Ex. O at :15–:21 (video of media report regarding

this incident displaying photographs of the padlocked gate).)  As a result, the clinic building and parking lot were rendered completely inaccessible to patients and staff.  (*Id.* Ex. N ¶ 5.)  The police were called, but the responding officer was unable to remove the locks with the bolt cutters he had on hand.  (*Id.* ¶ 7.)[13]  Thus, the officer requested assistance from the fire department, and responders from the Hempstead Volunteer Fire Department were ultimately able to use "forcible entry saws" to remove the locks.  (*Id.* ¶¶ 7–8.)

Once the gates were opened, Moscinski walked directly in front of the first vehicle waiting to enter the parking lot.  (*Id.* ¶ 9.)  When the responding officer asked him to move out of the way, Moscinski refused.  (*Id.* ¶ 10.)  The responding officer then attempted to physically remove him from the driveway, at which point Moscinski "immediately went limp and fell to the ground, where he laid on his back across the driveway in front of the vehicle, preventing any and all vehicles from entering the parking lot."  (*Id.* ¶ 11; *see also id.* Ex. O at :26 (video of media report regarding this incident displaying a photograph of Moscinski laying in front of a vehicle).)  To effect his arrest for disorderly conduct, police officers had to "sit [Moscinski] up [them]selves" and carry his limp body to a police car.  (*Id.* Ex. N ¶¶ 12, 14.)  In the police car, Moscinski reportedly said, "at least I slowed them down some—I slowed them down a little bit today."  (*Id.* ¶ 13.)

Following his arrest, Moscinski was tried and convicted of violating the FACE Act.  (*See id.* Ex. M at 93:7–13 (transcript reflecting U.S. Magistrate Judge Steven L. Tiscone's statement that "the evidence proves beyond a reasonable doubt that whatever additional goals he may have had, the defendant [Moscinski] clearly intended to, and did, interfere with the operation of a

---

[13] The responding officer has also reported that there were multiple vehicles lined up waiting to enter the clinic's parking lot when he arrived on the scene.  (Pullman Decl. Ex. N ¶ 5.)

facility that was engaged in a provision of reproductive health services.  Accordingly, I find him guilty of the sole charge of violating the FACE Act.").)  After this incident, Moscinski reported that his "main motivation was to try to keep that Planned Parenthood closed for as long as possible, so that I would have an opportunity to talk to the mothers who were coming in that morning."  (*Id.* Ex. O at :46–1:02.)[14]

### F.  Procedural History

The OAG filed its Complaint, alleging that Defendants violated the FACE Act and the NYSCAA, on June 8, 2023.  (*See* Compl.)  On July 26, 2023, the OAG filed its PI Motion.  (*See* Proposed OSC; Pl. Mem.; Pullman Decl.)  On August 25, 2023, pursuant to a briefing schedule approved by the Court, (*see* Dkt. No. 33), Defendants filed their opposition to the PI Motion, (Gies Opp'n; Red Rose Mem. of Law in Opp'n to Mot. for PI ("Red Rose Opp'n") (Dkt. No. 37); Ferrara Decl.; Moscinski Mem. of Law in Opp'n to Mot. for PI ("Moscinski Opp'n") (Dkt. No. 39); Miller Decl.)  On September 15, 2023, the OAG replied to Defendants' three opposition submissions.  (Pl.'s Mem. in Supp. of Mot. for PI Responding to Red Rose Opp'n ("Pl. Red Rose Reply") (Dkt. No. 43); Pullman Reply Decl.; Pl.'s Mem. in Supp. of Mot. for PI Responding to Gies Opp'n (Dkt. No. 44); Pl.'s Mem. in Supp. of Mot. for PI Responding to Moscinski Opp'n (Dkt. No. 45).)  With leave of the Court, (*see* Dkt. No. 51), Defendants filed a joint surreply on

---

[14] There is no evidence in the record that Defendant Red Rose or any other individual—including any of the other Individual Defendants—were involved in planning or carrying out this clinic blockade with Moscinski.  (*See* Pullman Decl. Ex. O at 1:04–1:18 (Moscinski's statement to a media outlet that "the reason I was acting on my own was I didn't want to get anyone else implicated or involved in a possible violation of federal or state law, which could potentially have some severe consequences").)

September 27, 2023, (Defs.' Surreply in Opp'n to Mot. for PI ("Defs.' Surreply") (Dkt. No. 52).)[15]

The Court conducted a hearing on November 13, 2023.  During this hearing, and by agreement of the Parties, there was no live testimony.  Rather, the Parties played certain videos and discussed other exhibits.  The Court also conducted oral argument during this hearing.

## II.  Discussion

As noted above, the OAG alleges that Defendants engaged in "coordinated and repeated illegal conduct, ranging from criminal trespass to barricading clinic entrances in order to block access to abortion services in New York" and therefore seeks injunctive relief and damages pursuant to the FACE Act, 18 U.S.C. § 248, and the NYSCAA, N.Y. Civ. Rights Law § 79-m. (Compl. ¶¶ 1, 3, 101–10.)  In its PI Motion, the OAG seeks an order "enjoining [] Defendants during the pendency of this [A]ction from being present in an area extending thirty feet from any reproductive health facility in [New York State]."  (Proposed OSC 1.)

### A.  Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (emphasis and quotation marks omitted)).  "The 'purpose' of a preliminary injunction 'is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by

---

[15] The United States of America, through the U.S. Attorney for the Southern District of New York, also submitted a Statement of Interest relating to the PI Motion pursuant to 28 U.S.C. § 517.  (*See* Letter from Amanda M. Lee, Esq. to Court (Sept. 19, 2023) (Dkt. No. 48); Statement of Interest of the United States of America ("Statement of Interest") (Dkt. No. 49).)

preventing during the pendency of the suit the occurrence of that irreparable sort of harm which

the movant fears will occur.'"  *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam)

(quoting *New York v. Nuclear Regul. Comm'n*, 550 F.2d 745, 754 (2d Cir. 1977)); *see also*

*Williams v. Rosenblatt Sec., Inc.*, 136 F. Supp. 3d 593, 616 n.11 (S.D.N.Y. 2015) ("Preliminary

injunctive relief is designed to preserve the status quo and prevent irreparable harm until the

court has an opportunity to rule on the lawsuit's merits." (quotation marks omitted)).

　　"A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable

harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions

going to the merits of its claims to make them fair ground for litigation, plus a balance of the

hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction

is in the public interest.'"  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d

Cir. 2015) (quoting *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)); *accord*

*RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022).[16]  "The final

consideration in the preliminary injunction analysis concerns [both] whether the balance of

---

[16] The OAG explains that some district courts in the Second Circuit continue to apply "the pre-*Winter* ('traditional') [preliminary injunction] standard, which does not include the third prong addressing public interest[,]" and suggests that a showing that the preliminary injunction is in the public interest "may not be necessary."  (Pl. Mem. 18 n.1 (collecting cases).)  Because Second Circuit cases are clear that "[a] party seeking a preliminary injunction *must show* . . . [']that a preliminary injunction is in the public interest[,]'" *RiseandShine Corp.*, 41 F.4th at 119 (emphasis added) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)); *accord Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) ("A party seeking a preliminary injunction *must demonstrate*[] . . . that the 'public interest would not be disserved' by the issuance of an injunction." (emphasis added) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010))), this Court declines to follow those district courts that do not apply the public interest prong of the preliminary injunction analysis, *see Barton v. Ne. Transp., Inc.*, No. 21-CV-326, 2022 WL 203593, at *11 (S.D.N.Y. Jan. 24, 2022) (explaining that "district courts are 'bound by the decisions of the Supreme Court of the United States and those of the Circuit Court of Appeals in their own circuit, but are not bound by those of a federal court of co-ordinate jurisdiction[]'" (quoting *Cont'l Sec. Co. v. Interborough Rapid Transit Co.*, 165 F. 945, 959–60 (S.D.N.Y. 1908))).

equities tips in favor of granting the injunction and whether that injunction is in the public interest." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 86 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022).

For the reasons that follow, the Court finds that the imposition of a preliminary injunction is appropriate in this case.  In short, the OAG has demonstrated a likelihood of irreparable harm if a preliminary injunction does not issue, a probability of success on the merits as to all Defendants, and that the public interest favors an injunction.

B.  Likelihood of Irreparable Harm

Generally speaking, preliminary injunctive relief is available only to the extent the court finds that "irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original); *see also id*. at 22–23 ("Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (emphasis added)).   "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'"  *Actavis PLC*, 787 F.3d at 660; *accord Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009).

The OAG argues that the Court should apply a presumption of irreparable harm in this case.  (Pl. Mem. 23–24.)  "In certain circumstances, generally when the party seeks a statutory injunction, [the Second Circuit has] dispensed with the requirement of showing irreparable harm, and instead employ[ed] a presumption of irreparable harm based on a statutory violation."  *City*

*of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120 (2d Cir. 2010) (citing

*United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 27 (2d Cir. 1972)); *see also United States v.*

*Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 754–55 (S.D.N.Y. 2015) (applying a presumption of

irreparable harm where the statute upon which the sought-after injunction was based "[did] not

specifically require proof of irreparable harm").  The statutes at issue here—the FACE Act and

NYSCAA—authorize the Attorney General to seek an injunction to prevent violations of those

statutes.  18 U.S.C. § 248(c)(3) (providing that where "the Attorney General of a State has

reasonable cause to believe that any person or group of persons is being, has been, or may be

injured by conduct constituting a violation of [the FACE Act], such Attorney General may

commence a civil action in the name of such State" and such civil actions may seek "temporary,

preliminary[,] or permanent injunctive relief"); N.Y. Civ. Rights Law § 79-m (same in

connection with the NYSCAA).  However, a presumption of irreparable harm may be

inappropriate "where the requested injunction might curtail activity protected by the First

Amendment and thereby inflict irreparable injury on the defendant."  *New York ex rel. Spitzer v.*

*Cain*, 418 F. Supp. 2d 457, 472–73 (S.D.N.Y. 2006); *see also Elrod v. Burns*, 427 U.S. 347, 373

(1976) ("The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."); *accord Roman Cath. Diocese of Brooklyn v.*

*Cuomo*, 592 U.S. —, 141 S. Ct. 63, 67 (2020).  Thus, because the requested preliminary

injunction implicates First Amendment concerns, *see infra* Section II.E, the Court declines the

OAG's invitation to apply a presumption of irreparable harm.

     Nevertheless, based on a review of the evidence, the Court finds that the OAG has met its

burden of establishing the requisite likelihood of irreparable harm in the absence of injunctive

relief.  *Mazurek*, 520 U.S. at 972 (making clear that the moving party "carries the burden of

persuasion" at the preliminary injunction stage).  Specifically, the OAG argues that Defendants

have already caused irreparable harm because they have unreasonably impeded women's access

to healthcare.  (Pl. Mem. 24.)  The OAG also contends that Defendants "have both demonstrated

and explicitly stated their intent to continue their unlawful conduct."  (*Id.* at 25.)

