UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, *Attorney General of the State of New York*,

                              Plaintiff,

    v.

RED ROSE RESCUE, *et al.*,

                              Defendants.

No. 23-CV-4832 (KMK)

<u>OPINION & ORDER</u>

---

Heather McKay, Esq.
Julia K. Toce, Esq.
Sandra E. Pullman, Esq.
Zoe Ridolfi-Starr, Esq.
Office of the New York Attorney General
New York, Rochester, and Watertown, NY
*Counsel for Plaintiff*

Christopher A. Ferrara, Esq.
Michael McHale, Esq.
Thomas More Society
Whitestone, NY and Omaha, NE
*Counsel for Defendants Red Rose Rescue, Christopher Moscinski,*
*Matthew Connolly, William Goodman, Laura Gies, and John Hinshaw*

Dennis J. Ring, Esq.
Law Office of Dennis J. Ring
Whitestone, NY
*Counsel for Defendant Christopher Moscinski*

Catherine Short, Esq.
Life Legal Defense Foundation
Ojai, CA
*Counsel for Defendant Laura Gies*

John P. Margand, Esq.
Law Offices of John P. Margand, P.C.
Yonkers, NY
*Counsel for Defendant Laura Gies*

KENNETH M. KARAS, United States District Judge:

The Office of the New York State Attorney General (the "OAG" or "Plaintiff") brings this Action against Red Rose Rescue ("Red Rose"), Christopher Moscinski ("Moscinski"), Matthew Connolly ("Connolly"), William Goodman ("Goodman"), Laura Gies ("Gies"), John Hinshaw ("Hinshaw"), and "John and Jane Does" (together, "Defendants"). (*See generally* Compl. (Dkt. No. 1).)[1]  The OAG alleges that Defendants engaged in "coordinated and repeated illegal conduct, ranging from criminal trespass to barricading clinic entrances in order to block access to abortion services in New York" and therefore seeks injunctive relief and damages pursuant to the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 (the "FACE Act" or "FACE"), and the New York Clinic Access Act, N.Y. Civ. Rights Law § 79-m (the "NYSCAA"). (Compl. ¶¶ 1, 3, 101–10.)  Before the Court is the OAG's Motion for Summary Judgment (the "Motion"). (*See* Pl's Not. of Mot. (Dkt. Nos. 84, 88).)  For the below reasons, the Motion is granted.

## I.  Background

### A.  Factual Background

The Court has described the allegations and procedural history of this case in a prior Opinion. *See New York v. Red Rose Rescue*, 705 F. Supp. 3d 104, 112–18 (S.D.N.Y. 2023).  The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

---

[1] Defendants Moscinski, Connolly, Goodman, Gies, and Hinshaw are referred to herein as the "Individual Defendants."

In general, the Court cites to the ECF-stamped page number in the upper righthand corner of each page.  However, insofar as it cites to various court transcripts, the Court cites to the internal page and line numbers reflected in those exhibits.  Additionally, citations to video evidence are to the relevant timestamps in those videos.

The following facts are taken from Defendants' and the OAG's statements pursuant to Local Civil Rule 56.1, (Pl's Local Rule 56.1 Statement ("Pl's 56.1") (Dkt No. 84-1); Defs' Joint Local Rule 56.1 Response ("Defs' Resp. 56.1") (Dkt. No. 93)), as well as the OAG's Complaint and the admissible evidence submitted by the Parties.[2] The facts are recounted "in the light most

---

[2] Prior to briefing the instant Motion, the Parties stipulated that Defendants would not challenge the admissibility or authenticity of the evidence the OAG submitted in connection with its Motion for a Preliminary Injunction, nor would they challenge Red Rose's status "as a legal entity capable of being sued or bound by an injunction" in exchange for the OAG's agreement "to seek a liability determination based solely on the factual record it presented in its Motion [for a Preliminary Injunction]." (*See* Dkt. No. 82 ("Joint Stipulation").) The Parties thus jointly proposed ceasing discovery on liability and instead "brief[ing] summary judgment on liability on the existing record." (*Id.*) Defendants now contend that this stipulation precludes the OAG from citing to Defendants' Answers to the Complaint, as they were filed after the OAG's Motion for a Preliminary Injunction and are thus not included in that record. (*See* July 26, 2024 Ltr. from C. Short 1–2 (Dkt. No. 85).) The OAG argues that it "never contemplated such a prohibition" when agreeing to the stipulation and asserts that Defendants' Answers are "undoubtedly part of the record" to be considered on summary judgment. (*See* Aug. 1, 2024 Ltr. from S. Pullman 1–2 (Dkt. No. 87).)

"Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court." *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 14–15 (S.D.N.Y. 2019) (citation omitted). "Having agreed on a set of facts, the parties who adopted the stipulation, and this Court, must be bound by them; [the Court is] not free to pick and choose at will." *Id.* (quoting *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984)); *see also Biegler v. Educ. Credit Mgmt. Corp.*, 609 B.R. 289, 295 (N.D.N.Y. 2019) (same). A court "should not disturb a stipulation absent a showing of good cause such as fraud, collusion, mistake or duress, or unless the agreement is unconscionable or contrary to public policy, or unless it suggests an ambiguity indicating that the words did not fully and accurately represent the parties' agreement." *Katel Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010); *see also Mason Tenders*, 400 F. Supp. 3d at 14 (same). Although the OAG argues that the stipulation is ambiguous, the stipulation plainly restricts the summary judgment record to that presented with the Motion for a Preliminary Injunction. (*See* Joint Stipulation.) Moreover, the OAG's caselaw, which focuses on cases where summary judgment was deemed premature, is inapposite to this Motion, where the record is already replete with undisputed facts. *See Muhammad v. Annucci*, No. 22-CV-6025, 2024 WL 945226, at *1 (W.D.N.Y. Mar. 5, 2024) (denying summary judgment as premature where "discovery ha[d] not yet begun," "[d]efendants' motion to dismiss remain[ed] pending," and "[d]efendants ha[d] not submitted their answers"); *Long Island R. Co. v. New York Cent. R. Co.*, 26 F.R.D. 145, 147 (E.D.N.Y. 1960) (denying summary judgment as premature where "defendant's failure to answer leaves the Court without any indication of the factual issues in dispute").

favorable to" Defendants, the non-movants.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30

(2d Cir. 2018) (citation and quotation marks omitted).  The facts as described below are in

dispute only to the extent indicated.[3]

    1. Red Rose Rescue

Defendant Red Rose Rescue ("Red Rose"), a legal entity capable of suing and being

bound by an injunction, (Pl's 56.1 ¶ 9; Defs' Resp. 56.1 ¶ 9), is an anti-abortion group whose

---

Thus, absent good cause—which the OAG has not demonstrated here—the Court will not disturb the Parties' stipulation and accordingly, will not consider Defendants' Answers in deciding the Motion.  *See Booth v. Hartford Life & Accident Ins. Co. of Am.*, No. 08-CV-13, 2009 WL 652198, at *14 (D. Conn. Feb. 3, 2009) (declining to consider potentially relevant evidence because "the parties have stipulated that, on summary judgment, the court is not to consider information outside the Administrative Record").

[3] Where Defendants identify disputed facts but with semantic objections only or by asserting irrelevant facts, which do not actually challenge the factual substance described in the relevant paragraphs or depicted in the accompanying exhibits, the Court will not consider them as creating disputes of fact.  *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [its] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s]asserted facts without specifically controverting those same facts. . . . [A] number of [the] [p]laintiff['s] purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[]."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Moreover, to the extent Defendants' counter statement includes denials where they simply state that they have no knowledge about or lack information regarding the disputed fact, (*see, e.g.*, Defs' Resp. 56.1 ¶ 18), because Defendants have failed to specifically controvert these material facts, they will be deemed admitted, *see Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023) (citing Local Civ. R. 56.1(c) and deeming facts admitted where defendants noted they had no information as to those facts).

participants conduct "Red Rose Rescues" ("RRRs"), wherein they trespass into medical facilities

that perform abortions and "will not leave" until they are arrested and physically "taken away"

by law enforcement officers, (*see* Pullman Decl. in Supp. of Mot. for PI. Ex. A at 1 ("Red Rose

Mission Statement") (Dkt. No. 26-1); Pl's 56.1 ¶ 1; Defs' Resp. 56.1 ¶ 1; *see also People v.*

*Matthew Connolly, Christopher Moscinski, Laura Gies, and John Hinshaw* at 375:12–18

("Manhasset Tr.") (Dkt. No. 38-2)).  According to Monica Miller, the founder and Director of

Red Rose, (Pl's 56.1 ¶ 10; Defs' Resp. 56.1 ¶ 10), Red Rose has conducted over thirty such "Red

Rose Rescues" since 2017, the purpose of which is to "halt[]" doctors from providing abortions

while the clinics are physically occupied, (Pullman Decl. in Supp. of Mot. for PI, Ex. C, at

10:00–38 (Dkt. No. 26-3); Pl's 56.1 ¶¶ 2, 109; Defs' Resp. 56.1 ¶¶ 2, 109).  Red Rose expects

that law enforcement will be called to respond when its participants perform RRRs and

anticipates that the participants will be arrested.  (Pl's 56.1 ¶ 3; Defs' Resp. 56.1 ¶ 3; Red Rose

Mission Statement 2.)  The group instructs its participants not to "actively assist" with their

arrest.  (Red Rose Mission Statement 2; Pl's 56.1 ¶ 3; Defs' Resp. 56.1 ¶ 3.)  Instead, the

participants go limp and refuse to "cooperate[] with police removing them from abortion

clinics," thereby forcing law enforcement to carry them out.  (Pl's 56.1 ¶ 3; Defs' Resp. 56.1

¶ 3.)  Red Rose also instructs its participants to not plead guilty "[i]f and when placed on trial";

if possible, avoid pleading no contest; refuse to pay fines, do community service, or agree with

conditions of probation; and serve time in jail as "a spiritual extension of the rescue."  (Red Rose

Mission Statement 2; Pl's 56.1 ¶¶ 4–5; Defs' Resp. 56.1 ¶¶ 4–5.)

      The Individual Defendants have each participated in multiple RRRs and have been

arrested in connection with some of them.  (*See* Pl's 56.1 ¶ 11; Defs' Resp. ¶ 11; Pullman Decl.

in Supp. of Mot. for PI, Ex. D at 9:59–10:20 (Dkt. No. 26-4) (Defendant Christopher Moscinski

asserting he has been arrested "thirty or thirty-one times" and "at least nine times with the Red Rose Rescue"); Pullman Decl. in Supp. of Mot. for PI, Ex. P at 2 (Dkt. No. 26-16) (noting a 2018 judgment for trespassing conviction in Michigan for Connolly); Pullman Decl. in Supp. of Mot. for PI, Ex. F at 2 ("LifeSiteNews June 13, 2022") (Dkt. No. 26-6) (noting "Gies has participated in Red Rose Rescues" and describing Gies as "recently released" from a two-month sentence "result[ing] from a Red Rose Rescue . . . in April 2022"); Pullman Decl. in Supp. of Mot. for PI, Ex. L at 2 ("LifeSiteNews Sept. 16, 2022") (Dkt. No. 26-12) (noting Gies "has been arrested four times for her participation in Red Rose Rescues"); Pullman Decl. in Supp. of Mot. for PI, Ex. G at 484:10–89:10 ("Manhasset Tr. Excerpts") (Dkt. No. 26-7) (jury finding Gies, Moscinski, and Hinshaw guilty of obstructing governmental administration in connection with a Red Rose Rescue); Pullman Decl. in Supp. of Mot. for PI, Ex. J at 29:12–21 ("White Plains Sentencing Tr. Excerpts") (Dkt. No. 26-10) (sentencing Connolly, Goodman, and Moscinski for offenses committed in connection with a Red Rose Rescue); LifeSiteNews Sept. 16, 2022 at 3 (noting Moscinski, Goodman, and Connolly were "in prison for a rescue that they conducted" in November 2021).)