To start, it is undisputed that All Woman's Care, All Women's Medical, and the Planned

Parenthood clinic at issue in this case all provide a variety of healthcare services for women, of

which abortion is one example.  (*See* Ferrara Decl. Ex. 2 at 237:2–8 (explaining that All

Women's Care provides abortions, as well as "yearly [gynecological] followups [sic] and

checkups for women[,]"); Considine Decl. ¶ 6 (noting that All Women's Medical "provides full

gynecological services, including providing family planning services, routine yearly physicals,

sonography, out-patient surgeries[,] and abortion services"); Pullman Decl. Ex. M at 90:6–9

(explaining that the Planned Parenthood clinic provides a variety of reproductive healthcare

services, including "abortions, contraception, and diagnosis [of] and treatment for sexually

transmitted diseases").)  As another court in this District has stated, "[D]efendants are accused of

obstructing access to medical facilities, and 'women denied access [to reproductive healthcare

clinics] cannot be compensated by money damages; injunctive relief alone can assure them the

clinics' availability.'"  *Cain*, 418 F. Supp. 2d at 473 (quoting *N.Y. State Nat'l Org. for Women v.

Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)) (finding that the OAG established a likelihood of

irreparable harm in a case where it sought a preliminary injunction pursuant to, inter alia, the

FACE Act and NYSCAA); *see also United States v. Burke*, 15 F. Supp. 2d 1090, 1095 n.6 (D.

Kan. 1998) (explaining, in a FACE-Act case, that the defendant's challenged actions had "an

adverse impact on both the emotional state of women seeking services at the [reproductive

healthcare clinic at issue] and the physical well-being of employees providing services at th[at]

clinic" and that "[s]uch harm would be irreparable in the absence of an injunction"); *cf. New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 202 (2d Cir. 2001) (noting that "significant government interests" supporting the constitutionality of an injunction issued pursuant to the FACE Act included "advancing medical privacy and the well-being of patients seeking care at facilities").  In short, it should go without saying that women who are prevented from accessing—or who confront unreasonable difficulties when seeking to access—healthcare face irreparable harm.

Moreover, the OAG has demonstrated that this irreparable harm is likely—i.e., that it is "actual and imminent."  *Actavis PLC*, 787 F.3d at 660.  The OAG has submitted evidence that, as recently September of 2022, Red Rose founding member Miller informed a media outlet that they were aiming to organize more RRRs.  (*See* Pullman Decl. Ex. L at 3 ("According to [] Miller, the group plans to continue rescues. . . . Miller told LifeSiteNews that they are recruiting new rescuers, especially young people, and hope to have more rescues organized within the next six months.").)  Additionally, even after being released from a term of imprisonment stemming from an RRR, Gies has told reporters that her anti-abortion activities remain undeterred "because they're still dismembering children every day in the United States of America."  (*Id.* Ex. F at 2.) Moreover, Red Rose—through its public Facebook page—has declared that "[r]escues will continue until . . . no more babies die."  (*Id.* Ex. E (Red Rose Facebook post dated May 2, 2022); *see also id.* Ex. K (January 18, 2019 article in which Moscinski is quoted as saying:  "[T]here is an urgent need to reach out to mothers in crisis pregnancies, especially when all other efforts to dissuade them from abortion have failed.  I have seen the devastating impact abortion has had on women.  We all know that in every abortion a unique human being created and loved by God is brutally destroyed.  These are our brothers and sisters.  Once someone has this knowledge, then

it is clear that every effort must be made to protect these children and their mothers.  Our love for

them must not stop at some artificial property line established by those who profit from the

killing.").)  Finally, although the record contains very little evidence regarding RRRs conducted

outside of New York, the OAG alleges that there have been at least twenty-eight RRRs dating

back to September 2017.  (*See* Compl. ¶¶ 64–89; *see also* Pullman Decl. Ex. C at 10:06–:12

(statement of Miller in August 2021 that there have been "over thirty [RRRs] since . . .

September of 2017").)[17]

---

[17] Defendants suggest in just a single paragraph in their surreply that the OAG's "delay"
of approximately one year in filing this Action and the PI Motion belies the imminence of the
threatened harm.  (*See* Defs.' Surreply 9 & n.3).  As an initial matter, "[l]egal arguments raised
for the first time in a surreply, like arguments raised for the first time in a reply, are [generally
deemed] waived."  *Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 434 F. Supp. 3d
142, 161 (S.D.N.Y. 2020) (first alteration in original) (citation omitted).  However, mindful that
district courts "should generally consider delay in assessing irreparable harm[,]" *Tom Doherty
Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 39 (2d Cir. 1995), the Court notes—and Defendants
do not dispute—that several of the Individual Defendants were tried and incarcerated in
connection with criminal charges stemming from RRRs conducted in New York and elsewhere
at various points over the last few years, (*see, e.g.*, Pullman Decl. Ex. L at 3 (September 2022
news article stating that, "[a]ccording to . . . Miller, the group plans to continue rescues.  For the
time being, she explained that there are multiple pending trials and upcoming sentences from
past rescues.  Fr. Fidelis Moscinski, William Goodman, and Matthew Connolly are currently in
prison for a rescue that they conducted last November."); *see also id.* Ex. F (noting, on June 13,
2023, that Gies "was recently released" after serving a "nearly two-month" term of
imprisonment)).  Thus, because, at minimum, Moscinski, Connolly, Goodman, and Gies were, of
course, unable to engage in RRRs during the time they spent in prison, the fact that there has not
been an RRR in New York since November 2021 is not dispositive here.  Further, the Court does
not doubt that the OAG's "delay" is, at least in part, attributable to its investigation into the facts
and law underlying its claims, which Defendants do not suggest was done in bad faith.  *Lazor v.
Univ. of Conn.*, 560 F. Supp. 3d 674, 684–85 (D. Conn. 2021) ("[T]he Second Circuit has
recognized an exception [to the principle that a delay in seeking injunctive relief may counsel
against a finding of irreparable harm] for when a delay is adequately explained, such as when the
delay is a product of good faith efforts to investigate the underlying cause of action." (citing,
inter alia, *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005) and
*Tom Doherty Assocs., Inc.*, 60 F.3d at 39)); *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d
322, 333–34 (S.D.N.Y. 2011) (holding that a delay was justified when it was caused by, among
other things, "good faith efforts to investigate the facts and law" underlying the plaintiff's
claim); *cf. Tripathy v. Lockwood*, No. 22-949, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022)
(summary order) (concluding that the district court erred "in holding that [the plaintiff's]

In sum, the Court concludes that the OAG has established the requisite likelihood of irreparable harm for purposes of its PI Motion.

### C.  Likelihood of Success on the Merits

Next, the Court finds that the OAG has established a likelihood of success on the merits of its FACE Act and NYSCAA claims against all Defendants.[18]  "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty.  [It] need only make a showing that the probability of . . . prevailing is better than fifty percent.'"  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)), *appeal dismissed as moot sub nom. Broker Genius Inc. v. Gainor*, 756 F. App'x 81 (2d Cir. 2019); *accord M.V. Music v. V.P. Records Retail Outlet, Inc.*, — F. Supp. 3d —, 2023 WL 1070462, at *7 (E.D.N.Y. 2023); *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. 2020).

### 1.  Applicable Legal Framework

The OAG claims that Defendants engaged in "coordinated and repeated illegal conduct, ranging from criminal trespass to barricading clinic entrances in order to block access to abortion services in New York" in violation of the FACE Act and the NYSCAA.  (Compl. ¶¶ 1, 3, 101–10.)  As an initial matter, because these two statutes proscribe the same conduct using nearly identical language, the Court will analyze them in tandem.  *See Cain*, 418 F. Supp. 2d at 482 ("The terms of the [NYSCAA] are essentially identical to FACE, and all conduct constituting a

---

[twenty-nine]-month delay in moving for a preliminary injunction was, on its own, a sufficient reason to deny" his motion for a preliminary injunction).

[18] It bears emphasizing that, in so holding, the Court does *not* determine at this juncture that the OAG has necessarily prevailed on its FACE Act and NYSCAA claims against Defendants.

violation of FACE will also constitute a violation of the [NYSCAA].”); *New York ex rel. Spitzer v. Kraeger*, 160 F. Supp. 2d 360, 372 (N.D.N.Y. 2001) (“Since the language of the [NYSCAA] is almost identical to FACE, the standards for proving a violation of the [NYSCAA] [are] the same as those for proving a violation of FACE.”).

The FACE Act provides that “[w]hoever . . . by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[,]” is guilty of criminal interference.  18 U.S.C. § 248(a)(1); *see also* N.Y. Penal Law § 240.70(1)(a) (“A person is guilty of criminal interference with health services . . . in the second degree when: . . . by force or threat of force or by physical obstruction, he or she intentionally injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with, another person because such other person was or is obtaining or providing reproductive health services.”).[19]  There appears to be no dispute that the OAG’s claims are limited to allegations that Defendants violated the FACE Act and the NYSCAA by engaging in “physical obstruction,” rather than using “force or [any] threat[s] of force.”  *See* 18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a).  Nor does the OAG assert that Defendants injured anyone or “intimidate[d]” anyone as that term is defined in the statutes.  *See* 18 U.S.C. § 248(e)(3) (defining “intimidate” as “plac[ing] a person in reasonable apprehension of bodily harm to him- or herself or to another”); N.Y. Penal Law § 240.70(3)(c) (defining “intimidates” in substantially the same terms).  Accordingly, for purposes of deciding the OAG’s PI Motion, the OAG must

_____

[19] Although N.Y. Civ. Rights Law § 79-m empowers the Attorney General to seek injunctive relief for violations of the NYSCAA, its substantive provisions are found within New York’s Penal Law.  *See* N.Y. Penal Law §§ 240.70–71.

demonstrate that Defendants "(1) [engaged in] physical obstruction, (2) intentionally undertaken to . . . interfere with [or to attempt to interfere with] a person, (3) because that person is or has been obtaining or providing reproductive health services[] . . . ." *Cain*, 418 F. Supp. 2d at 473 (citing 18 U.S.C. § 248(a)(1)); *see also* N.Y. Penal Law § 240.70(1)(a); *accord United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011) (summary order) ("[U]nder the circumstances of this case, the government had to prove that [the defendant] (1) by physical obstruction, (2) intentionally interfered with or attempted to interfere with any person, (3) because that person was or had been obtaining or providing reproductive health services.").