    2.   <u>RRR at All Women's Care Clinic in Manhasset, NY</u>

On April 24, 2021, around 8:00 AM, Defendants Moscinski, Gies, and Hinshaw conducted a RRR at All Women's Care in Manhasset, New York. (Pl's 56.1 ¶ 16; Defs' Resp. 56.1 ¶ 16; Manhasset Tr. 361:58–62:19, 375:12–18.) All Women's Care, which provides abortion care as well as other reproduction health care, only allows patients with appointments to enter the clinic. (Pl's 56.1 ¶¶ 17–18; Defs' Resp. 56.1 ¶¶ 17–18.) During the spring of 2021, due to COVID-19 restrictions, the clinic did not permit relatives or companions to occupy patients inside. (Pl's 56.1 ¶ 19; Defs' Resp. 56.1 ¶ 19.)

Despite these restrictions, Moscinski, Gies, and Hinshaw gained entry into All Women's Care with the assistance of a female member of Red Rose who had made an appointment at the clinic.  (Pl's 56.1 ¶ 20; Defs' Resp. 56.1 ¶ 20.)[4]  Moscinski, an ordained Catholic priest, (Manhasset Tr. 375:20–21), entered the clinic in street clothes and carried a duffel bag containing his "monk robe," as he believed he would be denied access to the clinic if he were seen wearing it, (*id.* at 368:10–18; Pl's 56.1 ¶ 22; Defs' Resp. 56.1 ¶ 22).  Once inside, Moscinski donned the robe over his street clothes.  (Manhasset Tr. 368:10–69:5; Pl's 56.1 ¶ 23; Defs' Resp. 56.1 ¶ 23.)

Moscinski, Gies, and Hinshaw occupied the patient waiting room, carrying red roses and refusing to leave despite repeated requests from clinic staff and, eventually, from law enforcement.  (Manhasset Tr. 369:20–73:10, 249:1–14; Pl's 56.1 ¶¶ 24, 29; Defs' Resp. 56.1 ¶¶ 24, 29.)  At one point, Gies knelt down in one of the interior doorways between the waiting room and a hallway.  (Pullman Reply Decl. in Supp. of PI, Ex. 6 at 00:01–24 ("Ex. 6 Clinic Video") (Dkt. No. 43-7).)  Gies then crawled into the clinic hallway, where she sat on the floor, shouting at clinic staff.  (*Id.* at 1:01–3:26.)  Upon being told by law enforcement they would be arrested, Moscinski and Hinshaw dropped to the floor; Gies remained kneeling where she was on the floor in the hallway.  (Manhasset Tr. 371:4–73:7; Ex. 6 Clinic Video at 1:04–3:26; Pl's 56.1 ¶ 30; Defs' Resp. 56.1 ¶ 30.)  Police officers had to use special emergency services equipment— i.e., a "stair-chair"—to lift Moscinski, Gies, and Hinshaw off the floor and carry them out of the

---

[4] The record is somewhat unclear on whether the Red Rose member who made the appointment also let the Defendants into the clinic, as the OAG argues.  (*Compare* Pl's 56.1 ¶ 21, *with*, Defs' 56.1 ¶ 21; *see also* Manhasset Tr. 366:7–368:9 (Defendant Moscinski admitting to entering the clinic but not describing whether he was let in by the female Red Rose member)).)  Regardless, it is undisputed that an unnamed Red Rose member made an appointment at All Women's Care that day, and that subsequently, Moscinski, Gies, and Hinshaw gained access to the clinic.  (Pl's 56.1 ¶¶ 20, 22; Defs' 56.1¶¶ 20, 22.)

clinic. (Manhasset Tr. 372:9–73:7; Pl's 56.1 ¶ 31; Defs' Resp. 56.1 ¶ 31; *see also* Pullman

Reply Decl. in Supp. of PI, Exs. 8–9 (Dkt. Nos. 43-9, 43-10 (Gies and Moscinski arrests).)

During this process, Gies lay on the floor, shouting "I am not leaving." (Manhasset Tr.

249:1–24.)

Defendants' conduct disrupted the provision of reproductive health services and diverted

the execution of clinic staff's duties for approximately two hours. (Pl's 56.1 ¶¶ 33–34; Defs'

Resp. 56.1 ¶¶ 33–34.) During the RRR, clinic staff had patients "go ahead on outside to their

cars," letting them know that staff "would call them if [they] could." (Manhasset Tr.

253:12–17.) Gies later testified at trial that her "goal" was to stay in the clinic as long as

possible "to help stop abortion for the day," (*id.* at 355:8–22), because "[a]s long as I was there I

was hoping that there would be less abortions or no abortions," (*id.* at 345:24–25; *see also* Pl's

56.1 ¶ 35; Defs' Resp. 56.1 ¶ 35). Moscinski also testified that he was only "willing to walk out

the [clinic] door if all the other staff members who were practicing the butchering of children

through abortion would leave." (Manhasset Tr. 372:18–20; Pl's 56.1 ¶ 36; Defs' Resp. 56.1

¶ 36.) Similarly, Hinshaw testified that he would not leave unless law enforcement would "do

their job protecting innocent human life" and stop the clinic from performing abortions. (*See*

Manhasset Tr. 382:18–83:7; Pl's 56.1 ¶ 37; Defs' Resp. 56.1 ¶ 37.) Moscinski, Gies, and

Hinshaw were later convicted of trespassing and second degree obstructing governmental

administration in connection with the Manhasset RRR. (Manhasset Tr. Excerpts 484:10–91:4;

Pl's 56.1 ¶ 40; Defs' Resp. 56.1 ¶ 40.)[5]

---

[5] Hinshaw was sentenced to thirty days' imprisonment for obstruction and fifteen days
for trespassing, Moscinski was sentenced to ninety days' imprisonment, and Gies was sentenced
to forty-five days' imprisonment. (Pl's 56.1 ¶¶ 41, 43; Defs' Resp. 56.1 ¶ 41, 43.)

3.  <u>RRR at All Women's Health and Medical Services in White Plains, NY</u>

On November 27, 2021, Defendants Moscinski, Goodman, and Connolly, along with other members of Red Rose, invaded All Women's Health and Medical Services in White Plains, NY ("All Women's Medical"), a medical facility which provides abortion care and other reproductive care services.  (Pl's 56.1 ¶¶ 44–45; Defs' Resp. 56.1 ¶¶ 44–45.)  To access the clinic, a female Red Rose member made an appointment, was buzzed into the clinic as a patient by security, and then opened the door to allow the other Red Rose members to enter.  (Pl's 56.1 ¶ 46; Defs' Resp. 56.1 ¶ 46; Ferrara Decl. in Opp to PI, Ex. 1, Trial Transcript of *People v. Matthew Connolly, William Goodman and Christopher Moscinski* at 137:16–38:25, 66:10–67:14 ("White Plains Tr.") (Dkt. No. 38-1); Pullman Decl. in Supp. of Mot., Ex. 1 at 32:05–33:15, 40:09–40:30 (Dkt. No. 84-3).)

Upon entering, Moscinski and Goodman went up the stairs, maneuvering past a staff member who attempted to prevent them from ascending into the clinic, and occupied the clinic waiting room, holding red roses.  (Pullman Reply Decl. in Supp. of PI, Ex. 5 at 00:01–00:50 (Dkt. No. 43-6); Pullman Decl. in Supp. of Mot., Ex. 3 at 1:12–2:12 ("Lacaya Bodycam Video") (Dkt. No. 84-5).)  After police officers arrived on the scene, Moscinski and Goodman told the officers that they were affiliated with Red Rose, and Moscinski identified himself to the officers as the organizer of the invasion.  (Lacaya Bodycam Video at 34:35–40, 22:28–45; Pl's 56.1 ¶¶ 50–51; Defs' Resp. 56.1 ¶¶ 50–51.)  Over the course of two hours, Moscinski and Goodman refused repeated requests to leave, even when threatened with arrest, and informed the officers that they would remain in the waiting room so that they could stop the clinic from performing abortions.  (Lacaya Bodycam Video at 8:15–25, 22:30–45, 53:22–26; Pl's 56.1 ¶¶ 49, 52, 73; Defs' Resp. 56.1 ¶¶ 49, 52, 73.)  Moscinski told officers that "[t]here is one way we could leave.

I think my friend and I would leave if everybody else who works here left before us and we would follow them out." (Lacaya Bodycam Video at 8:15–25; Pl's 56.1 ¶ 52; Defs' Resp. 56.1 ¶ 52.) During Moscinski and Goodman's time in the waiting room, they did not counsel a single patient who was there for an abortion. (Pl's 56.1 ¶ 55; Defs' Resp. 56.1 ¶ 55.)

During the same period of time, in the clinic entrance vestibule downstairs, Connolly and several other Red Rose members—carrying red roses—stood in front of the interior doorway and refused requests that they leave. (Pullman Decl. Ex. 1 at 40:09–40:30; Pullman Reply Decl. in Supp. of Mot. for PI, Ex. 1 ("Ex. 1 Clinic Photograph") (Dkt. No. 43-2); Pullman Reply Decl. in Supp. of Mot. for PI, Ex. 2 at 00:01–6:10 ("Ex. 2 Clinic Video") (Dkt. No. 43-3); Pullman Decl. in Supp. of Mot., Ex. 4 at 5:19–9:18 ("Hutt Bodycam Video") (Dkt. No. 84-6).) Connolly knelt in the doorway, in front of the clinic interior door, and eventually laid down on the floor in the doorway, refusing multiple requests to leave. (Ex. 1 Clinic Photograph; Hutt Bodycam Video at 5:19–9:18, 1:30:35–31:55; Lacaya Bodycam Video at 1:42:50–43:31; Pl's 56.1 ¶ 73; Defs' Resp. 56.1 ¶ 73.)

While in the vestibule, Red Rose members also confronted patients who tried to enter the clinic, attempting to block some from entering. (Hutt Bodycam Video at 12:18–27, 26:55–27:14; Pl's 56.1 ¶ 58; Defs' 56.1 ¶ 58.) One unnamed female Red Rose Rescue member approached a patient who entered the vestibule and stood in front of her, repeatedly blocking her path to the entrance, as the patient objected "Excuse me, can you not come in my face?" (Hutt Bodycam Video at 12:23–27; Pl's 56.1 ¶¶ 58–59; Defs' 56.1 ¶¶ 58–59.) The patient finally managed to walk around the Red Rose member and was guided inside by a police officer. (Hutt Bodycam Video at 12:35–40; Pl's 56.1 ¶ 60; Defs' 56.1 ¶ 60.) Gies, who was present in the vestibule, objected that the officer was "helping to escort people in," to which the officer

responded, "you're trespassing." (Hutt Bodycam Video at 12:55–13:03; Pl's 56.1 ¶ 61; Defs'
56.1 ¶ 61.)