Both the FACE Act and the NYSCAA provide numerous statutory definitions that guide the Court's analysis. *See* 18 U.S.C. § 248(e); N.Y. Penal Law § 240.70(3). Under both statutes, the phrase "'interfere with' means to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2); *see* N.Y. Penal Law § 240.70(3)(b) (same). In addition, "the term 'facility' includes a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located[,]" 18 U.S.C. § 248(e)(1); *see* N.Y. Penal Law § 240.70(3)(a) (defining "health care facility" in the same terms), and, in turn, "'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy[,]" 18 U.S.C. § 248(e)(5); *see* N.Y. Penal Law § 240.70(3)(e) (similar).

### 2. Physical Obstruction

In light of the importance of the physical-obstruction element in this case, the Court pauses briefly to describe that element in more detail. Under both the FACE Act and NYSCAA,

"physical obstruction" is defined as "rendering impassable ingress to or egress from a facility

that provides reproductive health services or . . . rendering passage to or from such a facility . . .

unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d)

(same). Importantly, "[t]here must be an *actual* obstruction" to trigger liability under these

statutes. *Cain*, 418 F. Supp. 2d at 480 (emphasis added); *see also Operation Rescue Nat'l*, 273

F.3d at 195 (noting that the concept of "constructive obstruction" is "an uncertain and potentially

slippery concept"). Although "merely making the approach to health facilities 'unpleasant and

even emotionally difficult does not automatically' constitute a violation" of the FACE Act and

NYSCAA, *Cain*, 418 F. Supp. 2d at 480 (quoting *Operation Rescue Nat'l*, 273 F.3d at 195–96),

those statutes "do[] not limit physical obstruction to bodily obstruction, but rather [are] broadly

phrased to prohibit any act rendering passage to the facility unreasonably difficult[,]" *United*

*States v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001); *accord Cain*, 418 F. Supp. 2d at 480.

Moreover, "the obstruction need not be permanent or entirely successful. That patients may

eventually have reached [the facility at issue] in spite of [the] defendants' actions is therefore

beside the point." *Cain*, 418 F. Supp. 2d at 480 n.18; *see also Kraeger*, 160 F. Supp. 2d at 373

("It is not necessary to show that a clinic was shut down, that people could not get into a clinic at

all for a period of time, or that anyone was actually denied medical services." (citing *United*

*States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998), *aff'd*, 226 F.3d 253 (3d Cir. 2000), *cert*

*denied*, 532 U.S. 971 (2001))).

    Courts have found that a wide variety of obstructive acts can constitute "physical

obstruction" for purposes of the FACE Act and, by extension, the NYSCAA. For example, in

*Cain*, the court found that "standing directly in front of a patient and preventing her from

approaching [a] clinic while [the defendants] attempt[ed] to give her literature" and "standing

directly in front of [a clinic] door and refusing to move until a security guard approache[d]"

constituted physical obstruction.  *Cain*, 418 F. Supp. 2d at 480; *see also Operation Rescue Nat'l*,

273 F.3d at 194 ("The record shows that some of the defendants have also interfered with

pedestrians as they approach the building, . . . *standing in front of them as the pedestrians tried*

*to enter the building*.  When allowed close to facility entrances, the protestors have sometimes

*blocked clinic doors by standing directly in front of them* and trying to communicate with those

entering or leaving facility buildings.  This behavior was apparently so extensive that it rendered

building access unreasonably difficult." (emphases added)); *Dugan*, 450 F. App'x at 22

(affirming the defendant's conviction because there was sufficient evidence that he "kneeled

intentionally in front of [a clinic] door to block it" such that "the door could not have opened"

(citation omitted)).  Similarly, in *Kraeger*, the court determined that the defendants had engaged

in physical obstruction by, among other things, "crowd[ing] patients, walk[ing] very closely to

them, and step[ping] in their way, making it very difficult for patients to maneuver around

them."  *Kraeger*, 160 F. Supp. 2d at 376.  That said, the court in *United States v. Scott* concluded

that one defendant, who "extended her arm to offer literature to clients," and had "on occasion []

passed [her arm] in front of an escort who was walking alongside [a] client[] [and] [a]t other

times, . . . passed in front of escorts and clients in an attempt to walk next to the client and offer

literature[,]" did not physically obstruct anyone because, in part, she "never stopped the forward

progress of an individual seeking reproductive services."  958 F. Supp. 761, 772 (D. Conn.

1997), *aff'd and remanded sub nom. United States v. Vazquez*, 145 F.3d 74 (2d Cir. 1998).

Finally, in *New York ex rel. Underwood v. Griepp*, the court discussed evidence that

showed one defendant "approach[ing] a patient head on and attempt[ing] to provide her a

pamphlet."  No. 17-CV-3706, 2018 WL 3518527, at *44 (E.D.N.Y. July 20, 2018), *aff'd sub*

*nom. New York ex rel. James v. Griepp*, 11 F.4th 174 (2d Cir. 2021).[20]  "Because [the defendant]

was directly in the patient's path, the patient, her companion, and her escorts deviated slightly

from their path to get around [the defendant], without changing their pace."  *Id.*  "As the group

stepped around him, [the defendant] made no effort to interfere with their progress toward the

[c]linic."  *Id.*  The court concluded that this defendant did not "physically obstruct[]" the patient

in question in violation of the FACE Act and the NYSCAA because "the patient 'did not

encounter any significant or unreasonable delay in leaving the clinic.'"  *Id.* (quoting *Kraeger*,

160 F. Supp. 2d at 371).

The Court now turns to assessing whether—in light of the foregoing legal principles—the

OAG has established the requisite likelihood of success on the merits with respect to each

Defendant.

### a.  Moscinski

With respect to Moscinski, the OAG has established the requisite likelihood of success as

to the physical-obstruction element.[21]  Focusing only on the July 7, 2022 incident at the Planned

---

[20] The Court is aware that *Griepp* has an exceedingly tortured procedural history before
the Second Circuit.  *See New York v. Griepp*, 991 F.3d 81 (2d Cir.) (a divided panel vacating in
part, affirming in part, and remanding where the majority determined that the district court erred
in weighing the evidence and applying the law), *vacated sub nom. People v. Griepp*, 997 F.3d
1258 (Mem) (2d Cir. 2021) (granting petitions for rehearing, vacating the panel's prior opinion,
and noting that "the decision of the district court remains in place").  However, the bottom line is
that the Second Circuit ultimately affirmed Judge Amon's extremely thorough and well-reasoned
opinion denying a separate OAG motion for injunctive relief under, inter alia, the FACE Act and
NYSCAA.  *See Griepp*, 11 F.4th at 177–78 ("In [affirming the district court's denial of a
preliminary injunction], and consistent with [the Second Circuit's] prior holdings . . . , we do not
specifically affirm or question the array of evidentiary and factual findings made by the district
court.  Rather, we hold simply that the district court did not abuse its discretion in finding that
preliminary injunctive relief was not warranted at this time." (citing *Brennan's, Inc. v. Brennan's
Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004))).

[21] The OAG argues that the Court should apply the doctrine of collateral estoppel as
against Moscinski because he "has been found guilty of a criminal violation of [the] FACE

Parenthood clinic in Hempstead, NY, Moscinski plainly engaged in physical obstruction when he

placed numerous heavy-duty locks on the clinic's front gates, (*see* Pullman Decl. Ex. M at

89:23–90:1; *id.* Ex. N ¶¶ 5–6; *see also id.* Ex. O at :15–:21 (video of media report regarding this

incident displaying photographs of the padlocked gate)), and when, after the authorities managed

to remove the locks, he laid down in front of the entrance to the clinic's parking lot, (*see id.*

Ex. N ¶¶ 9–11; *see also id.* Ex. O at :26 (video of media report regarding this incident displaying

a photograph of Moscinski laying in front of a vehicle)).  Under the clear statutory definition of

"physical obstruction," Moscinski's actions "render[ed] impassable ingress to or egress from"

the Planned Parenthood clinic.  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d); *see also*

*Cain*, 418 F. Supp. 2d at 480 (noting that "[a]cts of physical obstruction that are sufficient to

create liability under [the] FACE [Act] include obstructing or slowing access to driveways or

parking lots" (citing *Operation Rescue Nat'l*, 273 F.3d at 196)).

---

[Act]."  (Pl. Mem. 19.)  In reality, given that the OAG did not criminally prosecute Moscinski in federal court for a violation of a federal statute, the OAG is asking the Court to apply the doctrine of *nonmutual* offensive collateral estoppel.  *See Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 77 n.1 (2d Cir. 2019) ("Nonmutual offensive collateral estoppel is a species of collateral estoppel (or 'issue preclusion,' as it is also known) that operates to 'preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff.'" (quoting *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005))).  As the Second Circuit has explained, "[t]o invoke this doctrine, a plaintiff must satisfy four conditions: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits."  *Id.* at 79–80 (quoting *Faulkner*, 409 F.3d at 37).  "Additionally, in order to blunt the fear that nonmutual offensive collateral estoppel may be unfair to a defendant or fail to promote judicial economy, district courts must ensure that application of the doctrine is not unfair."  *Id.* at 80 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)).

Putting aside the fact that Moscinski has not disputed his liability under the FACE Act for his actions at the Planned Parenthood clinic, (*see generally* Moscinski Opp'n), the OAG has failed even to mention, let alone address, the required fairness analysis.  Thus, the Court declines to apply the doctrine of nonmutual offensive collateral estoppel as against Moscinski at this juncture.

b.  Connolly

Turning to Connolly, the Court finds that the OAG has made a sufficient showing that it is likely to succeed in establishing that he engaged in physical obstruction.  The OAG has put forth evidence that Connolly engaged in physical obstruction at All Women's Medical.  (*See, e.g.*, Pullman Reply Decl. Ex. 1.)  Specifically, there is evidence that Connolly kneeled in front of an interior doorway that leads into that clinic.  (*See id.*)  Additionally, there is video evidence that Connolly, alongside other RRR participants, stood before that same doorway and refused clinic staff requests that they leave the premises.  (*See id.* Ex. 2 (6:11 video showing Connolly and others inside a vestibule in front of the clinic's doorway)).)  All Women's Medical's Chief Administrator has stated that, all told, Connolly blocked that doorway for approximately two hours.  (*See* Considine Decl. ¶¶ 2, 18.)  Thus, Connolly likely engaged in physical obstruction at All Women's Medical.  *See Mahoney*, 247 F.3d at 283–84 (affirming the district court's finding of liability under the FACE Act where, during a demonstration, he had knelt three feet in front of an emergency exit door); *see also Dugan*, 450 F. App'x at 22 (agreeing with the district court that "the testimony of the clinic's security guard established that [the defendant] kneeled intentionally in front of [a] door to block it, thus satisfying the first two elements" of the FACE Act).