A short while later, the same unnamed Red Rose member stood just outside the clinic's
exterior doorway and blocked two patients attempting to enter the clinic. (Pullman Reply Decl.
in Supp. of PI, Ex. 3 at 2:00–27; Pullman Reply Decl. in Supp. of PI, Ex. 4 at 4:31–45.) When
the two patients approached the clinic, the Red Rose member attempted to engage them and
remained directly in front of the patients as they approached the clinic door, forcing them to stop
walking. (Pullman Reply Decl. in Supp. of PI, Ex. 3 at 2:00–27; Pullman Reply Decl. in Supp.
of PI, Ex. 4 at 4:31–45.) That Red Rose member then stood in front of the door so that the
patients could not enter until a security guard opened the door from inside and assisted the
patients into the vestibule. (Pullman Reply Decl. in Supp. of PI, Ex. 3 at 2:00–27; Pullman
Reply Decl. in Supp. of PI, Ex. 4 at 4:31–45.) Once the first patient finally got inside the
vestibule, she had to turn sideways to squeeze past Connolly, who was kneeling in the doorway,
to ultimately enter the clinic. (Hutt Bodycam Video at 25:15–19; Pl's 56.1 ¶ 71; Defs' Resp.
56.1 ¶ 71.) The second patient had to do the same. (Hutt Bodycam Video at 25:20–25; Pl's 56.1
¶ 72; Defs' Resp. 56.1 ¶ 72.)

Connolly and the other Red Rose members occupied the doorway and vestibule for
approximately two hours, during which time they did not counsel any patients. (*See generally*
Hutt Bodycam Video.) During the two-hour invasion, the clinic was unable to provide any
healthcare services and no patients could see their doctor until Defendants were removed. (Pl's
56.1 ¶¶ 74, 82; Defs' Resp. 56.1 ¶¶ 74, 82; White Plains Tr. 155:6–56:2.) Instead, clinic staff
instructed patients who were waiting in the waiting room to leave and wait in their cars, and
called patients who had appointments later that day and told them not to come in. (Pl's 56.1

¶¶ 75–76; Defs' Resp. 56.1 ¶¶ 75–76.)  Clinic staff were also diverted from their job responsibilities during this time as they had to respond to Defendants' presence in the clinic. (Pl's 56.1 ¶¶ 75–76; Defs' Resp. 56.1 ¶¶ 75–76.)

After repeatedly refusing to leave, Moscinski, Goodman, and Connolly were eventually arrested.  (Pl's 56.1 ¶¶ 73, 81; Defs' Resp. ¶¶ 73, 81.)  Upon their arrests, the Defendants collapsed on the floor (apart from Connolly, who was already laying on the floor) and refused to move or stand, requiring the police to physically carry them out of the building.  (*See* Pl's 56.1 ¶ 81; Defs' Resp. 56.1 ¶ 81; Hutt Bodycam Video at 1:42:47–46:19 (Connolly's arrest); Lacaya Bodycam Video at 1:42:00–46:00 (same); Lacaya Bodycam Video at 1:51:00–2:04:07 (Moscinski and Goodman's arrests).)  Following a trial, Moscinski, Goodman, and Connolly were convicted of criminal trespass in the third degree for their actions during the RRR and each sentenced to three months in jail.  (Pl's 56.1 ¶ 86; Defs' Resp. 56.1 ¶ 86.)

4.  Incident at Planned Parenthood Clinic in Hempstead, NY

On July 7, 2022, Moscinski barricaded the entrance to a Planned Parenthood Clinic in Hempstead, NY, which provides abortion care and other reproductive health services.  (Pl's 56.1 ¶¶ 91–92; Defs' Resp. 56.1 ¶¶ 91–92.)  Moscinski locked the front gates of the clinic shut with six industrial locks and chains, which blocked the driveway into the parking lot as well as the pedestrian gates, rendering the building and parking lot completely inaccessible to both staff and patients.  (Pullman Decl. in Supp. of Mot. for PI, Ex. N ¶¶ 5–6 ("Zajkowski Decl.") (Dkt. No. 26-14); Pullman Decl. in Supp. of Mot. for PI, Ex. O at 00:15–20 ("Video of Franciscan Friar Arrest") (Dkt. No. 26-15); Pl's 56.1 ¶¶ 92, 94–95; Defs' Resp. 56.1 ¶¶ 92, 94–95.)  When police arrived, they were unable to remove the locks with bolt cutters and had to call the fire department to use "forcible entry saws" to cut and remove the locks.  (Zajkowski Decl. ¶¶ 6–8; Video of

Franciscan Friar Arrest at 00:20–23; Pl's 56.1 ¶¶ 96–98; Defs' Resp. 56.1 ¶¶ 96–98.)  Multiple vehicles were waiting to enter the lot when the gates were opened, but Moscinski walked in front of the first vehicle and blocked its path.  (Zajkowski Decl. ¶¶ 5, 9; Pl's 56.1 ¶¶ 99–100; Defs' Resp. 56.1 ¶¶ 99–100.)  A police officer instructed Moscinski to move out of the way; when he refused, the office tried to physically remove him, at which point Moscinski went limp, fell to the ground, and lay in the driveway in front of the vehicles.  (Zajkowski Decl. ¶¶ 10–11; Pl's 56.1 ¶¶ 100–02; Defs' Resp. 56.1 ¶¶ 100–02; Video of Franciscan Friar Arrest at 00:23–30.) Police officers ultimately had to pick Moscinski up off the ground and carry his body to the police car.  (Zajkowski Decl. ¶ 12; Pl's 56.1 ¶ 103; Defs' Resp. 56.1 ¶ 103.)  In the police car, Moscinski stated, "at least I slowed them down some—I slowed them down a little bit today." (Zajkowski Decl. ¶ 13; Pl's 56.1 ¶ 104; Defs' Resp. 56.1 ¶ 104.)  Moscinski was tried and found guilty of violating FACE and was sentenced to the statutory maximum of six months.  (Pullman Decl. in Supp. of Mot. for PI, Ex. M., Excerpts of Trial Transcript of *United States of America v. Christopher Moscinski*, 22-CR-485, at 93:7–13 ("Hempstead Tr. Excerpts") (Dkt. No. 26-13); Pl's 56.1 ¶ 105; Defs' Resp. 56.1 ¶ 105.)  Moscinski has since admitted that his "main motivation" for his conduct "was to keep that Planned Parenthood closed for as long as possible."  (Video of Franciscan Friar Arrest at 00:47–1:00; Pl's 56.1 ¶ 107; Defs' Resp. 56.1 ¶ 107.)

  B.  Procedural History

The OAG filed its Complaint on June 8, 2023, alleging that Defendants violated the FACE Act and the NYSCAA.  (*See* Compl.)  On July 26, 2023, the OAG moved for a Preliminary Injunction.  (*See* Dkt Nos. 24–26.)  After the Preliminary Injunction was fully briefed, (*see* Dkt. Nos. 37, 39, 43–45, 52), the Court conducted a hearing on November 13, 2023,

(*see* Dkt. (minute entry for Nov. 13, 2023)).  During this hearing, by agreement of the Parties, there was no live testimony.  Instead, the Parties played certain videos and discussed other exhibits.  The Court also conducted oral argument during this hearing.

On December 7, 2023, the Court granted in part the OAG's Motion for a Preliminary Injunction and established a fifteen-foot buffer zone around reproductive healthcare clinics in the Eastern and Southern Districts of New York. *Red Rose Rescue*, 705 F. Supp. at 141–42. (*See also* Dkt. No. 55 (the "Opinion" or "Op."); Dkt. No. 62 (the "Injunction").)[6]

Following the entry of the Injunction, and after receiving an extension of time to respond, Defendants served their Answers to the OAG's Complaint. (*See* Dkt. Nos. 63–64, 69–71.)  On April 24, 2024, the Parties filed a joint letter requesting that the liability and remedies stage be bifurcated and proposing a schedule for briefing summary judgment on liability, (Joint Stipulation), which the Court approved by memo endorsement the next day, (Dkt. No. 83).

The OAG filed its Motion on July 15, 2024. (*See* Pl's Mem. of Law in Supp. of Mot. (Dkt. No. 84); Pl's Not. of Mot; Pl's 56.1.)  On August 15, 2024, Defendants filed their Opposition Papers to the OAG's Motion. (*See* Def. Gies' Mem. in Opp'n to Mot. ("Gies

---

[6] Specifically, the Injunction prohibits:

[Defendants] and all other persons, known or unknown, acting on their behalf or in concert with them, and receiving actual or constructive notice of this Order . . . from knowingly being present within fifteen feet of either edge of any doorway, walkway, or driveway entrance of any facility providing reproductive health care services, . . . with the intent to injure, intimidate, or interfere with any person because that person is or has been obtaining or providing reproductive health services, as proscribed by the FACE Act and the NYSCAA, in either the Southern or Eastern Districts of New York . . . ; and IT IS FURTHER ORDERED that this Order may be enforced by a motion for criminal and/or civil contempt.

(Dkt. No. 62 at 2.)

Opp'n") (Dkt. No. 91); Defs' Connolly, Goodman, Hinshaw, and Red Rose Rescue's Mem. in

Opp'n to Mot. ("RRR Opp'n") (Dkt. No. 92);[7] Defs' Resp. 56.1); Joinder of Def. Moscinski in

Defs' Connolly, Goodman, Hinshaw, and Red Rose Rescue's Mem. in Opp'n to Mot.

("Moscinski Opp'n") (Dkt. No. 94).)[8]  The OAG filed its Replies on August 30, 2024.  (*See* Pl's

Reply to RRR Opp'n ("Reply to RRR") (Dkt. No. 97); Pl's Reply to Moscinski Opp'n ("Reply to

Moscinski") (Dkt. No. 98); Pl's Reply to Gies Opp'n ("Reply to Gies") (Dkt. No. 99).)[9]

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v.

Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Reyes v. Upfield US Inc.*, No.

22-CV-6722, 2025 WL 786656, at *5 (S.D.N.Y. Mar. 12, 2025) (same).  "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in [her] favor."  *Torcivia v.*

---

[7] RRR's Opposition was originally filed at Docket No. 93.  On August 19, 2024, RRR refiled the Opposition to correct certain page references in Annexed Exhibit A.  (*See* Dkt. Nos. 95, 95-1.)

[8] Moscinski joined in RRR's Opposition in full, to the extent applicable to him.  (*See* Dkt. No. 96.)

[9] On August 27, 2024, the OAG filed a Motion for an Order to Show Cause for Contempt as to Red Rose, alleging that a member of Red Rose violated the Injunction on four dates in 2024.  (*See* Dkt. No. 96 at 5.)  After full briefing, an evidentiary hearing, and oral argument, (*see* Dkt. Nos. 101–04; Minute Entries for Nov. 4, 2024, Dec. 19, 2024, Feb. 12, 2025, and Mar. 10, 2025), the Court found that Red Rose had not violated the Injunction and, accordingly, denied the OAG's Motion, (*see* Dkt. No. 138).

*Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).

"The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10, 2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same). "However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same).

Importantly, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y.

Oct. 12, 2023) (same), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward*, 2023 WL 6387180, at *12 (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 323–24)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)); *accord* Fed. R. Civ. P.56(c)(4); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

    B. Analysis

    The OAG asserts that summary judgment is warranted as the record conclusively establishes that Defendants violated the FACE Act and the NYSCAA during their invasions of All Women's Care, All Women's Medical, and the Hempstead Planned Parenthood Clinic. (Pl's Mem. 16.) Defendants raise myriad arguments in opposition, which the Court will address only as necessary to decide the instant Motion.