Defendants argue that Connolly was, "[i]f anything, . . . facilitat[ing] 'ingress to or egress from' the clinic[,]" because he was propping open a door that is typically locked.  (Red Rose Opp'n 10.)  The Court disagrees.  To start, the fact that the door was opened, rather than closed, is immaterial as a legal matter; what matters is that Connolly appeared to "render passage to or from" the clinic "unreasonably difficult."  *See* 18 U.S.C. § 248(e)(4); N.Y. Penal Law

§ 240.70(3)(d).[22]  Likewise, it is of no moment that the door is typically locked, as courts have

concluded that the FACE Act has been violated even where obstructed doors have been locked,

*see, e.g.*, *Mahoney*, 247 F.3d at 283–84 (affirming the district court's physical-obstruction

finding where the defendant had "positioned himself three feet" from a door that was "rarely

used" and "generally locked" (quotation marks omitted)); *see also Cain*, 418 F. Supp. 2d at 480

n.18 (explaining that physical obstruction as defined in the FACE Act "need not be . . . entirely

successful" and that whether "[a] patient[] may eventually [reach a reproductive healthcare

facility] in spite of defendants' actions is . . . beside the point"), and, in any event, the FACE Act

proscribes *attempts* to "interfere with any person because that person is or has been . . . obtaining

or providing reproductive health services[,]" 18 U.S.C. § 248(a)(1).[23]

In short, the OAG has made a sufficient showing at this stage that Connolly engaged in

physical obstruction for purposes of liability under the FACE Act and NYSCAA.

### c.  Gies

With regard to Gies, the OAG has established that it likely can demonstrate that Gies

engaged in physical obstruction at All Women's Care.  Specifically, the OAG has submitted

---

[22] The definition of physical obstruction covers *both* "rendering impassable ingress to or egress from a facility" *and* "rendering passage to or from such a facility . . . unreasonably difficult or hazardous."  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  Thus, Defendants' myopic focus on the former aspect of physical obstruction is misplaced.  (*See* Red Rose Opp'n 10; Gies Opp'n 12.)

[23] To the extent that Defendants assert that Connolly only partially blocked the clinic doorway, the Court does not see how that is relevant to his liability under the FACE Act.  "Confined to forbidding the *complete* blockage of clinic entrances (and thus dispensing with the 'unreasonably difficult' language, . . .), the [FACE] Act would be easily evaded, for example by blockaders' leaving just enough space between two of them for a person to squeeze through, touching the blockaders on either side . . . or by lying down across the entrance so that the entrant has to step—or jump?—over the blockader."  *United States v. Soderna*, 82 F.3d 1370, 1377 (7th Cir. 1996).

evidence that Gies physically obstructed—by "rendering passage . . . unreasonably difficult[,]"
18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d)—a doorway and hallway within All
Women's Care.  (*See, e.g.*, Pullman Reply Decl. Ex. 6 at :03–:24 (video evidence of Gies
kneeling in an interior clinic doorway); *id.* at 1:04–3:26 (video evidence of Gies crawling from
the doorway into the clinic hallway where she remained for the remainder of the video clip); *see
also id.* at :43–:52 (portion of the video clip in which Gies states, "this is just a chance for you
guys to realize what you're doing; we're willing to lay our lives down . . . what are you doing?
You're making money off . . . the crisis of these women?").)  Such acts likely constitute physical
obstruction for purposes of the FACE Act and the NYSCAA.  *See Cain*, 418 F. Supp. 2d at 480
(listing "blocking clinic doors by standing directly in front of them" as an example of physical
obstruction (citing *Operation Rescue Nat'l*, 273 F.3d at 194)); *cf. Gregg*, 32 F. Supp. 2d at 156
(finding that the defendants "engaged in physical obstruction" where they admitted in their
opposition brief that, among other things, "several of [them] entered the premises [at issue] and
lay prone on the stairway and hallway" (quotation marks omitted)).

### d.  Goodman

As to Goodman, the Court finds that the OAG has met its burden of demonstrating that
he has likely engaged in physical obstruction within the meaning of the FACE Act and the
NYSCAA.[24]

---

[24] Insofar as the OAG contends that Exhibit 5 to the Pullman Reply Declaration shows
Moscinski and Goodman "forc[ing] their way" into All Women's Medical and thereby creating a
physical obstruction in the stairway, the Court disagrees.  (*See* Pl. Red Rose Reply 8; Pullman
Reply Decl. Ex. 5; *id.* Ex. 10 at 6 (news article showing an image of Goodman—who appears to
be the same man with Moscinski in Exhibit 5—being carried out All Women's Medical by
police officers).)  A full review of that 51 second video clip reveals nothing resembling a
violation of the FACE Act and the NYSCAA; simply put, no one appears to engage in physical
obstruction in this video.  (*See* Pullman Reply Decl. Ex. 5.)

In its opening brief, the OAG principally argues that the Individual Defendants engaged in physical obstruction during the RRRs at All Women's Care and All Women's Medical by "occupying waiting room[s] and rendering [them] unusable."  (*See* Pl. Mem. 20–22; *see also* Pl. Red Rose Reply 8–9.)  In short, the OAG contends that the Individual Defendants' acts and omissions at those facilities—and their foreseeable consequences—effectively "render[ed] passage to or from [the clinics] . . . unreasonably difficult."  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  The Court agrees.

As noted above, after Moscinski, Gies, and Hinshaw entered All Women's Care without authorization, they refused multiple requests from staff members that they leave the facility. (*See* Pullman Decl. Ex. G at 369:20–371:3.)  After the police were called to the scene, these Defendants also refused to leave when asked by police officers.  (*See, e.g.*, *id.* at 371:4–372:6.) Then, when facing arrest for criminal trespass, these Defendants dropped to the floor and thereby forced police officers to pick them up with special equipment and carry them out of the building. (*See id.* at 371:24–373:7.)  During this time—which lasted approximately two hours, (*see id.* at 253:8–11)—patients were asked to exit the clinic and wait in their vehicles, (*see id.* at 253:12–18), and, consequently, were unable to receive reproductive healthcare services as scheduled. Clinic staff members were also diverted from their job responsibilities in light of the Individual Defendants presence and conduct.  (*See generally* Pullman Reply Decl. Exs. 6–8 (video evidence from the All Women's Care RRR showing clinic staff focused on addressing Gies' unauthorized presence in the facility rather than healthcare-related tasks).)

Similarly, at All Women's Medical, after gaining entry into the facility, Moscinski and Goodman proceeded to the upstairs waiting room.  (Considine Decl. ¶¶ 15–18; Pullman Reply Decl. Ex. 5.)  When clinic staff members asked them to leave, they refused.  (*See* Considine

Decl. ¶¶ 11, 19; Pullman Decl. Ex. H at 155:11–156:2).  After staff members called the police in

light of Defendants' refusal to leave, Moscinski and Goodman continued refusing to leave when

asked by responding officers and, when those officers sought to arrest them for criminal trespass,

they "laid down on the floor . . . and had to be physically carried out" of the facility.  (Considine

Decl. ¶¶ 12, 14, 19, 22.)  In total, this RRR lasted for approximately two hours, (*see* Pullman

Decl. Ex. H at 155:6–10), and during that time staff members had patients leave the facility and

wait in their cars, and also had patients with later appointments refrain from coming to the

facility "until further notice[,]" (Considine Decl. ¶ 17.)  Further, staff members were prevented

from engaging in any healthcare-related responsibilities while they addressed the RRR

participants presence at the facility.  (*See, e.g.*, Pullman Reply Decl. Ex. 2 (surveillance video

showing clinic staff members denying a subset of RRR participants access to the facility);

Considine Decl. ¶ 20 (Considine's statement that All Women's Medical "was unable to provide

any reproductive healthcare services during the entirety of" the RRR at that clinic).)

     Given this factual landscape, the D.C. Circuit's holding in *Mahoney* is instructive.  Under

the circumstances of that case, the D.C. Circuit agreed with the district court that the defendant

engaged in physical obstruction when he "kneel[ed] and pray[ed] before a door that was mainly

used as an emergency exit."  *Mahoney*, 247 F.3d at 284.  In making this determination, the

*Mahoney* court also noted that:

> [The defendant] entered [a] cordoned-off area in part so that he would be arrested
> with [] other demonstrators, and that is precisely what happened.  It required
> fourteen police officers to take Mahoney and the other defendants into custody.  In
> crossing the police line after the officers warned those within the cordoned area that
> they would be arrested, [the defendant] contributed to the disruption and to the
> interference with those trying to enter or leave the clinic. . . . By contributing to the
> demonstration within a few feet of the clinic entrances, [the defendant's] actions
> compelled patients to enter the clinic through the "crowded and chaotic" rear
> entrance.  This was *a foreseeable and intended consequence of his action*, and it
> constitutes "physical obstruction."

*Id.* (emphasis added) (citations omitted); *see also United States v. Lindgren*, 883 F. Supp. 1321, 1328 (D.N.D. 1995) (finding, where the defendants had blockaded a clinic with cars, that the subsequent "crowd of emergency vehicles, rescue workers, police officers, protesters, and onlookers *that was foreseeably drawn to the site*" contributed to making clinic "access unreasonably difficult" (emphasis added)).