    1. The FACE Act and the NYSCAA

    The FACE Act provides that "[w]hoever . . . by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[,]" is guilty of criminal interference. 18 U.S.C. § 248(a)(1). Likewise, the NYSCAA provides that "[a] person is guilty of criminal interference with health services . . . in

18

the second degree when: . . . by force or threat of force or by physical obstruction, he or she intentionally injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with, another person because such other person was or is obtaining or providing reproductive health services." N.Y. Penal Law § 240.70(1)(a). Because these two statutes proscribe the same conduct using nearly identical language, the Court will analyze them in tandem. *See New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 482 (S.D.N.Y. 2006) ("The terms of the [NYSCAA] are essentially identical to FACE, and all conduct constituting a violation of FACE will also constitute a violation of the [NYSCAA].").; *New York ex rel. Spitzer v. Kraeger*, 160 F. Supp. 2d 360, 372 (N.D.N.Y. 2001) ("Since the language of the [NYSCAA] is almost identical to FACE, the standards for proving a violation of the [NYSCAA] [are] the same as those for proving a violation of FACE.").

The Parties do not dispute that the violations OAG seeks to prove are based only on physical obstruction, not on force or threat of force. (*See generally* Pl's Mem.; RRR Opp'n 6; Gies Opp'n 6.) The Parties also do not dispute that the alleged violations are based only on interference, not on claims of injury or intimidation. (*See generally* Pl's Mem.; RRR Opp'n 6; Gies Opp'n 6.) Thus, for purposes of this Motion, the OAG must demonstrate that Defendants "(1) [engaged in] physical obstruction, (2) intentionally undertaken to . . . interfere with [or to attempt to interfere with] a person, (3) because that person is or has been obtaining or providing reproductive health services[] . . . . " *Cain*, 418 F. Supp. 2d at 473 (citing 18 U.S.C. § 248(a)(1)); *see also* N.Y. Penal Law § 240.70(1)(a); *accord United States v. Dugan*, 450 F. App'x 20, 22 (2d Cir. 2011) (summary order) ("[U]nder the circumstances of this case, the government had to prove that [the defendant] (1) by physical obstruction, (2) intentionally interfered with or

attempted to interfere with any person, (3) because that person was or had been obtaining or providing reproductive health services.").

As to the latter two elements, both statutes define the phrase "interfere with" as "restrict[ing] a person's freedom of movement."  18 U.S.C. § 248(e)(2); *see* N.Y. Penal Law § 240.70(3)(b) (same).  In addition, both statutes define "facility" as "a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located[,]" 18 U.S.C. § 248(e)(1); *see* N.Y. Penal Law § 240.70(3)(a) (defining "health care facility" in the same terms), and, in turn, "'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy[,]" 18 U.S.C. § 248(e)(5); *see* N.Y. Penal Law § 240.70(3)(e) (similar).

### 2.  Physical Obstruction

Because the crux of the Motion here turns on the definition of "physical obstruction," it is necessary to examine that element more closely.  Under both the FACE Act and NYSCAA, "physical obstruction" is defined as "rendering impassable ingress to or egress from a facility that provides reproductive health services or . . . rendering passage to or from such a facility . . . unreasonably difficult or hazardous."  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d) (same).  Importantly, "[t]here must be an *actual* obstruction" to trigger liability under these statutes.  *Cain*, 418 F. Supp. 2d at 480 (emphasis added); *see also New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001) (cautioning that the concept of "constructive obstruction"—i.e., one without an actual obstruction—is "an uncertain and

potentially slippery concept").  However, although "merely making the approach to health facilities 'unpleasant and even emotionally difficult does not automatically' constitute" physical obstruction, *Cain*, 418 F. Supp. 2d at 480 (quoting *Operation Rescue Nat'l*, 273 F.3d at 195–96), those statutes "do[] not limit physical obstruction to *bodily* obstruction, but rather [are] broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult[,]" *United States v. Mahoney*, 247 F.3d 279, 284 (D.C. Cir. 2001) (emphasis added); *accord Cain*, 418 F. Supp. 2d at 480.  Moreover, "the obstruction need not be permanent or entirely successful.  That patients may eventually have reached [the facility at issue] in spite of [the] defendants' actions is therefore beside the point."  *Cain*, 418 F. Supp. 2d at 480 n.18; *see also Kraeger*, 160 F. Supp. 2d at 373 ("It is not necessary to show that a clinic was shut down, that people could not get into a clinic at all for a period of time, or that anyone was actually denied medical services." (citing *United States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998), *aff'd*, 226 F.3d 253 (3d Cir. 2000), *cert denied*, 532 U.S. 971 (2001))).

Courts have found that a wide variety of obstructive acts can constitute "physical obstruction" for purposes of the FACE Act and, by extension, the NYSCAA.  For instance, courts have found acts of physical obstruction to include "obstructing or slowing access to driveways or parking lots; standing in front of pedestrians as they try to enter a clinic; blocking clinic doors by standing directly in front of them; blocking patients inside automobiles by standing close to car doors; and participating in a demonstration so close to a clinic entrance that patients are compelled to use an alternate entrance."  *Cain*, 418 F. Supp. 2d at 480 (internal citations omitted).  Courts have also found physical obstruction where individuals: "kneeled intentionally in front of [a clinic] door to block it" such that "the door could not have opened," *Dugan*, 450 F. App'x at 22 (citation omitted); "crowded patients, walked very closely to them,

and stepped in their way, making it very difficult for patients to maneuver around them,"
*Kraeger*, 160 F. Supp. 2d at 376; "st[ood] directly in front of a patient and prevent[ed] her from
approaching [a] clinic," *Cain*, 418 F. Supp. 2d at 480; and "entered [clinic] premises and lay
prone on the stairway and hallway," *Gregg*, 32 F. Supp. 2d at 156.  Further, courts have found
that defendants physically obstructed clinics when they engaged in conduct designed "so that
[they] would be arrested," the "foreseeable and intended consequences" of which—i.e., the
increased presence of law enforcement and eventual arrests—"contributed to the disruption and
to the interference with those trying to enter or leave the clinic."  *Mahoney*, 247 F.3d at 284; *see
also United States v. Lindgren*, 883 F. Supp. 1321, 1328 (D.N.D. 1995) (finding, where the
defendants had blockaded a clinic with cars, that the subsequent "crowd of emergency vehicles,
rescue workers, police officers, protesters, and onlookers *that was foreseeably drawn to the site*"
contributed to making clinic "access unreasonably difficult" (emphasis added)).

Given those legal principles, and after reviewing the full record, the Court concludes that
each Defendant engaged in physical obstruction in violation of FACE and the NYSCAA and,
moreover, that Defendants have not identified a triable issue of fact sufficient to survive
summary judgment on this element.

a.  Moscinski

Beginning with Moscinski, the Court finds the undisputed facts in the record demonstrate
that he engaged in physical obstruction on three occasions.

First, Moscinski engaged in physical obstruction on July 7, 2022, at the Planned
Parenthood clinic in Hempstead, NY, when he placed numerous heavy-duty locks on the clinic's
front gates, and when, after the fire department removed the locks, he laid down in front of the
entrance to the clinic's parking lot, preventing all staff and patients from accessing the clinic

entirely.  (*See* Hempstead Tr. Excerpts 89:20–90:5; *see generally* Zajkowski Decl.; *see also* Pl's 56.1 ¶¶ 92, 94–98, 100–03; Defs' Resp. 56.1 ¶¶ 92, 94–98, 100–03.)  By physically barring entrance into the facility, Moscinski thus, per the plain language of FACE, "render[ed] impassable ingress to or egress from" the Planned Parenthood clinic.[10]  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d); *see also Mahoney*, 247 F.3d at 284 (affirming the district court's conclusion that a defendant who "used his body to obstruct" a clinic entrance engaged in physical obstruction); *Cain*, 418 F. Supp. 2d at 480 (noting that "[a]cts of physical obstruction that are sufficient to create liability under [the] FACE [Act] include obstructing or slowing access to driveways or parking lots" (citing *Operation Rescue Nat'l*, 273 F.3d at 196)); *Lindgren*, 883 F. Supp. at 1328 (concluding that defendants' positioning of cars to blockade a clinic driveway "rendered the clinic completely impassable to access by automobile" and "rendered pedestrian passage to the clinic unreasonably difficult"); *Pennington v. Meyers*, No. 21-CV-2591, 2022 WL 656163, at *10 (D. Kan. Mar. 4, 2022) (finding that allegations that defendants "stood between [plaintiffs'] car and their ingress and egress from the facility" were sufficient to "support a plausible FACE Act claim").[11]

---

[10] The OAG argues that, because Moscinski was already convicted of a criminal FACE Act violation for this incident, he is "collaterally estopped from disputing the underlying facts of that case," (Pl's Mem. 25), and further argues that its collateral estoppel claim should be granted because Moscinski failed to address it in his Opposition, (Reply to Moscinski 1).  Because Moscinski does not, in fact, dispute the underlying facts of the Hempstead incident, and those facts clearly demonstrate that he engaged in physical obstruction, the Court deems it unnecessary to address the OAG's collateral estoppel argument.

[11] Indeed, Defendants appear to concede that Moscinski engaged in physical obstruction during the Hempstead incident.  (*See* RRR Opp'n 6–7 (noting the Court "applied the term 'impassable' only to obstructive conduct by Defendant Moscinski at a Hempstead, NY clinic"); *id.* at 28, 28 n.6 (noting an argument based on Defendants' "mere presence as trespassers" "obviously does not apply to Defendant Moscinski's actions at the Hempstead clinic"); *see also* Dkt. No. 96 (Moscinski joining Red Rose's Opposition in full).)

Second and third, Moscinski engaged in physical obstruction during the RRRs at All Women's Care and All Women's Medical.  This Court concluded in its prior Opinion that the Individual Defendants' actions at those facilities—and the foreseeable consequences of those actions—"render[ed] passage to or from [the clinics] . . . unreasonably difficult."  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  (Op. 30.)  The Court sees no reason to disturb this conclusion.

As described in Section I.A.2, once Moscinski, Gies, and Hinshaw entered All Women's Care unauthorized, they refused multiple requests from staff that they vacate the facility, and, once police arrived on the scene, similarly refused to leave when asked by police officers. (Manhasset Tr. 369:23–73:7, 249:1–24; Pl's 56.1 ¶¶ 24, 29; Defs' Resp. 56.1 ¶¶ 24, 29.)  Upon being informed that they would be arrested for trespass, Moscinski and Hinshaw dropped to the floor and they, along with Gies (who was already on the floor in the hallway), forced police to pick them up with special equipment and carry them out of the building.  (Manhasset Tr. 371:4–73:7; Ex. 6 Clinic Video at 1:04–3:26; Pullman Reply Decl. in Supp. of PI, Exs. 8–9; Pl's 56.1 ¶¶ 30–31; Defs' Resp. 56.1 ¶¶ 30–31.)  During the course of this approximately two-hour operation, patients were asked to leave the clinic and wait in their cars, thus preventing them from receiving their scheduled reproductive health services.  (Pl's 56.1 ¶¶ 33–34; Defs' Resp. 56.1 ¶¶ 33–34; Manhasset Tr. 253:12–17.)  Additionally, clinic staff were diverted from their normal job responsibilities due to the Defendants' presence and conduct.  (*See generally* Pullman Reply Decl. in Supp. of PI, Exs. 6–8 (video evidence from the All Women's Care RRR showing clinic staff focused on addressing Gies' unauthorized presence in the facility rather than healthcare-related tasks).)