In the instant case, Defendants entered All Women's Care and All Women's Medical, knowing that, as RRR participants, if they were unable to convince any women in the clinic that they should not get an abortion, they would remain inside the clinic "in solidarity with their abandoned brothers and sisters performing a non-violent act of defense through their continued presence inside the killing centers[,] remaining with them for as long as they [could.]"  (Pullman Decl. Ex. A at 1; *see also* Miller Decl. ¶¶ 9–10.)  Given that remaining in clinics without authorization foreseeably leads, if not compels, staff members to call the authorities, the Code of Conduct for RRR participants states that "[i]f possible, [RRR participants] will not actively assist with unjust arrests, but not directly resist [arrest] either[.]"  (Pullman Decl. Ex. A at 2.)  As a result, when the Individual Defendants here faced arrest, they dropped to the ground and refused to leave the clinics, either on their own or while under arrest.  *See supra* Sections I.C.–D.  Thus, numerous police officers were required to remove them from the clinics.  (*See, e.g.*, Pullman Decl. Exs. 6–9 (All Women's Care); Pullman Reply Decl. Ex. 10 at 5–7 (All Women's Medical).)  And, as described above, during the time they remained in the clinics, patients were precluded from receiving—and staff members were precluded from providing—healthcare services.  As the record amply demonstrates, this chain of events, culminating in the delay or outright denial of reproductive healthcare services, was the "foreseeable and intended consequence of [the Individual Defendants'] action[s], and it constitute[d] 'physical

obstruction.'" *Mahoney*, 247 F.3d at 284.[25]  Indeed, as noted above, some of the Individual

Defendants have admitted that they have participated in RRRs precisely to slow down the

medical activities at the clinics.  (*See, e.g.*, Pullman Decl. Ex. G at 355:20–22 (Gies statement

that "as far as I was concerned, as long as I [could] stay in there to help stop abortion for the day,

that was my goal"); *see also* Ferrara Decl. Ex. 2 at 345:24–25 ("As long as I [Gies] was there I

was hoping that there would be less abortions or no abortions[.]"); Pullman Decl. Ex. C at

10:18–:28 (Miller's statement in an interview that "our experience is that as long as there is a

pro-life presence in the abortion clinic, the abortions are halted").)  Accordingly, the OAG is

---

[25] The Court recognizes that this holding may superficially appear to run up against the
Second Circuit's warning against reliance upon the concept of "constructive obstruction" in
*Operation Rescue National*.  273 F.3d at 195 (characterizing "the rubric of 'constructive
obstruction'" as "an uncertain and potentially slippery concept"); *see also Cain*, 418 F. Supp. 2d
at 480 (noting that the Second Circuit "criticiz[ed]" the concept of constructive obstruction);
*Griepp*, 2018 WL 3518527, at *41 (explaining that the Second Circuit "rejected the concept of
'constructive obstruction'").  However, as described above, the obstruction at issue here was
physical, not constructive, because patients and clinic staff members were, in fact, physically
precluded from entering and moving about the clinics.  *See Mahoney*, 247 F.3d at 284
(explaining that the FACE Act "does not limit physical obstruction to bodily obstruction, but
rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably
difficult."); *see also Cain*, 418 F. Supp. 2d at 480 (noting that the liability under the FACE Act
requires an "*actual* obstruction" (emphasis added)).  Moreover, the *Operation Rescue National*
court was confronted with a district court's findings that "constructive obstruction" in violation
of the FACE Act included "defendants who approach[ed] and yell[ed] at patients" *outside* of the
clinic at issue and who had engaged in other "protest activity typically deserving of protection."
*See Operation Rescue Nat'l*, 273 F.3d at 195–96 (quotation marks omitted).  That simply is not
the case here, where Defendants' "protest activity" occurred inside of private reproductive
healthcare clinics.
     Further, the Court notes that the Second Circuit issued its warning criticizing the
"constructive obstruction" in dicta.  *See id.* at 195–96 (criticizing the district court's reliance on
the "rubric of 'constructive obstruction'" because, in doing so, it "failed to differentiate illegal
protestor activity from . . . typical, albeit aggressive, protest activities" protected under the First
Amendment).

likely to succeed in showing that the Individual Defendants—including Goodman—engaged in physical obstruction during the RRRs in which they participated.[26]

Defendants' reliance on *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997) in their papers and at oral argument is misplaced.  (*See, e.g.*, Red Rose Opp'n 24.)  There, the district court had found that a police officer told a protester that her "mere presence" and "the presence of other picketers" *near* a reproductive healthcare clinic violated North Carolina's FACE-Act analogue because their activities were causing patients to reschedule their appointments at the clinic.  *See id.* at 582; *see also* N.C. Gen. Stat. § 14-277.4(a) ("No person shall obstruct or block another person's access to or egress from a health care facility or from the common areas of the real property upon which the facility is located in a manner that deprives or delays the person from

---

[26] Defendants appear to argue that the FACE Act and the NYSCAA should not apply *within* the premises at issue.  (*See* Red Rose Opp'n 28.)  However, such a limitation on the reach of those statutes would plainly lead to absurd results.  *See CSX Transp. Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 471 (2d Cir. 2018) ("A statute should be interpreted in a way that avoids absurd results." (quoting *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004))); *accord Cuthill v. Blinken*, 990 F.3d 272, 281 (2d Cir. 2021).  (*See also* Statement of Interest 14.)  Taken to its extreme, under Defendants' interpretation a would-be blockader could avoid liability simply by setting up his blockade a few steps inside a clinic entrance, rather than just outside that entrance.  Indeed, the FACE Act's definition of "facility" demonstrates that that statute was meant to cover not only "the building or structure in which the facility is located[,]" but also "clinic[s], physician's office[s], or other facilit[ies] that provide[] reproductive health services[.]" 18 U.S.C. § 248(e)(1).  Of course, such "facilities" may include, for example, clinics within office buildings with other, completely unrelated tenants, and the physical obstruction of such clinics can lead to liability under the FACE Act, assuming its other elements are met.  *Cf. Gregg*, 32 F. Supp. 2d at 156 (concluding that the defendants "engaged in physical obstruction" where, among other things, they had admitted that "several of [them had] entered the premises [at issue] and lay prone on the stairway and hallway" (quotation marks omitted)); *see also id.* at 153 (stating that certain defendants "blocked access to [the clinic at issue] by placing themselves inside the clinic building on the second floor landing in front of the clinic's patient health waiting room entrance and office area").  Thus, Defendants' argument against imposing liability for FACE Act and NYSCAA violations where the conduct at issue occurs *inside* a clinic—such as it is—is inconsistent with a plain reading of these statutes.

obtaining or providing health care services in the facility.").  According to the district court, applying § 14-277.4 in this way would be unconstitutional.  *See Hoffman*, 126 F.3d at 582.

The Fourth Circuit agreed that the application of § 14-277.4 to such activities "would present a substantial constitutional question" because "[p]eaceful leafletting and picketing are both forms of expression meriting First Amendment protection[] and the record provide[d] no indication that the activities in which [the p]laintiffs engaged physically obstructed or blocked access to or egress from health care facilities."  *Id.* (citation omitted).  However, because it held that § 14-277.4 prohibited "only conduct that imposes physical impediments to entering or exiting a health care facility[,]" that court explained that North Carolina's statute "is not violated by peaceful protest activity that does not physically obstruct or block access to or egress from a health care facility" and therefore determined that "law enforcement officers exceeded their authority in threatening [the p]laintiffs with arrest for activities that did not violate § 14–277.4," without reaching the constitutional issue.  *Id.* at 581–82; *see also id.* at 582–89 (holding that "Congress acted within its authority under the Commerce Clause in enacting [the] FACE [Act] and that the statute does not violate the First Amendment").

The circumstances of the instant case are altogether different from those at issue in *Hoffman*.  The OAG is not arguing that any of Defendants' "mere presence" *outside of* the facilities at issue—along with any corresponding appointment cancellations—is sufficient to trigger liability under the FACE Act and the NYSCAA.  To the contrary, the OAG asserts that Defendants physically obstructed patients from entering All Women's Care and All Women's Medical when they went *inside* those clinics, refused to leave when asked, and ultimately needed to be removed against their will by numerous police officers, all of which obstructed patients' and staff members' access to the clinics.  *See supra* Sections I.C.–D.

Defendants also assert that this application of the FACE Act and the NYSCAA goes beyond the plain terms of those statutes, and they therefore urge the Court to resolve any ambiguities in these statutes by applying the rule of lenity.  (*See* Red Rose Opp'n 18; Gies Opp'n 13–14.)  "[T]he rule [of lenity] applies only if 'after seizing everything from which aid can be derived [when interpreting a criminal statute],' there remains 'grievous ambiguity.'"  *Puglin v. Garland*, 599 U.S. 600, 610 (2023) (quoting *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016)); *accord United States v. Scott*, 990 F.3d 94, 121 (2d Cir. 2021) (en banc) (explaining that the rule of lenity "is the last canon of construction, applicable only if, 'after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the [c]ourt must simply guess as to what Congress intended'" (quoting *United States v. Castleman*, 572 U.S. 157, 172–73 (2014))).  Although the Court does not doubt the applicability of the rule of lenity to criminal statutes in civil contexts, it declines to apply it here.  *See, e.g.*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 408–09 (2003) (applying the rule of lenity when interpreting a criminal statute in the context of a civil RICO case).

As an initial matter, the FACE Act and the NYSCAA are not ambiguous.  To the contrary, with respect to physical obstruction, both statutes clearly prohibit, inter alia, (1) engaging in physical obstruction, (2) to intentionally interfere with or attempted to interfere with any person, (3) because that person was or had been obtaining or providing reproductive health services.  *See* 18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a).  Further, in order to make plain the contours of the conduct they prohibit, the statutes provide multiple defined terms, including "facility," "interfere with," "physical obstruction," and "reproductive health services."  *See* 18 U.S.C. § 248(e); *see also* N.Y. Penal Law § 240.70(3).  Indeed, when confronted with contentions that the FACE Act is unconstitutionally vague, courts have consistently concluded

that the terms of the Act—including "physical obstruction"—are sufficiently clear to pass constitutional muster.  *See, e.g.*, *United States v. Dinwiddie*, 76 F.3d 913, 924 (8th Cir. 1996) (concluding that the FACE Act was not unconstitutionally vague in part because the term "physical obstruction" was "quite clear[,]" particularly given that the statute "provides [a] narrow definition[] of th[at] term[]"); *Soderna*, 82 F.3d 1376–77 (holding that the definition of "physical obstruction" under the FACE Act is not unconstitutionally vague); *see also United States v. Balint*, 201 F.3d 928, 934 & n.1 (7th Cir. 2000) (noting that the "[FACE] Act has withstood numerous vagueness challenges[]" and collecting cases); *accord United States v. Weslin*, 156 F.3d 292, 295 (2d Cir. 1998) ("Several of our sister circuits have considered constitutional challenges to [the] FACE [Act], and all of them have found the statute to be constitutional.  We agree, and we have little to add to their analyses." (citations omitted)).