Similarly, at All Women's Medical, as noted in Section I.A.3, after gaining unauthorized access to the clinic, Moscinski and Goodman occupied the upstairs waiting room, where they refused to leave despite repeated requests from staff and police officers. (Lacaya Bodycam Video at 8:15–25, 22:30–45, 53:22–26; Pl's 56.1 ¶¶ 49, 52, 73; Defs' Resp. 56.1 ¶¶ 49, 52, 73.) Once police informed Moscinski and Goodman they were being arrested for criminal trespass, Moscinski and Goodman knelt on the floor, refused to cooperate, and had to be physically carried by law enforcement down the stairs and out of the facility. (Pl's 56.1 ¶ 81; Defs' Resp. ¶ 81; Lacaya Bodycam Video at 1:51:00–2:04:07.)

This RRR lasted for approximately two hours, during which time staff members had patients leave their facility and wait in their cars, and called patients with appointments later that day and told them not to come into the clinic. (Pl's 56.1 ¶¶ 74–76, 82; Defs' Resp. 56.1 ¶¶ 74–76, 82; White Plains Tr. 155:11–56:2.) Staff members were also diverted from their normal duties while they dealt with the Defendants' presence at the clinic and interfaced with police officers. (Pl's 56.1 ¶¶ 75–76; Defs' Resp. 56.1 ¶¶ 75–76.)

Given this undisputed factual record, the Court concludes that Moscinski engaged in physical obstruction at All Women's Care and All Women's Medical. As the Court reasoned in its prior Opinion:

> Defendants entered All Women's Care and All Women's Medical, knowing that, as RRR participants, if they were unable to convince any women in the clinic that they should not get an abortion, they would remain inside the clinic "in solidarity with their abandoned brothers and sisters performing a non-violent act of defense through their continued presence inside the killing centers[,] remaining with them for as long as they [could.]" Given that remaining in clinics without authorization foreseeably leads, if not compels, staff members to call the authorities, the Code of Conduct for RRR participants states that "[i]f possible, [RRR participants] will not actively assist with unjust arrests, but not directly resist [arrest] either[.]" As a result, when the Individual Defendants here faced arrest, they dropped to the ground and refused to leave the clinics, either on their own or while under arrest. . . . Thus, numerous police officers were required to remove them from the clinics. And, as

> described above, during the time they remained in the clinics, patients were precluded from receiving—and staff members were precluded from providing—healthcare services. As the record amply demonstrates, this chain of events, culminating in the delay or outright denial of reproductive healthcare services, was the foreseeable and intended consequence of [the Individual Defendants'] action[s], and it constitute[d] physical obstruction.

(Op. 32–33 (internal quotation marks and citations omitted).)

Defendants, however, object to this conclusion, characterizing the Court's prior Opinion as holding "that trespassers at abortion clinics violate FACE by their *mere unwanted presence and subsequent arrest* inside the facility because it is 'foreseeable' that, in the following 'chain of events', the clinic will temporarily stop or 'slow down' its operations." (RRR Opp'n 17 (emphasis in original).) This "theory of foreseeable obstruction by *business disruption*," (*id.* (emphasis in original)), Defendants claim, endorses an "any act-foreseeability" standard that amounts to allowing "constructive obstruction," (*id.* at 22), "thereby convert[ing] FACE into a 'buffer zone equivalent,'" (*id.* at 13.) Defendants overread the Court's prior Opinion.

In that Opinion, the Court did not hold that "mere presence" within the buffer zone—either of defendants or of law enforcement—constitutes a FACE violation. Instead, after noting that FACE requires an *actual* obstruction, (Op. 23), the Court concluded that the record established Defendants had, in fact, engaged in such obstructions. A reexamination of the full record here bears out this conclusion and undercuts Defendants' claim that their actions did not restrict anyone's freedom of movement. (RRR Opp'n 22.)

First, Defendants' occupation of the clinics—which included physical blockades of interior doorways—made it unreasonably difficult for staff and patients to enter the clinics, precluding those individuals from providing and receiving healthcare services. *See Mahoney*, 247 F.3d at 284; *Lindgren*, 883 F. Supp. at 1328; *see also United States v. Roach*, 947 F. Supp. 872, 874 (E.D. Pa. 1996) (finding physical obstruction where, as a result of defendants' actions,

"twenty-five clients had to reschedule their procedures" until later that day, "[s]ix clients rescheduled for another day[,] [o]ne cancelled, . . . another never showed[, and] [t]here were no walk-in clients that day").

Second, those actions lead to the arrival of law enforcement, whose presence added to the general chaos, disrupting the provision of services, and creating additional physical obstacles to clinic access. *Mahoney*, 247 F.3d at 284; *see also Lindgren*, 883 F. Supp. at 1328 (finding, where the defendants had blockaded a clinic with cars, that the subsequent "crowd of emergency vehicles, rescue workers, police officers, protesters, and onlookers" contributed to making clinic "access unreasonably difficult"); *see also FemHealth USA, Inc. v. Williams*, No. 22-CV-00565, 2022 WL 4241269, at *4 (M.D. Tenn. Sept. 14, 2022) (finding a plaintiff was "likely to succeed on their claim that [d]efendants violated the FACE Act" where defendants' actions caused multiple security officers to "respond[] to the area, two of whom physically blocked the groups' access to the building by standing in the doorway," causing the "groups['] presence [to] interfere[] with persons attempting to access the building"), *appeal dismissed*, 83 F.4th 551 (6th Cir. 2023).[12]

And third, Defendants plainly physically obstructed clinic entrances when they forced law enforcement to arrest them and carry them out of the building. These arrests—which on one occasion necessitated the use of emergency services equipment to remove Defendants,

---

[12] Defendants argue that "[t]he mere presence of *police officers* here adds nothing to the picture, as their mere presence no more physically 'blocked clinic access' than Defendants' presence." (RRR Opp'n 19 (emphasis in original).) Defendants again miss the point. It is not the mere presence of police officers that amounts to a physical obstruction. It is that their presence, which was a reasonably foreseeable consequence of Defendants' obstructive actions, contributed to the disruption inside the clinic and the interference with those trying to obtain and provide reproductive health services. *See Lindgren*, 883 F. Supp. at 1328; *FemHealth USA, Inc.*, 2022 WL 4241269, at *4.

(Manhasset Tr. 372:9–73:7; Pl's 56.1 ¶ 31; Defs' Resp. 56.1 ¶ 31)—blocked clinic stairways and interior and exterior doorways in their entirety, rendering clinic access unreasonably difficult, if not impassable, *see Gregg*, 32 F. Supp. 2d at 154–156 (concluding defendants created physical obstructions as defined by FACE when they "refused to leave the clinic entranceway and had to be physically removed and carried away by police officers"); *Roach*, 947 F. Supp. at 874, 876–77 (finding, for purposes of granting a preliminary injunction, that plaintiffs demonstrated they would likely prove defendants violated FACE where they blocked clinic entrances and exits, "did not disperse[,] and had to be physically removed from the clinic's entrances/exits and carried by law enforcement officers to the Sheriffs' vans"); *United States v. Burke*, 15 F. Supp. 2d 1090, 1092–93, 1095 (D. Kan. 1998) (concluding the evidence clearly established that defendant engaged in physical obstruction when he, inter alia, blocked a clinic door with his body, "refused to cooperate[,] and the police had to physically remove [him] from the premises," and, on another occasion, refused to cooperate with police so that they had to "pick[] up [the defendant], carr[y] him to the patrol car, and place[] him inside").

Indeed, Defendants' "constructive obstruction" argument is entirely premised on the fiction, repeated at length throughout their briefing, that they were *merely physically present* in the clinics.  (*E.g.*, RRR Opp'n 14, 17–18, 20–21.)[13]  But mere repetition does not render it so,

---

[13] Defendants rely heavily on the Second Circuit's opinion in *Operation Rescue National*, in which the court warned against using "the rubric of 'constructive obstruction,' an uncertain and potentially slippery concept."  273 F. 3d at 195.  But, as the Court noted in its prior Opinion, the facts of this case are a far cry from those in *Operation Rescue National*, where the Second Circuit criticized a district court's findings that "defendants who approach[ed] and yell[ed] at patients" outside of the clinic had engaged in "constructive obstruction."  273 F.3d at 195–96.  Here, as detailed Supra Section 1.A.2, Defendants engaged in actual, *physical* obstruction, both inside and outside the clinics.

Defendants' reliance on *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997) is similarly misplaced.  In *Hoffman*, the Fourth Circuit concluded that the state analogue to FACE did not

particularly in light of the extensive video and photographic evidence depicting Defendants, inter alia, standing or laying in doorways, blocking entrances, and forcing law enforcement to physically carry them out through those doorways and entrances.  (*See* Supra Sections 1.A.2–3.) Accordingly, for the foregoing reasons, the Court concludes that Moscinski engaged in physical obstruction during the RRRs at All Women's Care and All Women's Medical.

> b.  Goodman

As for Goodman, the evidence demonstrates that he engaged in physical obstruction during the RRR at All Women's Medical.  It is undisputed that Goodman, along with Moscinski, gained entry to the clinic, occupied the upstairs waiting room, and refused to leave until he was arrested and forcibly carried out of the clinic.  (Lacaya Bodycam Video at 8:15–25, 22:30–45, 53:22–26; 1:51:00–2:04:07; Pl's 56.1 ¶¶ 49, 52, 73; Defs' Resp. 56.1 ¶¶ 49, 52, 73.)  This conduct disrupted the provision of reproductive health services for around two hours.  (Pl's 56.1 ¶¶ 74–76, 82; Defs' Resp. 56.1 ¶¶ 74–76, 82; White Plains Tr. 155:6–56:2.)

Accordingly, for substantially the same reasons as set forth above with respect to Moscinski's participation in the RRR at All Women's Medical, the Court concludes that Goodman engaged in physical obstruction in violation of the FACE Act and the NYSCAA.