And with respect to the FACE Act, even if that statute were ambiguous, its legislative history makes clear that Congress intended for it to cover conduct such as that at issue here.[27] *Scott*, 990 F.3d at 121 (considering "[l]egislative history and purpose" when declining to apply the rule of lenity).  Specifically, its purpose states that it was enacted "to protect and promote the public safety and health and activities . . . by establishing [f]ederal criminal penalties and civil remedies for certain violent, threatening, *obstructive* and destructive conduct that is intended to

---

[27] Given that this legislative history applies only to the FACE Act, the Court acknowledges that it does not apply to the NYSCAA.  However, "[t]o obtain a preliminary injunction, a party need only demonstrate likelihood of success on *one claim* against each defendant."  *Haymount Urgent Care PC v. Gofund Advance, LLC*, No. 22-CV-1245, 2022 WL 836743, at *1 (S.D.N.Y. Mar. 21, 2022) (emphasis added) (citing *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019)).  Thus, insofar as the OAG is likely to succeed on its FACE Act claim, it simply does not matter whether it is likely to succeed on its NYSCAA claim on this theory.  That being said, it bears noting that Defendants have cited nothing in the legislative history of the NYSCAA that suggests its drafters had another, different intent than Congress did in enacting the FACE Act.

injure, intimidate or *interfere* with persons seeking to obtain or provide reproductive health

services."  Freedom of Access to Clinic Entrances Act of 1994, Pub. L. No. 103-259, § 2, 108

Stat. 694 (1994) (emphases added).  Although the FACE Act was enacted, in part, in response to

over a decade of violence directed toward abortion clinics and providers, it was also enacted to in

response to "blockades and invasions of clinics."  *See* H.R. Rep. No. 103-306, at 6–7 (1993),

*reprinted in* 1994 U.S.C.C.A.N. 699, 703–04.  Indeed, members of Congress were mindful of the

fact that "[t]hroughout the country, . . . groups ha[d] organized blockades designed to bar access

to reproductive facilities and overwhelm local law enforcement" and that "[t]h[o]se blockades

disrupt[ed] a wide range of services, terrorize[d] patients and staff, and impose[d] upon clinics,

individuals and responding jurisdictions millions of dollars of costs for law enforcement,

prosecutions, staff time, medical expenses, and property damage."  *Id.* at 704 (noting that

"[d]ozens and often hundreds of persons trespass onto clinic property and physically barricade

entrances and exits by sitting or lying down, by standing and locking arms or by chaining

themselves to fences, doors or other clinic property. . . . Another technique, known as

'invasions,' involves a number of pro-life demonstrators storming and entering clinics that are in

the process of offering services to patients.").  Moreover, a conference committee report explains

that "Congress ha[d] found[] . . . an interstate campaign of violent, threatening, obstructive and

destructive conduct aimed at providers of reproductive health services across the nation ha[d]

injured providers of such services and their patients" and that such conduct "included blockades

and invasions of medical facilities."  H.R. Conf. Rep. No. 103-488, at 7 (1994), *reprinted in*

1994 U.S.C.C.A.N. 724, 724.  Thus, the legislative history of the FACE Act demonstrates that

the conduct for which Defendants face liability in this case was exactly the sort of conduct

Congress meant to address.  The Court concludes, therefore, that the rule of lenity has no application here.

### e.  Hinshaw

Turning to Hinshaw, the OAG has also established that it is likely to succeed on the merits as against him.  To be sure, relative to the other Individual Defendants, the OAG's motion papers suggest that Hinshaw is a relatively minor player in RRRs across the country.[28] However, the OAG has adduced evidence that he participated in the April 24, 2021 All Women's Care RRR, (Pullman Decl. Ex. G at 374:7–11, 375:12–18), and that he was tried and convicted of criminal trespass and second-degree obstruction of governmental administration based on his involvement in that RRR, (*see id.* at 488:14–491:3.)  *See also supra* Section I.C.  Accordingly, for substantially the same reasons as set forth above with respect to Goodman, the Court concludes that the OAG is likely to demonstrate that Hinshaw engaged in physical obstruction at All Women's Care in violation of the FACE Act and the NYSCAA.

### f.  Red Rose

Finally, the Courts finds that the OAG is likely to establish that, more generally, members of Red Rose as an organization have engaged in physical obstruction by "rendering passage to or from such a facility . . . unreasonably difficult[.]"  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).[29]  As discussed above, the Individual Defendants are likely to be

---

[28] In its reply brief, the OAG does note that "Hinshaw and Goodman were convicted of criminal FACE Act violations" after it filed its PI Motion.  (Pl. Red Rose Reply 12 n.4.) However, it does nothing more than provide a link to a U.S. Department of Justice press release and does not suggest that the offense conduct underlying that conviction is relevant to the instant analysis.

[29] For purposes of this analysis, the Court will not impute Moscinski's blockade of the Planned Parenthood clinic in Hempstead, NY to Red Rose.  *See supra* Section I.E.  (*See also* Pullman Decl. Ex. O at 1:04–1:18 (Moscinski's explaining that "the reason I was acting on my

found to have engaged in physical obstruction in connection with the RRRs in which they participated in New York.  Moreover, the OAG has submitted video evidence that shows an unnamed female RRR participant outside of All Women's Medical: engaging two women who are approaching the clinic; remaining in front of them as they approach the clinic door such that they need to stop walking; standing in the way of the door so that they cannot enter; remaining in place until a security guard or police officer opens the door from the inside to let the women in; and then following the women inside the clinic.  (*See* Pullman Reply Decl. Ex. 3 at 2:00–2:27; *id.* Ex 4 at 4:31–4:58; *see also id.* Ex. 1 (screenshot from surveillance video footage of the All Women's Medical vestibule, in which two female RRR participants can be seen obstructing the interior doorway alongside Connolly).)  Acts such as these have been found to be physical obstruction for purposes of the FACE Act and the NYSCAA.  *See, e.g.*, *Cain*, 418 F. Supp. 2d at 480 (listing "standing directly in front of a patient and preventing her from approaching the clinic while [the defendants] attempt to give her literature" and "standing directly in front of [a clinic] door and refusing to move until a security guard approaches" as examples of physical obstruction); *see also Operation Rescue Nat'l*, 273 F.3d at 194 (explaining that certain defendants engaged in physical obstruction insofar as they "impeded the operation of [reproductive healthcare] facilities by engaging in protest activities in front of facility entrances and driveways" and "blocked clinic doors by standing directly in front of them and trying to communicate with those entering or leaving facility buildings"); *cf. Scott*, 958 F. Supp. at 772 (concluding that the defendant did not physically obstruct anyone because, in part, she "never

---

own [in connection with the Planned Parenthood blockade] was I didn't want to get anyone else implicated or involved in a possible violation of federal or state law, which could potentially have some severe consequences").)

stopped the forward progress of an individual seeking reproductive services").[30]  Defendants'

near-constant, conclusory refrain that Red Rose engages in "non-obstructive" rescues does

nothing to change this analysis.  (*See, e.g.*, Red Rose Opp'n 7, 11–12, 15, 19–20, 25.)

*          *          *

In sum, the Court finds that the OAG has adduced sufficient evidence to demonstrate a

likelihood of success as to the physical-obstruction element with respect to all Defendants.

### 3.  Remaining FACE Act and NYSCAA Factors

Next, the Court has little trouble finding that the OAG established a likelihood of success

with respect to the second and third elements required to establish FACE Act and NYSCAA

violations.  *See Cain*, 418 F. Supp. 2d at 473 (explaining that, in addition to physical obstruction,

a plaintiff seeking to establish liability under the FACE Act and the NYSCAA must demonstrate

that a defendant engaged in physical obstruction "(2) intentionally . . . to . . . interfere with [or to

attempt to interfere with] a person[] (3) because that person is or has been obtaining or providing

reproductive health services (citing 18 U.S.C. § 248(a)(1))).[31]  Beginning with the final element,

---

[30] During oral argument, counsel for Defendants spent a great deal of time attempting to undermine this conclusion by pointing to video evidence demonstrating that several patients were able to enter All Women's Medical unobstructed during the RRR at that clinic.  (*See, e.g.*, Pullman Reply Decl. Ex. 4 at 4:06–:21 (surveillance video showing two individuals entering All Women's Medical without facing any obstruction); *id.* at 5:01–:18 (same).)  In doing so, however, counsel ignored the fact that whether patients ultimately reach a clinic or receive reproductive healthcare services is not dispositive in connection with establishing liability under the FACE Act and the NYSCAA.  *See Cain*, 418 F. Supp. 2d at 480 n.18 ("[Physical] obstruction need not be permanent or entirely successful.  That patients may eventually have reached [a clinic] in spite of [the] defendants' actions is . . . *beside the point*." (emphasis added)); *Kraeger*, 160 F. Supp. 2d at 373 (explaining that, for purposes of showing physical obstruction, "[i]t is not necessary to show that a clinic was shut down, that people could not get into a clinic at all for a period of time, or that anyone was actually denied medical services").

[31] The OAG states that these elements of the statutory analysis "can be considered together," (Pl. Mem. 22), but cites no authority for that proposition.  Thus, the Court declines to analyze these elements in tandem.

the Court notes that Defendants do not appear to contest this element of the statutory analysis—
that they acted "because the interfered-with person was seeking, obtaining, or providing, or had
obtained or provided, or might obtain or provide, reproductive health services." *Sharpe v.
Conole*, 386 F.3d 482, 484 (2d Cir. 2004); *see also* 18 U.S.C. § 248(a)(1); N.Y. Penal Law
§ 240.70(1)(a); *see also Cain*, 418 F. Supp. 2d at 481 ("The second intent element is
uncontested: defendants freely admit to approaching women who are seeking reproductive health
services.").  And in any event, there can be no doubt that these Defendants engaged in the acts at
issue in this case at the clinics they chose because those clinics perform abortions; the RRR
participants' overarching goal is "to persuade women to change their minds and leave the
abortion facility[.]"  (Miller Decl. ¶ 5; *see also* Pullman Decl. Ex. A at 1 (stating, in the RRR
Mission Statement, that RRR participants "peacefully talk to women scheduled for abortion, with
the goal of persuading them to choose life"); Pullman Decl. Ex. F at 2 (explaining that Gies anti-
abortion activities are "undeterred—even when just released from prison—'because they're still
dismembering children every day in the United States of America[]'".)  In addition, with respect
to Moscinski, his "main motivation" when blockading the Planned Parenthood clinic "was to try
to keep that [clinic] closed for as long as possible, so that [he] would have an opportunity to talk
to the mothers who were coming in that morning."  (Pullman Decl. Ex. O at :46–1:02; *see also
id.* Ex. N ¶ 13 (declaration of police officer who responded to the Planned Parenthood clinic that
quotes Moscinski as saying, "at least I slowed them down some—I slowed them down a little bit
today").)