---

pose any constitutional concerns because it "prohibits only conduct that imposes physical impediments to entering or existing a health care facility," but could not be applied to prohibit "mere presence" outside of the facility, absence evidence of physical obstruction.  126 F.3d at 581–582.  The Court distinguished *Hoffman* in its prior Opinion, noting that here, unlike in *Hoffman*, there was no question of Defendants being liable for their mere presence *outside* of the facility at issue, but instead, the question was whether they violated FACE "when they went *inside* [the] clinics, refused to leave when asked, and ultimately needed to be removed against their will by numerous police officers, all of which obstructed patients' and staff members' access to the clinics."  (*See* Op. 35.)  For the same reasons given above, that conclusion holds.

c.  Hinshaw

Similarly, as to Hinshaw, the evidence demonstrates that he engaged in physical obstruction during the RRR at All Women's Care.  It is undisputed that Hinshaw, along with Moscinski and Gies, gained entry into the clinic and occupied the patient waiting room, refusing to leave until they were ultimately arrested and physically removed.  (Manhasset Tr. 369:23–73:7, 249:1–24; Pl's 56.1 ¶¶ 24, 29, 31; Defs' Resp. 56.1 ¶¶ 24, 29, 31.)  Their conduct, as discussed above, disrupted the provision of reproductive health services and diverted the execution of clinic staff's duties for approximately two hours.  (Pl's 56.1 ¶¶ 33–34; Defs' Resp. 56.1 ¶¶ 33–34.)  Hinshaw was later tried and convicted of criminal trespass and second-degree obstruction of governmental administration based on his involvement in that RRR.  (*See* Manhasset Tr. Excerpts 488:14–91:3.)[14]

Accordingly, for substantially the same reasons as set forth above with respect to Moscinski and Goodman, the Court concludes that Hinshaw engaged in physical obstruction at All Women's Care in violation of the FACE Act and the NYSCAA.

d.  Connolly

Regarding Connolly, the Court finds that the record demonstrates that he also engaged in physical obstruction at All Women's Medical.  It is undisputed that Connolly, along with other RRR participants, stood before an interior doorway leading into the clinic and refused clinic staff requests to leave.  (Ex. 1 Clinic Photograph; Ex. 2 Clinic Video at 00:01–6:10.)  Further, it is undisputed that Connolly later knelt in front of that same interior door and eventually laid down

---

[14] Defendants note that Hinshaw was "not even depicted" on the video evidence submitted by the OAG.  (RRR Opp'n 18.)  This is of no moment, as it is undisputed that Hinshaw participated in this RRR as described above.  (*See, e.g.*, Manhasset Tr. Excerpts 488:14–91:3; Pl's 56.1 ¶¶ 24, 29, 30–31; Defs' Resp. 56.1 ¶¶ 24, 29, 30–31.)

in the doorway, blocking it for approximately two hours.  (Ex. 1 Clinic Photograph; Hutt

Bodycam Video at 5:19–9:18, 1:30:35–31:55; Lacaya Bodycam Video at 1:42:50–43:31; Pl's

56.1 ¶ 73; Defs' Resp. 56.1 ¶ 73.)  During this time, Connolly refused all requests to leave, even

when warned of his imminent arrest, and was eventually forcibly removed by police officers and

carried out of the clinic.  (Hutt Bodycam Video at 1:42:47–46:19; Lacaya Bodycam Video at

1:42:00–46:00; Pl's 56.1 ¶¶ 73, 81; Defs' Resp. 56.1 ¶¶ 73, 81.)  Thus, the record establishes that

Connolly engaged in physical obstruction in violation of FACE and the NYSCAA.  *See*

*Mahoney*, 247 F.3d at 283–84 (affirming the district court's finding of liability under the FACE

Act where, during a demonstration, defendant knelt three feet in front of an emergency exit

door); *see also Dugan*, 450 F. App'x at 22 (agreeing with the district court that "the testimony of

the clinic's security guard established that [the defendant] kneeled intentionally in front of [a]

door to block it, thus satisfying the first two elements" of the FACE Act); *see also Cain*, 418 F.

Supp. 2d at 480 (listing "blocking clinic doors by standing directly in front of them" as an

example of physical obstruction (citing *Operation Rescue Nat'l*, 273 F.3d at 194)).[15]

        Defendants spill much ink arguing that because multiple clients were able to enter the

clinic while Connolly blocked the doorway, he could not have rendered passage *unreasonably*

---

        [15] Defendants argue that Connolly did not physically obstruct the doorway but instead, "actually facilitated ease of entry into the clinic" by propping open an interior door that was normally locked.  (*See* RRR Opp'n 10.)  As the Court already explained in its prior Order, this rather generous characterization of Connolly's actions is immaterial as a legal matter, (Op. 27), as what matters is whether Connolly "render[ed] passage to or from" the facility "unreasonably difficult," *see* 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  Further, that the interior door was typically locked does not factor into the analysis, as a FACE violation can occur even where defendants obstruct locked doors.  *See, e.g.*, *Mahoney*, 247 F.3d at 283–84 (affirming a finding of physical obstruction where the defendant had "positioned himself three feet" from a "rarely used" and "generally locked" door (quotation marks omitted)).  And in any event, FACE proscribes *attempts* to interfere with persons "obtaining or providing reproductive health services[,]" 18 U.S.C. § 248(a)(1), and as discussed Infra Section II.B.2, Connolly's intent to do so is evident from the indisputable facts in the record.

difficult. (*See* RRR Opp'n 10–11; *id.* at 20 (asserting "[t]here was no 'unreasonable' difficulty in access" as "client-after-client *immediately* reached the facility because Connolly 'yield[ed] space for the other person to pass'" (emphasis in original) (quoting *New York ex rel. Underwood v. Griepp*, No. 17-CV-3706, 2018 WL 3518527, at *41 (E.D.N.Y. July 20, 2018), *aff'd sub nom. New York ex rel. James v. Griepp*, 11 F.4th 174 (2d Cir. 2021).) Putting aside that there is no evidence from the video footage that Connolly "yielded space" for anyone to pass, (*see generally* Hutt Bodycam Video; Lacaya Bodycam Video), physical obstruction "need not be permanent or entirely successful" to create liability, *Cain*, 418 F. Supp. 2d at 480 n.18. Instead, "[t]hat patients may *eventually* have reached the Center in spite of defendants' actions is . . . beside the point." *Id.* (emphasis added); *see Gregg*, 32 F. Supp. 2d at 156 ("[A]s long as access is made 'unreasonably difficult or hazardous,' it is not necessary to establish that there was absolutely no way to enter an abortion facility in order to prove a violation of the Act."); *see also United States v. Soderna*, 82 F.3d 1370, 1377 (7th Cir. 1996) (rejecting a narrow reading of physical obstruction as "[c]onfined to forbidding the *complete* blockage of clinic entrances" because otherwise, "the [FACE] Act would be easily evaded, for example . . . by lying down across the entrance so that the entrant has to step—or jump?—over the blockader"); *FemHealth USA, Inc.*, 2022 WL 4241269, at *4 (granting a preliminary injunction and finding that "[a]lthough several people were able to enter and exit the building during this time," the defendants' presence likely "interfered with persons attempting to access the building . . . [and] obtaining or providing reproductive health services").[16] Moreover, given the video evidence demonstrating that

---

[16] Nor is the Court persuaded by Defendants' categorical claim that Connolly did not violate FACE because *Griepp I* established there is no physical obstruction when "someone has to walk around a pro-life advocate while accessing a clinic, incurring a delay of 'one second, at most.'" (RRR Opp'n 14–15 (citing *Griepp I*, 2018 WL 35185247, at *44).) In *Griepp I*, Judge

multiple clients had to step over Connolly's body, angle their own bodies sideways, or receive assistance from law enforcement to enter the clinic, (*see* Hutt Bodycam Video at 12:35, 25:15–25; Pl's 56.1 ¶¶ 71–72; Defs' Resp. 56.1 ¶ 71–72), Defendants' claim that Connolly's presence did not render access "unreasonably" difficult belies the evidence (and common sense) and, therefore, is insufficient to avoid liability, *see Gregg*, 32 F. Supp. 2d at 156 (finding "defendants made ingress into [the facility] unreasonably difficult, in that persons seeking to enter [the facility] had to step or climb over the bodies of defendants as they blocked the entrances"); *see also Kraeger*, 160 F. Supp. 2d at 376 (finding physical obstruction where defendants "ma[de] it very difficult for patients to maneuver around them").

e.  Gies

As for Gies, the record establishes that she also engaged in physical obstruction at All Women's Care. Specifically, it is undisputed that Gies knelt in an interior door between the waiting room and a hallway, (Ex. 6 Clinic Video at 00:01–24), before crawling into the clinic hallway where she sat on the floor, shouting at clinic staff, (*id.* at 1:01–13:26). Gies remained on the floor even after she was told she would be arrested, (Manhasset Tr. 371:4–73:7; Ex. 6 Clinic Video at 1:04–3:26; Pl's 56.1 ¶ 30; Defs' Resp. 56.1 ¶ 30), and repeatedly informed staff and police "I am not leaving," (Manhasset Tr. 249:1–24), before she was eventually forcibly removed in a stair-chair by police officers, (Manhasset Tr. 372:9–73:7; Pl's 56.1 ¶ 31; Defs' Resp. 56.1 ¶ 31). Because the record demonstrates that Gies physically obstructed a doorway

---

Amon determined—based on the specific facts in that case—there was no physical obstruction when a protester approached a patient outside a clinic, causing the patient to "deviate slightly from [her] path to get around [the protester]," because that slight deviation did not make access "unreasonably difficult or hazardous." 2018 WL 3518527, at *44. Those facts are a far cry from Connolly's actions here, which, as described above, forced patients to clamber over and around his kneeling and eventually prostrate form.

and hallway within All Women's Care, the Court concludes that she "rendered passage . . . unreasonably difficult" in violation of FACE and the NYCAA.  *See* 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d); *see also Dugan*, 450 F. App'x at 22 (concluding a defendant violated FACE when he knelt "directly in front of the door so the door could not have opened" and was removed by police after he "refused to move"); *Gregg*, 32 F. Supp. 2d at 156 (finding physical obstruction where a defendant "entered [clinic] premises and lay prone on the stairway and hallway"); *Cain*, 418 F. Supp. 2d at 480 (noting that "blocking clinic doors by standing directly in front of them" is physical obstruction "sufficient to create liability under FACE").

Gies, however, engages in some rather strained statutory interpretation to argue that she did not violate FACE, because: (i) FACE only prohibits physical obstruction of facility *entrances*, (Gies Opp'n 9–11, 19–20); (ii) a "facility" for purposes of FACE does not include "an interior waiting room," (*id.* at 13); and (iii) FACE only prohibits "actual material or bodily (not constructive)" obstructions, (*id.* at 12, 15–16).  In other words, Gies asserts that she cannot be liable under the plain text of the statute because her actions inside the clinic waiting room did not actually obstruct the entrance of the facility.  (*See id.* at 9, 25–27.)  The Court is unpersuaded.

First, under Gies' argument, taken to its logical conclusion, someone seeking to prevent access to a clinic could avoid liability under FACE simply by entering a clinic, moving a few feet back from the entrance, and setting up a blockade there that, while allowing people to enter the doorway, prevents them from reaching the rest of the facility.  Although such an act would plainly constitute "rendering impassable ingress to or egress from a facility that provides reproductive health services or . . . rendering passage to or from such a facility . . . unreasonably difficult or hazardous," 18 U.S.C. § 248(e)(4), under Gies' restrictive interpretation, it could not be a FACE violation.  Nothing in the text of the statute compels such an absurd result.  *See CSX*

*Transp. Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 471 (2d Cir. 2018) ("A statute should be interpreted in a way that avoids absurd results." (internal citations and quotation marks omitted)); *cf. Soderna*, 82 F.3d at 1377 (cautioning against restrictive readings of FACE that would allow it to be "easily evaded," because "[i]f as we believe the government is allowed to prohibit the obstruction of access to abortion clinics, it must be allowed to define 'obstruction' with sufficient breadth to make the prohibition effective"). Indeed, such an interpretation is inconsistent with the plain text of the statute. *See Gregg*, 32 F. Supp. 2d at 156 (concluding defendants engaged in physical obstruction where, inter alia, they "entered the premises and lay prone on the stairway and hallway"); *see id.* at 153 (noting that some defendants "blocked access to [the clinic at issue] by placing themselves inside the clinic building on the second floor landing in front of the clinic's patient waiting room entrance and office area"); *cf. Mahoney*, 247 F.3d at 284 (noting that FACE "does not distinguish between frequently used and infrequently used means of egress").[17]

Second, it similarly defies logic that a "facility" for purposes of FACE cannot include an "interior waiting room" because "[a] waiting room, by itself, does not provide reproductive health services." (*See* Gies Opp'n 13–14.) As the OAG points out, medical facilities frequently include waiting rooms, "in which patients wait to receive such [reproductive health] services."