Finally, as to the threshold intent requirement—which, in this case, is that Defendants'
physical obstruction was "intentionally undertaken to . . . interfere with [or to attempt to interfere
with] a person," *Cain*, 418 F. Supp. 2d at 473 (citing 18 U.S.C. § 248(a)(1)); *see also* N.Y. Penal

Law § 240.70(1)(a)—"[D]efendant[s'] purpose in engaging in obstructive acts is irrelevant."
*Kraeger*, 160 F. Supp. 2d at 374 (citing *Weslin*, 156 F.3d at 298).  As the Second Circuit
explained in *Weslin*, where the defendants claimed that the objective of their obstructive acts was
"to save the lives of unborn children[,]" "[n]o matter what their ultimate purpose . . . may have
been, the defendants do not deny—nor could they plausibly deny—that they meant to block the
entrances to the [clinic at issue] and that they did so because they wished to prevent the clinic
from performing abortions."  156 F.3d at 298; *see also Operation Rescue Nat'l*, 273 F.3d at 194
("Although the protestors' purpose may have been to communicate their views, their activities
had the effect of obstructing access to the facilities [at issue] and making egress and ingress
unreasonably difficult for patients."); *Dugan*, 450 F. App'x at 22 (relying on *Weslin* and
determining that "the district court was entitled to infer from [the defendant's statements that his
actions were motivated by his general sympathy for the cause of protesters that were out in front
of a Planned Parenthood clinic] that [the defendant] had acted with the requisite motive").  So
too here.  (*See, e.g.*, Pullman Decl. Ex. C at 10:18–:28 ("[O]ur experience is that as long as there
is a pro-life presence in the abortion clinic, the abortions are halted."); *id.* Ex. G at 355:20–22
(Gies testimony that "as far as I was concerned, as long as I [could] stay in there to help stop
abortion for the day, that was my goal"); Ferrara Decl. Ex. 2 at 345:24–25 (Gies testimony that
"[a]s long as I was there I was hoping that there would be less abortions or no abortions"); *see
also* Pullman Decl. Ex. F at 3 ("[T]he majority of the time [when participating in an RRR],
you're able to occupy the staff and the police so long that you keep them from actually
committing abortions for the entire day.").)

     In sum, the OAG has clearly established a likelihood of success as to the remaining
elements required for liability under the FACE Act and the NYSCAA.

D.  Public Interest and Balance of Equities

The Court also finds that the preliminary injunction that the OAG seeks "is in the public interest."  *Actavis PLC*, 787 F.3d at 650 (citation omitted); *see also Green Haven Prison Preparative Meeting of Religious Soc'y of Friends*, 16 F.4th at 86 ("The final consideration in the preliminary injunction analysis concerns whether the balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest.").[32]

The OAG argues that the injunction it seeks is in the public interest because "Congress has determined that [the] FACE [Act] serves the public interest 'by ensuring that individuals who seek to provide or obtain reproductive health services can do so free from unlawful interference.'"  (Pl. Mem. 25–26 (quoting *United States v. Roach*, 947 F. Supp. 872, 877 (E.D. Pa. 1996)).)  Although the OAG's cursory analysis leaves something to be desired, the Court agrees that the requested injunction is in the public interest.  Injunctions like the one at issue here have been found to serve "significant government interests[,]" including:  "(1) ensuring public safety and order; (2) protecting freedom to receive reproductive health services; (3) advancing medical privacy and the well-being of patients seeking care at facilities; and (4) safeguarding private property."  *Operation Rescue Nat'l*, 273 F.3d at 202 (discussing these interests in the context of analyzing the constitutionality of a preliminary injunction).[33]

---

[32] The Court recognizes that this analysis overlaps somewhat with the First Amendment analysis below.  *See infra* Section II.E.

[33] Insofar as Defendants assert that the Supreme Court's holding in *Dobbs v. Jackson Women's Health Org.*, that "the Constitution does not confer a right to abortion" changes this analysis, 597 U.S. —, 142 S. Ct. 2228, 2279 (2022), the Court disagrees, (*see* Red Rose Opp'n 28–29.)  Defendants point to nothing in that decision that minimizes the importance of these statutorily-endorsed government interests, nor do they cite any supporting legal authority.  *Cf. United States v. Williams*, —F. Supp. 3d—, 2023 WL 7386049 at *6–9 (S.D.N.Y. Nov. 8, 2023) (concluding—in the context of a motion to dismiss an indictment—that "*Dobbs* did not cast into question the reproductive health-care provisions of the FACE Act").  And, in addition, New

In addition, the Court finds that the balance of equities tips in favor of granting the injunction.  To be sure, and as discussed below, the injunction might burden Defendants' rights under the First Amendment, which are crucially important.  *See, e.g.*, *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[34]  Nevertheless, in light of the actions alleged in this case and the countervailing interests noted above that such actions impinge, an appropriately tailored injunction is proper here.[35]

---

York's state legislature has found "that comprehensive reproductive health care is a fundamental component of every individual's health, privacy and equality.  Therefore, it is the policy of the state that: . . . Every individual who becomes pregnant has the fundamental right to choose to carry the pregnancy to term, to give birth to a child, or to have an abortion[.]"  N.Y. Pub. Health Law § 2599-aa; *see also Hope v. Perales*, 634 N.E.2d 184, 186 (N.Y. 1994) (noting that "the fundamental right of reproductive choice" is "inherent in the due process liberty right guaranteed by [New York's state c]onstitution"); *cf. People v. Crowley*, 538 N.Y.S.2d 146, 150–51 (Just. Ct. 1989) (recognizing that the New York state legislature had "clearly made a determination of values" in favor of abortion rights when it enacted an "Abortion Liberalization Statute" in 1970).

[34] The Court emphasizes, however, that the protections afforded to Defendants under the First Amendment do *not* permit them to trespass onto the property of private reproductive health facilities in order to make their anti-abortion views known.  *See United States v. Wilson*, 154 F.3d 658, 663 (7th Cir. 1998) (explaining that conduct that "interferes with the personal liberty and property rights of others[] . . . is not protected by the First Amendment" (citing *Soderna*, 82 F.3d at 1375)).

[35] The Court finds itself compelled to address Defendants' obtuse argument that the injunction the OAG seeks is "pointless."  (*See, e.g.*, Red Rose Opp'n 8, 16, 27, 29.)  To the extent they argue that an injunction would be "pointless" because certain of the Individual Defendants will almost certainly violate it, the Court finds that argument to be a complete non-starter.  And, moreover, putting aside the fact that this argument ignores the important interests referenced above, which the OAG is seeking to vindicate, it is far from "pointless" for the OAG to seek an injunction against allegedly intransigent parties where such an injunction would make available a panoply of relief mechanisms for contempt that can supplement available penalties for violations of state laws such as criminal trespass (that, the Court hastens to add, do not appear to be effective in deterring Defendants' alleged unlawful conduct on their own).

E.  Constitutionality of the Preliminary Injunction

Because the Court has found that preliminary injunctive relief is appropriate in this case, it must now examine the terms of the injunction that the OAG seeks.  *Cain*, 418 F. Supp. 2d at 484 ("Having determined that injunctive relief is appropriate to remedy a FACE [Act] violation, a court must take care to craft an injunction that does not violate the First Amendment rights of the defendant[s].").  Where, as here, a proposed injunction is content-neutral, "the proper test for evaluating [such] injunctions under the First Amendment [is] 'whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest[.]"  *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 372 (1997) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)); *see also Operation Rescue Nat'l*, 273 F.3d at 202 (applying the *Madsen* test when affirming the grant of a preliminary injunction under the FACE Act); *Cain*, 418 F. Supp. 2d at 485 (applying the *Madsen* test when granting a preliminary injunction under the FACE Act).[36]  Notably, a content-neutral restriction of speech, "unlike a content-*based* restriction . . . 'need not be the least restrictive or least intrusive means of' serving the government's interests."  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (emphasis added) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).  "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency."  *Id.* (alteration in original)

---

[36] The Parties do not dispute that the proposed preliminary injunction is content-neutral, nor could they given that the OAG presses the Court to grant an injunction that is not based on "the content of the regulated speech," *Madsen*, 512 U.S. at 763 (quotation marks omitted), and that the injunction "is a regulation of the places where some speech may occur," rather than a "regulation of speech[,]" *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quotation marks omitted); *see also Operation Rescue Nat'l*, 273 F.3d at 202 ("It is well settled that an injunction of this nature (i.e., directed at protestors outside of abortion clinics but based on their unlawful behavior) is content-neutral." (italics omitted)).

(quotation marks omitted); *see also id.* ("[T]he government [] may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." (quotation marks omitted)).

Significantly, "the Second Circuit has explained[] [that] 'buffer zones immediately around entrances . . . are narrowly tailored to ensure clinic access and to burden no more speech than is necessary.'" *Cain*, 418 F. Supp. 2d at 486 (quoting *Operation Rescue Nat'l*, 273 F.3d at 204)). As discussed above, *see supra* Section II.D, "[t]here is [] little question that th[e] type of injunction [the OAG seeks] serves significant governmental interests." *Operation Rescue Nat'l*, 273 F.3d at 202. Just as in *Operation Rescue National*, the proposed preliminary injunction would, at least, "(1) ensur[e] public safety and order; (2) protect[] freedom to receive reproductive health services; (3) advance[e] medical privacy and the well-being of patients seeking care at facilities; and (4) safeguard[] private property." *Id.*; *accord Cain*, 418 F. Supp. 2d at 484–85 ("Indeed, the Supreme Court has specifically noted that the state's interest in protecting the health of its citizens 'may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests.'" (quoting *Hill*, 530 U.S. at 715)).

With these principles in mind, the Court now assesses the specific terms of the OAG's proposed injunction, which seeks to "enjoin[] [] Defendants during the pendency of this [A]ction from being present in an area extending thirty feet from any reproductive health facility in [New York State,]" (Proposed OSC 1 ), in order to ensure that they "burden no more speech than necessary." *Schenck*, 512 U.S. at 765.[37]

---

[37] The Court notes that the OAG has not been entirely consistent in how it has termed the preliminary injunction that it seeks.  (*See, e.g.*, Pl. Mem. 9 (explaining that it seeks to enjoin Defendants, "and all those who work in concert with them, from knowingly approaching within

### 1.  Proposed Thirty-Foot Buffer Zone

First, the OAG argues that a thirty-foot buffer zone is appropriate under the circumstances of this case.  (Pl. Mem. 27–28.)  The Court disagrees.

As an initial matter, the Court notes that it has a certain level of discretion with respect to imposing a buffer zone.  *See Schenck*, 519 U.S. at 381 ("Although one might quibble about whether [fifteen] feet is too great or too small a distance if the goal is to ensure access, we defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear.").  A number of the cases to which the OAG points the Court suggest that fifteen feet is an appropriate size for a buffer zone around a reproductive health facility.  *See, e.g.*, *Schenck*, 519 U.S. at 367, 380–81 (upholding fifteen-foot buffer zones); *Operation Rescue Nat'l*, 273 F.3d at 190 (explaining that "[the] Supreme Court has previously reviewed and sustained court-made buffer zones of fifteen feet at the[] sites [at issue]"); *cf. Bruni v. City of Pittsburgh*, 941 F.3d 73, 77–78 (3d Cir. 2019) (affirming the constitutionality of a Pittsburgh ordinance that created "a fifteen-foot 'buffer zone' outside the entrance of any hospital or healthcare facility"), *cert denied*, 141 S. Ct. 578 (2021).  Of course, the Court recognizes that "previous cases have set no outer limit on the size of buffer zones" like the one the OAG seeks here.  *Operation Rescue Nat'l*, 273 F.3d at 204.  However, with regard to the cases that the OAG relies upon for the

---

thirty feet of any reproductive health facility in New York"); Pullman Decl. ¶ 2 (explaining that the OAG is seeking to enjoin Defendants, "as well as those who work in concert with then, from knowingly approaching within thirty feet of any facility providing reproductive health care in New York").)