---

[17] Gies attempts to distinguish *Gregg* by noting that "the question of whether blocking something other than ingress and egress to the facility entrances 'blocked access' for purposes of FACE was apparently never raised and was certainly not discussed in the opinion" and thus, "*Gregg* is not precedent on the issue of whether 'occupying' a facility, while not blocking access to the facility itself, violates FACE." (Gies Opp'n 18.) To the contrary, the Court assumes that said argument was not raised because its invalidity was self-evident from a plain reading of the statute's text. In other words, the fact that an absurd argument was not raised in a case does not, by itself, nullify that case's precedential worth as applied to that particular argument. Moreover, the Court notes Gies does not point to a single case where a court concluded FACE applies *only* to facility entrances.

(Reply to Gies 4.)  Moreover, Gies offers no support for the claim that FACE liability is to be parsed room by room.  Instead, the statutory definition of "facility" demonstrates that it covers not only "the building or structure in which the facility is located[,]" but also "clinic[s], physician's office[s], or other facilit[ies] that provide[] reproductive health services," 18 U.S.C. § 248(e)(1)—i.e., the facility as a whole—and Gies identifies no caselaw where a court concluded FACE did not apply because of the specific room (or hallway) in which the obstruction occurred.

Third, as discussed extensively above, the claim that Gies and the other Defendants engaged only in "constructive obstruction" is conclusively refuted by the video and other undisputed evidence.  The record plainly demonstrates that Gies engaged in a physical obstruction by kneeling in and blocking an interior door in the clinic, crawling around in the hallway and refusing to leave, and forcing law enforcement to physically carry her out of the building, blockading clinic entrances in the process.  (*See* Supra Section I.A.2.)

### f.  Red Rose

Finally, as to Red Rose as an organization, the record is also clear that members of that organization engaged in physical obstruction in violation of FACE and the NYCAA.  First, as discussed above, the Individual Defendants engaged in physical obstruction during their participation in the RRR's at All Women's Care and All Women's Medical.[18]  Additionally, the photographic and video evidence in the record depicts two female RRR participants, along with

---

[18] The Court does not impute Moscinski's conduct at the Hempstead Planned Parenthood to Red Rose, as the record demonstrates that Moscinski was acting independently at that blockade.  (Video of Franciscan Friar Arrest at 1:04–18 (Moscinski explaining that "the reason I was acting on my own [in connection with the Planned Parenthood blockade] was I didn't want to get anyone else implicated or involved in a possible violation of federal or state law, which could potentially have some severe consequences").)

Connolly, blocking the interior doorway of the clinic, refusing staff member requests that they leave.  (Ex. 1 Clinic Photograph; Ex. 2 Clinic Video at 00:01–6:10.)  Further, the video evidence shows an unnamed female RRR participant at the All Women's Medical invasion: engaging two women who are approaching the clinic; remaining in front of them as they approach the clinic door such that they need to stop walking; standing in the way of the door so that they cannot enter; remaining in place until a security guard or police officer opens the door from the inside to let the women in; and then following the women inside the clinic.  (Pullman Reply Decl. in Supp. of PI, Ex. 3 at 2:00–27; Pullman Reply Decl. in Supp. of PI, Ex. 4 at 4:31–45.)  Other video footage from that day shows the same unnamed female RRR participant inside the vestibule, approaching a patient who entered the vestibule and standing directly in front of her, repeatedly blocking her path to the entrance, until the patient objects, "Excuse me, can you not come in my face?"  (Hutt Bodycam Video at 12:23–27; Pl's 56.1 ¶¶ 58–59; Defs' 56.1 ¶¶ 58–59.)  These incidents undeniably constitute physical obstruction.  *See Cain*, 418 F. Supp. 2d at 480 (finding physical obstruction in violation of FACE where defendants "st[ood] directly in front of a patient and prevent[ed] her from approaching the clinic" and "st[ood] directly in front of the [clinic] door and refuse[d] to move until a security guard approache[d]"); *see also Kraeger*, 160 F. Supp. 2d at 376 (finding physical obstruction where defendants "crowd[ed] patients, walk[ed] very closely to them, and step[ped] in their way, making it very difficult for patients to maneuver around them"); *cf. Scott*, 958 F. Supp. at 772, 776–77 (finding the evidence did not support a FACE violation where the defendant "never stopped the forward progress of an individual seeking reproductive services").

37

Although Defendants do not seriously dispute these facts,[19] they claim that any physical obstruction cannot be imputed to Red Rose as an organization, as "[t]here is no evidence that the specific conduct of the pro-life advocates in the vestibule or on the sidewalk outside the White Plains clinic was authorized or directed by Red Rose Rescue."[20]  (RRR Opp'n 12; *see also id.* ("There is no claim of conspiracy according to which Goodman in the waiting room, or Connolly in the vestibule, would be liable for what unidentified non-party pro-life advocates allegedly did in the vestibule or on the sidewalk.").)  As an initial matter, Defendants cite no case law for the proposition that an organization can be held liable for the acts of its members or affiliates only if the organization *specifically* authorized the conduct at hand.  (*See generally* RRR Opp'n.) Further, per a declaration submitted by Monica Miller, the founder of Red Rose, anyone is free to conduct a Red Rose Rescue anywhere by following its concept.  (Miller Decl. in Opp'n to PI ¶ 2 (Dkt. No. 40).)  Moreover, Miller has attested that "many RRRs happen all over the country with no input from [her.]"  (*Id.*)  Thus, by Defendants own admission, a lack of evidence that

---

[19] Defendants do assert, in a conclusory fashion, that the unnamed female participant "never stopped the forward progress" of the two women and never "'barricaded' the door," as it "freely opened from the inside."  (RRR Opp'n 11.)  But this argument—again—ignores that an obstruction need not be permanent to be successful.  *See Cain*, 418 F. Supp. 2d at 480 n.18; *Kraeger*, 160 F. Supp. 2d at 373.  Further, Defendants' self-serving characterization of these events is belied by the video evidence, which plainly depicts the participants standing in front of the two clients so that they need to stop walking, standing in front of the door so that they cannot enter, and remaining there until a security guard opens the door from the inside, which allowed the women inside.  (Pullman Reply Decl. in Supp. of PI, Ex. 3 at 2:00–27; Pullman Reply Decl. in Supp. of PI, Ex. 4 at 4:31–45.)  Defendants do, however, concede that the unnamed female participant "prevent[ed] the forward progress of [a] client in the vestibule."  (RRR Opp'n 12.) That alone is sufficient to establish physical obstruction as defined by FACE and the NYSCAA. *See Cain*, 418 F. Supp. 2d at 480.

[20] Defendants appear to concede that *Moscinski's* conduct during the invasion at All Women's Medical, at the least, can be imputed to Red Rose.  (*See* RRR Opp'n 12 n.2 (acknowledging that "Moscinski did tell police he was affiliated with Red Rose Rescue").)

Red Rose specifically authorized these specific participants' specific actions does not demonstrate that the participants were *not* acting on behalf of Red Rose.

Moreover, the record contradicts Defendants' claim that the unidentified participants in the All Women's Medical RRR were not Red Rose members. (*See* Pullman Reply Decl. in Supp. of PI, Ex. 10 ("LifeNet: Red Rose Rescue Comes to White Plains, NY") (Dkt. No. 43-11).) The individuals depicted in the video and photographic evidence all carried red roses and entered the facility in a coordinated group with Connolly, behind Moscinski and Goodman. (Ex. 1 Clinic Photograph; Ex. 2 Clinic Video at 00:01–6:10; Hutt Bodycam Video at 5:19–9:18.) The other unnamed members—including the female participant described above—remained in the vestibule with Connolly, intermittently offering him support as he knelt in the doorway. (Hutt Bodycam Video at 5:19–9:18, 1:30:35–31:55; Lacaya Bodycam Video at 1:42:50–43:31.) Moreover, Moscinski, who informed law enforcement that he organized the clinic invasion (Lacaya Bodycam Video at 22:28–45), admitted to the group being affiliated with Red Rose, (*id.* at 34:35–40). Thus, Defendants' conclusory assertions aside, it is unreasonable to infer that the unnamed participants in the invasion were unaffiliated with Red Rose, and instead, just happened to be in the same place at the same time. *See 183 Bronx Deli Grocery Corp. v. United States*, No. 11-CV-1527, 2012 WL 2359664, at *3 (S.D.N.Y. June 18, 2012) ("The non-movant cannot avoid summary judgment simply by asserting a metaphysical doubt as to the material facts, and may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." (emphasis added) (citations and quotation marks omitted)).

### 3.  Remaining FACE Act and NYSCAA Factors

The record also establishes that Defendants intended to interfere with patients and staff because the interfered-with individuals were seeking, or providing, reproductive health services.

Under both the FACE Act and the NYSCAA, the phrase "'interfere with' means to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2); *see* N.Y. Penal Law § 240.70(3)(b) (same).  In addition, "the term 'facility' includes a hospital, clinic, physician's office, or other facility that provides reproductive health services, and includes the building or structure in which the facility is located[,]" 18 U.S.C. § 248(e)(1); *see* N.Y. Penal Law § 240.70(3)(a) (defining "health care facility" in the same terms), and, in turn, "'reproductive health services' means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy[,]" 18 U.S.C. § 248(e)(5); *see* N.Y. Penal Law § 240.70(3)(e) (similar).

First, as for the threshold intent requirement—that the physical obstruction was "intentionally undertaken to . . . interfere with [or to attempt to interfere with] a person," *Cain*, 418 F. Supp. 2d at 473 (citing 18 U.S.C. § 248(a)(1)); *see also* N.Y. Penal Law § 240.70(1)(a)— "[D]efendant[s'] purpose in engaging in obstructive acts is irrelevant," *Kraeger*, 160 F. Supp. 2d at 374 (citing *United States v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1998)).  The Second Circuit has made clear that when defendants claim that the objective of their obstructive acts was "to save the lives of unborn children[,]" "[n]o matter what their ultimate purpose . . . may have been, the defendants do not deny—nor could they plausibly deny—that they meant to block the entrances to the [clinic at issue] and that they did so because they wished to prevent the clinic from performing abortions."  *See Weslin*, 156 F.3d at 298; *see also Operation Rescue Nat'l*, 273

40

F.3d at 194 ("Although the protestors' purpose may have been to communicate their views, their activities had the effect of obstructing access to the facilities [at issue] and making egress and ingress unreasonably difficult for patients."); *Dugan*, 450 F. App'x at 22 (citing *Weslin* and determining "the district court was entitled to infer from [the defendant's statements that his actions were motivated by his general sympathy for the cause of protesters that were out in front of a Planned Parenthood clinic] that [the defendant] had acted with the requisite motive").