To the extent that the proposed preliminary injunction seeks to bind those working in concert with Defendants, the Court is not troubled given that the Federal Rules of Civil Procedure expressly state that such individuals are bound by injunctions issued by federal courts. *See* Fed. R. Civ. P. 65(d)(2) ("The order [issuing an injunction] binds only the following who receive actual notice of it by personal service or otherwise: . . . the parties; . . . the parties' officers, agents, servants, employees, and attorneys; and . . . other persons who are in active concert or participation with anyone [already] described[.]").

proposition that "courts have upheld, over First Amendment challenges, buffer zones of up to 100 feet[,]" (Pl. Mem. 27), those cases tend to involve unique factual circumstances that are not present here, *see, e.g.*, *Planned Parenthood Shasta-Diablo, Inc. v. Williams*, 898 P.2d 402, 409–10, 412 (Cal. 1995) (affirming a sixty-foot buffer zone because the underlying facts were like those present in *Madsen* where the Supreme Court determined a thirty-six-foot buffer zone was justified given the "relatively restricted geographic area in front of the family planning clinic, physical harassment of patients occurring within these narrow confines, and an earlier injunction that had not proved to be successful"); *Murray v. Lawson*, 649 A.2d 1253, 1268 (N.J. 1994) (determining that the imposition of a 100-foot buffer zone around the plaintiffs' *home* "burden[ed] no more speech than necessary to protect [the] plaintiffs' residential-privacy interest").

Beyond that, in support of its requested buffer zone, the OAG does little more than generally assert that thirty feet is "appropriate to ensure that clinics can avail themselves of protection by law enforcement and continue to operate if and when Defendants refuse to comply with [any injunction,]" (Pl. Mem. 28; *see also* Pl. Red Rose Reply 12 ("An injunction keeping [Defendants thirty] feet away from clinics in New York is appropriately tailored." (footnote omitted))), and point to ipse dixit statements from Considine and the Director of Security for the Planned Parenthood of Greater New York that thirty feet is an appropriate size for buffer zones, (*see* Considine Decl. ¶ 24; Pullman Reply Decl. Ex. 11 ¶ 20).  That, without more, does not justify a blanket thirty-foot buffer zone, particularly where the record is devoid of any evidence as to the unique attributes of the many facilities that would necessarily be implicated by the proposed injunction.  *See, e.g.*, *Operation Rescue Nat'l*, 273 F.3d at 203–10 (analyzing buffer zones at two specific facilities by reference to actual evidence relating to those specific

facilities).  Indeed, in *United States v. Scott*, the Second Circuit upheld the district court's

decision to expand a buffer zone from fourteen feet to twenty-eight feet, but it did so because the

defendant was "a serial violator of injunctions that the district court successively fashioned in an

attempt to secure for the public safe access to reproductive health care facilities[,]" with a

"record of abusive conduct" that had resulted in, among other things, police officers restraining

the defendant and warning him not to block patients' passage to a clinic "on as many as twenty

occasions[.]"  187 F.3d 282, 284, 288–89 (2d Cir. 1999) (quotation marks omitted).  Although

the OAG contends that Defendants here also have a "record of abusive conduct," (Pl. Mem. 27–

28 (citation omitted)), it fails to establish that their conduct has risen to the level of the

defendants in *Scott*.  Thus, given that buffer zones potentially implicate Defendants' First

Amendment rights, the Court concludes that a fifteen-foot buffer zone will more appropriately

balance Defendants' rights alongside the significant government interests discussed above.  *See,*

*e.g.*, *Schenck*, 519 U.S. at 380–81 (upholding a fifteen-foot fixed buffer zone where there was

evidence that "protesters purposefully or effectively blocked or hindered people from entering

and exiting the clinic doorways, from driving up to and away from clinic entrances, and from

driving in and out of clinic parking lots" and that sidewalk counselors "followed and crowded

people right up to the doorways of the clinics (and sometimes beyond) and then tended to stay in

the doorways, shouting at the individuals who had managed to get inside"); *see also Operation*

*Rescue Nat'l*, 273 F.3d at 203, 209 (vacating the district court's decision to expand a buffer zone

from fifteen feet to sixty feet because such an expansion was "more extensive than necessary" to

preserve access to the clinics at issue, but leaving a preexisting fifteen-foot buffer zone intact).

Defendants argue that, based on the OAG's allegations, it should be seeking an injunction

against trespass, rather than the imposition of a buffer zone.  (Red Rose Opp'n 26–27; Defs.'

Surreply 8.)  But that argument ignores the reality that the FACE Act and the NYSCAA can be violated immediately outside of reproductive healthcare clinics, *see, e.g.*, *Cain*, 418 F. Supp. 2d at 480 (finding that a defendant "standing directly in front of a patient and preventing her from approaching [a] clinic" constituted physical obstruction under the FACE Act); *see also Operation Rescue Nat'l*, 273 F.3d at 194 (similar), as well as the fact that certain RRR participants appear to have done just that here, (*see, e.g.*, Pullman Reply Decl. Ex. 3 at 2:00–2:27 (surveillance video of RRR participant preventing a patient from entering All Women's Medical); *id.* Ex 4 at 4:31–4:58 (same); Pullman Decl. Ex. O at :26 (video reflecting a photograph of Moscinski laying in front of a vehicle outside of the Hempstead Planned Parenthood clinic)).  Accordingly, contrary to Defendants' assertion, a fifteen-foot buffer zone does meet the requirement for "a close fit between ends and means" under *McCullen*, 573 U.S. at 486, in that it will prevent Defendants from engaging in conduct that violates the FACE Act and the NYSCAA both inside, and immediately outside of, reproductive healthcare clinics.  "Th[is] buffer zone is a small zone necessary to provide patients and staff unrestricted access to the front of [] clinic[s] and [] clinic driveway[s].  [Defendants] still have alternative avenues of communication available.  They can still stand adjacent to the buffer zone, verbally communicate to people, pass out literature, and hold signs.  Further, the buffer zone creates clear guidelines for both [] police department[s] and [D]efendants to follow."  *Kraeger*, 160 F. Supp. 2d at 379.[38]

---

[38] In this connection, it is important to emphasize that the FACE Act—and injunctions flowing therefrom—are not content-based restrictions on core speech.  *See Weslin*, 156 F.3d at 296–97 (explaining that "[the] FACE [Act] does not discriminate on the basis of content" because, inter alia, "'pro-choice' protestors as well as 'pro-life' protestors come within the terms of the statute[,]" as it "applies to those who would interfere with the provision of counseling at a clinic in which patients are encouraged *not* to have abortions" (emphasis added)); *accord Wilson*, 154 F.3d at 664 ("Because [the] FACE [Act] furthers the significant government interest of protecting women who are in need of reproductive health services, *is not aimed at expression*, and is narrowly tailored in that it only prohibits the use of force, threat of force, and physical

2.  Geographic Scope

Finally, the OAG asserts that the proposed injunction should extend to all reproductive health facility across New York State.  (Pl. Mem. 28–30.)  The Court disagrees.

In *Operation Rescue National*, the Second Circuit upheld a preliminary injunction that included, among other things, fifteen-feet buffer zones at certain reproductive healthcare facilities in the Western District of New York, where the defendants had been involved in anti-abortion protests in that District.  273 F.3d at 190–91.  Similarly, in *People ex rel. Abrams v. Terry*, the Second Circuit upheld a district court's "denial of a motion to vacate or modify [a] injunction" that proscribed "trespassing on, blocking, or obstructing[] ingress into or egress from any facility at which abortions are performed in New York City and in all locations within the Southern District of New York" and imposed a fifteen-foot buffer zone.  45 F.3d 17, 18–19 & n.1 (2d Cir. 1995).  Importantly, although the injunction at issue was relatively limited in scope, the Attorney General in *Terry* had alleged that "the defendants participated in a nationwide conspiracy" in opposition to abortion.  *Id.* at 19.

---

obstruction and *leaves open sufficient alternative means to express an anti-abortion message such as picketing in a non-violent, nonobstructive manner*, it survives constitutional scrutiny." (emphases added)); *United States v. Gallagher*, — F. Supp. 3d —, 2023 WL 4317264, at *9 (M.D. Tenn. July 3, 2023) ("Insofar as the [FACE] Act does incidentally touch on speech, . . . it makes no content-based distinction.  The FACE Act is not only neutral as between interference by supporters and opponents of abortion, but neutral on the question of whether a perpetrator's moral position on reproductive healthcare was even part of his motivation at all.  All that matters is that the defendant by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been[] . . . obtaining or providing reproductive health services—for any reason, including entirely personal, apolitical ones." (citation and quotation marks omitted)).  Therefore, subject to the terms of the preliminary injunction granted herein, Defendants remain "at liberty to hold signs, pass out handbills, speak conversationally" and otherwise "exercise [their] free speech rights under the First Amendment."  *Weslin*, 156 F.3d at 298.

As noted, the proposed injunction implicates Defendants' First Amendment rights, and this Court will not lightly extend that burden on Defendants' rights to jurisdictions where, by the OAG's own admission, there has never been an RRR.  *See supra* Section I.  In this case, there is evidence that certain RRRs and Moscinski's blockade occurred in the Eastern and Southern Districts of New York—namely in Manhasset, Hempstead, and White Plains, NY.  Accordingly, based on the record before it, the Court finds that the injunction's geographical scope should include only the Eastern and Southern Districts of New York, rather than the entirety of New York State.  *See Terry*, 45 F.3d at 18–19 & n.1.[39]

### III.  Conclusion

For the reasons set forth above, Plaintiff's PI Motion is granted in part.  The OAG is directed to file a proposed Preliminary Injunction Order consistent with this Opinion and Order by no later than 5:00 p.m. EST on Monday, December 11, 2023.[40]

SO ORDERED.

Dated:   December 7, 2023
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

---

[39] Although the OAG asserts that granting a state-wide injunction will "preserve judicial resources," (Pl. Mem. 29), the Court emphasizes that "the prime objective of the First Amendment is not efficiency."  *McCullen*, 573 U.S. at 495.  Given the record as it stands, the Court will not burden Defendants' First Amendment rights across all of New York State.

[40] In doing so, the OAG is directed to clarify the definition of reproductive health facility and whether the injunction prohibits those bound from intentionally being within fifteen feet of such a facility, knowingly being within fifteen feet of such a facility, or otherwise.