Here, on this record, Defendants cannot plausibly deny they engaged in the acts at issue because they meant to interfere with—or block—the entrances to the clinics. (*See, e.g.*, Pl's 56.1 ¶ 107; Defs' Resp. 56.1 ¶ 107 (Moscinski admitting that his "main motivation" for blockading the Hempstead clinic "was to keep that Planned Parenthood closed for as long as possible"); Hempstead Tr. Excerpts 91:16–92:22 (same); Manhasset Tr. 355:8–22, 345:24–25 (Gies testifying that her "goal" was to stay in in All Women's Care as long as possible "to help stop abortion for the day," because "[a]s long as [she] was there [she] was hoping that there would be less abortions or no abortions"); Pullman Decl. in Supp. of Mot. for PI, Ex. F at 3 (Dkt. No. 26-6) (Gies stating that RRRs are "effective" because "the majority of the time, you're able to occupy the staff and the police so long that you keep them from actually committing abortions for the entire day"); Manhasset Tr. 382:10–83:7 (Hinshaw testifying that he refused to leave All Women's Care unless police officers "d[id] their job protecting innocent human life" and stopped the clinic from performing abortions"); Red Rose Mission Statement 2 ("If possible, Red Rose rescuers will not walk out of an open abortion mill but will remain in solidarity with the innocent unborn scheduled for execution.").) Accordingly, the Court concludes that no genuine dispute of material fact exists as to this element.

As for the last element—that Defendants intentionally interfered with individuals because those individuals were seeking, or providing, reproductive health services—the Court noted in its prior Order that "there can be no doubt that these Defendants engaged in the acts at issue in this case at the clinics they chose because those clinics perform abortions."  (Op. 42.)  The full record on summary judgment, as described above, decisively supports that conclusion.  (*See, e.g.*, Red Rose Mission Statement 1 (stating that RRR participants "peacefully talk to women scheduled for abortion, with the goal of persuading them to choose life"); Miller Decl ¶ 5 (noting the RRR's participants' "goal is to persuade women to change their minds and leave the abortion facility"); Hempstead Tr. Excerpts 92:3–7 (noting Moscinski "admitted that they targeted that particular building because they performed abortions at the clinic"); Pullman Decl. in Supp. of Mot. for PI, Ex. C, at 10:00–38 ("We've done over thirty Red Rose Rescues since Sept of 2017 . . . . And our experience is, that as long as there is a pro-life presence in the abortion clinic, the abortions are halted."); Manhasset Tr. 355:8–22 (Gies admitting her goal was to stay inside the clinic as long as possible to stop abortions from being performed); Manhasset Tr. 345:24–25 (Gies testimony that "[a]s long as I was there I was hoping that there would be less abortions or no abortions").)

~*~*~*~

In sum, the OAG has demonstrated that there is no genuine dispute of fact as to any of the elements of liability under FACE and the NYSCAA as to each of the Defendants. Accordingly, summary judgment is warranted.

### 4.  Constitutional Challenges

In an attempt to ward off summary judgment, however, Defendants raise two constitutional challenges to FACE, arguing that first, FACE exceeds Congress's authority to

regulate interstate commerce, (*see* RRR Opp'n 23; Gies Opp'n 27–28), and second, that applying FACE here violates the First Amendment as such application is based solely "on Defendants' *expressive viewpoint*," (RRR Opp'n 28–29). Neither argument succeeds.

        a.  Commerce Clause

First, Defendants argue that their "purely local, non-violent conduct did not involve channels or instrumentalities of interstate commerce, nor '*substantially* affect' interstate commerce." (*See* RRR Opp'n 24 (emphasis in original) (citing *United States v. Lopez*, 514 U.S. 549, 558–59 (1995)); *see also* Gies Opp'n 27–28.) Specifically, Defendants argue that "Congress may not penalize local conduct by arguing that, in the national aggregate, it substantially affects interstate commerce." (RRR Opp'n 24–25 (citing *United States v. Morrison*, 529 U.S. 598, 613 (2000)); *see also* Gies Opp'n 27–28.)

Fatal to this argument, however, is that the Second Circuit has already addressed and squarely rejected it, holding instead that the "FACE [Act] is a valid exercise of Congress's power under the Commerce Clause." *Weslin*, 156 F.3d at 296. When considering this issue, the Second Circuit noted that Congress had a "rational basis" to conclude that "the activities governed by FACE affect interstate commerce," as the legislative history demonstrated that "Congress specifically found that 'women travel interstate to obtain reproductive health services,'" *id.* (quoting H.R. Rep. No. 103–306 at 6 (1993), U.S. Code Cong. & Admin. News at 699, 70), and that "clinics purchase medical and other supplies in interstate commerce," *id.* (citing S. Rep. No. 103–117 at 31). Nor is the Second Circuit the only circuit to reach this conclusion. Indeed, all other circuits to consider the issue—including those considering it post-*Morrison*—have likewise held that the reproductive health provisions of FACE were validly enacted under the Commerce Clause. *See, e.g.*, *Norton v. Ashcroft*, 298 F.3d 547, 559 (6th Cir. 2002); *Gregg*, 226 F.3d at 267;

*Hoffman*, 126 F.3d at 588; *United States v. Bird*, 124 F.3d 667, 682 (5th Cir. 1997); *Soderna*, 82 F.3d at 1379; *United States v. Dinwiddie*, 76 F.3d 913, 920 (8th Cir. 1996); *Terry v. Reno*, 101 F.3d 1412, 1418 (D.C. Cir. 1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995); *United States v. Wilson*, 73 F.3d 675, 688 (7th Cir. 1995).[21]

This Court is bound to apply Second Circuit precedent "unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or [Second Circuit]." *United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009); *see also United States v. Williams*, 701 F. Supp. 3d 257, 269 (S.D.N.Y. 2023) (rejecting a Commerce Clause challenge to the FACE Act). Accordingly, because the Second Circuit has already determined FACE's validity under the Commerce Clause, Defendants' arguments must be rejected.

### b. First Amendment

Defendants' second constitutional challenge fares no better. Defendants claim that their conduct is "unquestionably expressive," and as such, FACE's application here is impermissibly based upon their "expressive viewpoint, not simply their mere presence as trespassers." (RRR Opp'n 28–29 (emphasis removed).) In other words, Defendants assert that because they were simply "trespasser[s] who [sat] in a clinic waiting room," the only way to impute FACE liability

---

[21] Tellingly, Defendants do not cite or acknowledge this caselaw, instead relying entirely on a dissent from an out of circuit case, *Bird*, 401 F.3d at 634 (DeMoss, J., dissenting), *cert. den. Bird v. United States*, 546 U.S. 864 (2005), and a concurrence from a Second Circuit case that addressed a *different* portion of the FACE Act regulating places of religious worship, *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 62 (2d Cir. 2021), *cert. denied*, 214 L. Ed. 2d 17, 143 S. Ct. 90 (2022). Moreover, Judge Walker's concurrence in *Jingrong* specifically contrasted the religious worship provision with the provision "prohibit[ing] violence at abortion clinics," noting that, for the latter, Congress made specific "legislative findings that women, doctors, and medical supplies may travel interstate for reproductive health services." 16 F.4th at 66. Accordingly, Defendants' reliance on Judge Walker's concurrence is misplaced. *See United States v. Williams*, 701 F. Supp. 3d 257, 270 (noting that "Judge Walker's concurrence [in *Jingrong*] therefore does not . . . undermine *Weslin*").

to them here is bootstrap their "pro-life intentions for being there" into "a magical 'physical obstruction.'"  (*Id.* at 28; *see also id.* (arguing this "conflates [having] a pro-life motive with the requisite intent to create a physical obstruction" (emphases removed).)

Again, crucially, Defendants' argument is premised on the notion, contradicted by the undisputed evidence, that they were passive trespassers during the rescues and thus, the only way to find "physical obstruction" is to examine their motives to shut down clinic operations.[22]  As detailed exhaustively above, Defendants were no mere trespassers but instead, created actual, physical obstructions.  (*See* Supra Section II.B.2.)  What matters for the purposes of FACE liability is that they deliberately engaged in such obstructive conduct; their motives for doing so are irrelevant.  *See Kraeger*, 160 F. Supp. 2d at 374 ("[D]efendant[s'] purpose in engaging in obstructive acts is irrelevant." (citing *Weslin*, 156 F.3d at 298)); *see also Operation Rescue Nat'l*, 273 F.3d at 194 ("Although the protestors' purpose may have been to communicate their views, their activities had the effect of obstructing access to the facilities [at issue] and making egress and ingress unreasonably difficult for patients.").  Thus, imputing FACE liability to Defendants here based upon their physically obstructive behavior is not targeting their speech based upon its content.  *See Weslin*, 156 F.3d at 296–97 (explaining that "[the] FACE [Act] does not discriminate on the basis of content" because, inter alia, "'pro-choice' protestors as well as 'pro-life' protestors come within the terms of the statute[,]" as it "applies to those who would interfere with the provision of counseling at a clinic in which patients are encouraged not to have abortions"); *see also United States v. Gallagher*, 680 F. Supp. 3d 886, 900 (M.D. Tenn. July 3, 2023) ("Insofar as the [FACE] Act does incidentally touch on speech, . . . it makes no content-

---

[22] Defendants acknowledge that this argument cannot extend to Moscinski's actions at the Hempstead clinic.  (*See* RRR Opp'n 28 n.6.)

based distinction. The FACE Act is not only neutral as between interference by supporters and opponents of abortion, but neutral on the question of whether a perpetrator's moral position on reproductive healthcare was even part of his motivation at all.  All that matters is that the defendant by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been[] . . . obtaining or providing reproductive health services—for any reason, including entirely personal, apolitical ones." (citation and quotation marks omitted)).[23]

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion is granted.  The Court will hold a telephonic status conference in this case on April 23, 2025, at 2:00 PM ET to discuss remedies.  (*See* Dkt. No. 82 (stipulating to a bifurcation of liability and remedies).)

---

[23] Defendants' attempt to analogize this case to *United States v. Lee*, 6 F.3d 1297 (8th Cir. 1993) (en banc), is unavailing.  In *Lee*, a defendant was convicted of conspiracy against civil rights in violation of 18 U.S.C. § 241 (1988) after he burned a cross near an apartment complex wherein numerous Black families resided.  6 F.3d at 1297.  Although concluding that § 241 was content neutral, the Eighth Circuit considered whether "[§] 241, as applied, violates the First Amendment by punishing the expressive act of cross burning."  *Id.* at 1299 (Gibson, J., concurring).  Specifically, the Eighth Circuit examined whether the jury instructions—which stated "the defendant's actions must be taken with the specific intent to intimidate or interfere"— "relie[d] on the subjective reactions of residents who witnessed the cross burning."  *Id.* at 1300–01.  The Eighth Circuit thus concluded that "the conviction rested entirely on speech, and not on separately identifiable conduct," *id.* at 1301, and accordingly, "as applied under the jury instructions of [the] case, section 241 targeted conduct which . . . [was] protected expressive conduct," *id.* at 1302.

Defendants argue that *Lee* applies because the only "physical obstruction" here "arises from others' reactions to expressive conduct"—i.e., the clinic staffers cancelling or moving appointments.  (*See* RRR 29–30 (emphasis removed).)  Once again, Defendants' claim that their actions never restricted freedom of movement by *persons* is belied by the record.  And unlike the facts in *Lee*, Defendants' liability under FACE relies on that "separately identifiable conduct"— i.e., the actual physical obstructions—and not "entirely on speech."  6 F.3d at 1301.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 84, 85, 88), and enter judgment for Plaintiff.

SO ORDERED.

Dated:    March 21, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

47