UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X     Case No. 7:23-cv-04832

People of the State of New York, by LETITIA JAMES,
Attorney General of the State of New York,

                                        Plaintiff,

            -against-

RED ROSE RESCUE, CHRISTOPHER MOSCINSKI,
MATTHEW CONNOLLY, WILLIAM GOODMAN, LAURA
GIES, JOHN HINSHAW, AND JOHN AND JANE DOES, the
last two named being fictitious names, the real names of such
persons being currently unknown but who are active in Red
Rose Rescue or act in concert with the above-named individuals
or organization to engage in, or who will engage in, the conduct
complained of herein,

                                        Defendants.

-----------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL



**LETITIA JAMES**
New York State Attorney General
28 Liberty St., 20th Floor
New York, New York 10005
(212) 416-8250

By:     /s/ Sandra Pullman
            Sandra Pullman
            Senior Counsel, Civil Rights Bureau
            Julia Toce
            Assistant Attorney General
            Heather McKay
            Assistant Attorney General
            Zoe Ridolfi-Starr
            Assistant Attorney General

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................... 1

LEGAL STANDARD ....................................................................................................... 10

ARGUMENT ................................................................................................................... 10

(1) Plaintiff's requests for production of documents are undeniably relevant ............................... 11

Request No. 4 ....................................................................................................... 11

Request No. 6 ....................................................................................................... 14

Request No. 7 ....................................................................................................... 16

Request No. 8 ....................................................................................................... 18

(2) Plaintiff's proposed search terms are proportional to the needs of the case............................. 19

(3) Defendants' wholesale refusal to engage in any ESI discovery is incompatible with their professional obligations and inconsistent with well-settled discovery protocols ............................ 20

(4) Plaintiff's interrogatories seek relevant and nonprivileged information ................................... 22

CONCLUSION ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................................................14

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*,
459 U.S. 87 (1982)................................................................................................14

*Buckley v. Valeo*,
424 U.S. 1 (1976)................................................................................................14

*Evergreen Ass'n, Inc. v. Schneiderman*,
153 A.D.3d 87 (2017)................................................................................................14

*FCX Solar, LLC v. FTC Solar, Inc.*,
No. 21-cv-03556 (RA)(VF), 2022 WL 3584946 (S.D.N.Y. Aug. 22, 2022)..........10

*Gibson v. Fla. Legislative Investigation Comm.*,
372 U.S. 539 (1963)................................................................................................14

*Ohio v. Reiner*,
532 U.S. 17 (2001)................................................................................................23

*OSRecovery, Inc. v. One Groupe Intern., Inc.*,
262 F. Supp. 2d 302 (S.D.N.Y. 2003)................................................................23

*William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
256 F.R.D. 134 (S.D.N.Y. 2009)................................................................21

**Constitution**

First Amendment ................................................................................................3, 14, 19, 23

Fifth Amendment ................................................................................................23

**Federal Statutes**

Access to Clinic Entrances Act, 18 U.S.C.
§ 248................................................................................................passim

**State Statutes**

New York Clinic Access Act, N.Y. Civ. Rights Law
§ 79-m ...................................................................................................................2, 10

**State Regulations**

N.Y. Comp. Codes R. & Regs.
tit. 22, § 202.12(b)..................................................................................................21

State Bar of California Standing Committee on Professional Responsibility and Conduct,
Formal Op. No. 2015- 193 ......................................................................................21

**Rules**

Federal Rule of Civil Procedure 26 ............................................................................10

Federal Rule of Civil Procedure Rule 65 .............................................................12, 17

## PRELIMINARY STATEMENT

As this Court knows, the parties agreed to conduct discovery on remedies, following the liability stage, should Plaintiff prevail on its claims as to any of the Defendants.  Dkt. No. 82. Plaintiff has since prevailed on all its claims against all Defendants. Dkt. No. 139.  Nonetheless, in the seven months since Plaintiff issued document requests related to remedies, none of the Defendants have produced any discovery whatsoever.  They engaged in discussions about search terms and numbers of hits in fits and starts, at the urging of this Court in multiple, lengthy conferences, but each time they ultimately maintained that Plaintiff is entitled to no information at all.  Their position is factually and legal untenable.

Plaintiff now moves to compel production of documents in response to four of its nine requests, as well as responses to its two interrogatories.

## FACTUAL BACKGROUND

On December 15, 2023, Judge Karas granted a preliminary injunction barring all Defendants, including named entity Red Rose Rescue, and all other persons, known or unknown, acting on their behalf or in concert with them, and receiving actual or constructive notice of the Order, "from knowingly being present within fifteen feet of any . . . entrance of any" reproductive health care clinic "with the intent to injure, intimidate, or interfere with any person" obtaining or providing reproductive health services.  Dkt. No. 62.

Thereafter, based in part on Defendants' agreement not to challenge the status of Red Rose Rescue as a legal entity capable of being sued or bound by an injunction, the parties agreed to bifurcate the case and forego discovery on liability.  Dkt. No. 82.  According to the stipulation, discovery on remedies would continue "solely as to remedies for those defendants found liable—

1

including damages, penalties, and the scope of the injunction—and then proceed to briefing and/or an evidentiary hearing on remedies, for a final determination by the Court." *Id.* Plaintiff agreed to "pursue written discovery in the first instance, including Requests for Admissions, in an effort to obviate the need for direct party of witness testimony." *Id.*

Before they received a ruling on liability, the parties litigated the meaning of the intent language in the preliminary injunction, as well as the extent to which individuals who are affiliated with Red Rose Rescue are covered by an injunction against it. Between September 2024 and March 2025, Judge Karas presided over multiple hearings on Plaintiff's motion for contempt based on new activity within the buffer zone at a reproductive health clinic in Manhattan. *See* Dkt. No. 100-137. Ultimately, the District Court found that the individual did not appear to possess the requisite intent to violate the injunction, and denied the motion, calling it a "close call." *See* Pullman Decl. Ex. A (Contempt Hearing Tr. at 72:25-73:1). He did not reach the question of whether the individual was covered by the injunction against Red Rose Rescue at the time she entered the buffer zone.

Judge Karas then granted Plaintiff's motion for summary judgment on March 21, 2025, finding all Defendants, including Defendant Red Rose Rescue, liable for violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248 and the New York Clinic Access Act, N.Y. Civ. Rights Law § 79-m. Dkt. No. 139. Citing to the parties' stipulation to bifurcate discovery, Judge Karas' Order granting summary judgment set a telephonic status conference for April 23, 2025. *Id.* At that conference, the parties proposed and the Court agreed that Plaintiff would propound written discovery demands by May 9, 2025. *See* Minute Entry 4/23/2025. The Court did not bar the parties from issuing any additional discovery demands or otherwise set an end date for discovery.

On May 9, 2025, Plaintiff served requests for documents on all parties.  *See* Pullman Decl. Ex. B (Plaintiff's Document Demands).  On June 9, 2025, all Defendants provided written responses to Plaintiff's document demands.  *See* Pullman Decl. Ex. C (Defendants' Discovery Responses).  Each Defendant raised numerous objections to the requests, and not one turned over any responsive documents.  To date, half a year later, Defendants have still failed to turn over a single responsive document, despite agreeing to conduct discovery, Dkt. No. 82, acknowledging that responsive, non-privileged documents exist, and despite numerous conversations with counsel, letters to the Court, and conferences with the Court, as described below.

As directed by Judge Krause, the parties filed a joint status letter on June 13, 2025, outlining Defendants' refusal to engage in discovery.  Dkt. No. 143.  There, counsel for Hinshaw, Goodman, Connolly and Red Rose Rescue asserted that they "cannot possibly be expected to conduct a search over the past eight years . . ." for certain documents, accused Plaintiff of purposefully attempting to violate the parties' Stipulation, and asserted sweeping First Amendment protections for documents.  *Id.*  Notably, although all Defendants have complained that Plaintiff's requests are overbroad, they have never suggested any reasonable limitations.

On June 27, 2025, Plaintiff met and conferred with Defendant Gies for an hour-long conversation.  In this conversation, counsel revealed that, despite Defendant Gies' claim to have no responsive documents, she had in fact identified at least one responsive social media post about her RRR activities that had not been turned over.  *See* Dkt. No. 144.  Counsel also described the difficulty in having her client manually search through emails, revealing that the parties were not using an ESI platform or any software at all to collect and review communications.  Though the hour-long phone call on June 27 ended with specific steps that counsel agreed to take to collect and review documents, counsel for Defendant Gies wrote

Plaintiff on June 30 that she had not been giving her undivided attention during the call and, contrary to her prior commitment, that she was not going to "badger" her client to search for any responsive documents. *Id.*

On August 1, 2025, Defendant Gies served amended discovery responses that simply removed the inaccurate representations she had made that "no responsive documents are in her possession, custody, or control." *See* Pullman Decl. Ex. D (Gies Amended Responses). Defendant Gies has never turned over the social media post identified as relevant and responsive, nor has she turned over any other responsive documents.

Following a request from Plaintiff and subsequent communication from all parties, *see* Dkt. No. 144-51, the Court held an in-person conference on July 29, 2025. In that conference, Plaintiff outlined three areas of inquiry that it intended to probe with its discovery demands: 1) who is covered by the injunction, meaning "who is Red Rose Rescue"; 2) what does the injunction cover; and 3) where the injunction should apply. *See* Pullman Decl. Ex. E (Discovery Conf. July 29, 2025 Tr. at 5-6).

At this hearing, Mr. Ferrara repeatedly stated that the Attorney General had actual knowledge of every person identified with RRR except for two. Pullman Decl. Ex. E at 21, 56. He even suggested to the Court that he would identify the two unknown people: "Suppose we were to say, without prejudice to our position, that none of these people should be subject to the injunction, here is a list of everybody that we know of that has ever participated in a Red Rose Rescue . . ." Pullman Decl. Ex. E at 64:16-19.

Mr. Ferrara also repeatedly asserted that the preliminary injunction applies to "those four defendants," meaning only the four individual defendants, and that remedies "are to be directed solely against the four Defendants found liable," repeatedly omitting Red Rose Rescue as a

Defendant found liable. *See* Pullman Decl. Ex. E at 24:7; 25:18-19. Based on counsel's repeated mischaracterizations, the Court clarified, "[o]kay, but – you keep saying that, but I mean, one of the Defendants found liable is Red Rose Rescue, right?" *Id.* at 25:20-22. Later in the hearing, the Court had cause to reiterate that Red Rose Rescue as an entity is subject to the injunction, stating, "but you stipulated that there would be discovery as to the remedies for those defendants found liable . . . which Red Rose Rescue was. Found liable . . . And so you stipulated there would be discovery as to the remedies, including damages, penalties, and most relevant here, the scope of the injunction." *Id.* at 62:15-23. The Court then continued to query, with no satisfactory response from defendants, on what grounds defendants could withhold discovery about the entity Red Rose Rescue. *Id.* at 62-64.

Then, after proposing and agreeing to disclose the two unknown individuals in Court, Mr. Ferrara subsequently refused to identify the two unknown actors. *See* Pullman Decl. Ex. F (Discovery Conference September 8, 2025 Tr. at 50:15-18) ("I believe they have the right to their associational privacy and that their names, if they have nothing to do with this case, are none of the Attorney General's business. It's that simple."). In response, Plaintiff propounded interrogatories to Defendants on September 12, 2025, to obtain the names of these two unknown actors who had participated in invasions in New York that have been found to violate the FACE Act. *See* Pullman Decl. Ex. G (Plaintiff's Interrogatories, September 12, 2025).

Also at the July 29 hearing, Mr. Ferrara represented to the Court that there were no future Rescues planned and thus there would be no documents responsive to Plaintiff's request #9:

> THE COURT: We've also talked about number 9 where your response, based on your consultation with Ms. Miller, is, there are no future – and again, I assume you interpreted 'invasion' here to be – you answered this as, there are no future Red Rose rescues . . .
> MR. FERRARA: Exactly.

Pullman Decl. Ex. E at 43:22-44:5.

Two days later, six individuals were charged for conducting a "rescue" in Upland, Pennsylvania, near Philadelphia, including Ms. Miller, with whom Mr. Ferrara reportedly consulted, and Defendant Will Goodman, who is individually represented by Mr. Ferrara. *See* Pullman Decl. Ex. H ("*Red Rose Rescue Shuts Down Abortion Center for the Day*," Red Rose Rescue, Aug. 6, 2025, *accessed at* https://www.redroserescue.com/post/red-rose-rescue-shuts-down-abortion-center-for-the-day).    The group took credit for this coordinated, unlawful trespass, describing the invasion of the clinic on its website and boasting, "Red Rose Rescue Shuts Down Abortion Center for the Day." *Id.*

Meanwhile, following the Court's instructions during the July 29 hearing, the parties held a meet and confer on August 8, 2025.  Defendants provided information about the electronic sources of information in their possession, Plaintiff proposed 67 search terms to identify responsive documents, and Defendants agreed to run the search terms without suggesting any edits or negotiating the terms in any way.  *See* Dkt. No. 153 (Joint Status Letter, August 13, 2025).

Defendants then took some preliminary steps to begin to conduct e-discovery.  For instance, Defendants Connolly, Hinshaw, Goodman, and RRR searched their emails for the proposed search terms and provided, for many of the terms, the number of "hits" or emails with the terms that were identified.  Defendant Gies provided the same on August 19, 2025. *See* Pullman Decl. Ex. I (Plaintiff's First Proposed Search Terms; Defendants' Responses). Plaintiff responded to each with revised terms, removing certain terms that resulted in an excessive number of hits.  *See* Pullman Decl. Ex. J (Plaintiff's Proposed Amended Search Terms).    Based on continued negotiations with counsel for Defendant Gies, the parties furthered narrowed the search terms to 22, five of which were limited to conversations with

6

specific identified people. *See* Pullman Decl. Ex. K (Plaintiff's Second Amended Proposed Search Terms).

The process soon began to unravel again when counsel for Defendants expressed confusion over de-duplicating their search results in order to obtain a more accurate number of responsive documents. Following the parties' August 26, 2025 joint status letter detailing the breakdown of further discussions related to ESI protocol, Dkt. No. 155, the Court held a telephonic conference on September 8, 2025. Much of that discussion surrounded the contours of electronic discovery, with the Court remarking "I was surprised, frankly, that none of the three of you [defense counsel] had heard of the idea of de-duplicating documents." *See* Pullman Decl. Ex. F at 16:24-25. The Court also noted, "I'm at a loss is, you know, what do we do next. You [Defendants] don't really propose anything other than to say they should back off their demands entirely." *Id.* at 17:21-23. The Court also noted that "it's very hard to evaluate those objections [undue burden and proportionality] without some understanding of what the universe of potentially responsive documents is." *Id.* at 34:5-7.

The conference concluded with the Court recommending that Defendants explore ESI platform options. Ms. Short requested that perhaps the OAG could assist in exploring options and Plaintiff's counsel agreed.

Following the September 8, 2025 conference, Plaintiff's counsel inquired internally with the OAG Practice Technologies Bureau to get the name of trusted ESI vendors, and to get a working understanding of the scope of services offered by these vendors. Plaintiff's counsel obtained tips on ways to reduce the overall cost and conducted an online search to collect additional vendor names. Plaintiff relayed this information to Defendants on

September 12, 2025.

Mr. Ferrara and Ms. Short wrote back outright rejecting further discussion of hiring an ESI vendor. *See* Pullman Decl. Ex. L (Ferrara and Short Emails). Ms. Short wrote on September 19, "please understand that the total for all services is not the main problem." *Id.* Mr. Ferrara wrote also on September 19: "Under no circumstances can my clients pay the expenses of an ESI vendor. It's just pointless. We have litigated enough over two sit-ins four years ago with none since in NY. I have no intention of starting a whole new line of argument about ESI expenses. That is a non-issue in this very small case." *Id.*

Though negotiations on search terms with Ms. Short and Mr. Ferrara continued for a time into September, they failed to progress, as Defendants continued to complain about the burden and relevance of the searches and flatly refused to engage an ESI vendor to undergo an accurate review for scope and content. Plaintiff proposed amended search terms on September 18, 2025, and has included with this motion updated proposals for the consideration. *See* Pullman Decl. Ex. M (September Proposed Search Terms); Ex. R, (Plaintiff's Proposed Search Terms, December 5, 2025). To date, Defendants have not made any document productions whatsoever.

Furthermore, though counsel routinely characterizes their clients as "housewives" and "homeless" people with "limited means" these defendants are not representing themselves *pro se*, but are represented by sophisticated and well-resourced counsel, apparently on a *pro bono* basis. For instance, the Thomas More Society reported total revenue of over $11 million in 2024, and $13 million in 2023. *See* Pullman Decl. Ex. N (Thomas More Society Form 990). The organization has put their vast resources to work litigating over fifty cases across the country in state and federal courts, including state

supreme and federal appellate courts of the highest caliber. *See generally*, https://www.thomasmoresociety.org/cases. Similarly, Life Legal Defense Foundation reported $3,482,332 revenue in FY 2024, and $2,926,890 in FY 2023. *See* Pullman Decl. Ex. O (Life Legal Defense Foundation Form 990).

These organizations' public claims about their finances and accomplishments bely the assertions counsel has made in this case of being unsophisticated counsel with no litigation experience and extremely limited resources.

Meanwhile, certain Defendants and their counsel have demonstrated near-complete disregard for the injunction entered in this case. On July 19, 2025, Defendant Moscinski was recorded pacing back and forth in front of the entrances to a clinic in the Bronx, well within the buffer zone. *See* Pullman Decl. Ex. P (Def. Moscinski Video, July 19, 2025). He passed within inches of the clinic escorts and flicked water on them. He then stopped directly in front of the entrance, telling clinic escorts who are standing between him and the entrance that he wanted to go inside. When the escort told him that he was not welcome inside the clinic, he feigned ignorance and asked why he was not allowed to go inside, and when he was told that he was not a patient and not welcome inside, he again repeated that he wanted to go into the clinic. *Id.*

In addition, counsel to Defendant Gies has boasted on her firm's website that, while her client was found to have violated the law in this case, the district court's preliminary injunction is "toothless" because of the intent requirement. *See* Pullman Decl. Ex. Q (Screenshot from Lifelegal.org).

Based on Defendants' total refusal to conduct discovery, their implausible claims about their lack of resources to do so, and their demonstrated disregard for the preliminary

injunction entered in this case, Plaintiff now moves to compel discovery in support of its request for an expanded permanent injunction, damages, and penalties.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 permits discovery as to any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Courts in this district have made clear, "The scope of relevancy under Rule 26 is quite broad." *FCX Solar, LLC v. FTC Solar, Inc.*, No. 21-cv-03556 (RA)(VF), 2022 WL 3584946, at *2 (S.D.N.Y. Aug. 22, 2022) (Figueredo, M.J.) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Plaintiff's burden to establish relevancy "is not heavy." *Id.* (citing *Pearlstein v. BlackBerry Ltd.*, 332 F.R.D. 117, 120 (S.D.N.Y. 2019)).

## ARGUMENT

Defendants have been found liable for violations of the FACE Act and New York Clinic Access Act and accordingly will be subject to a permanent injunction barring certain activities around reproductive health clinic entrances, as well as liable for damages and penalties. Plaintiff's discovery requests are clearly related to its claim for this type of relief.

Specifically, the requested information is relevant to the scope of the injunctive relief in four ways: (1) who will be covered by the injunction; (2) where in the state it will apply; (3) how large it will be; and (4) whether it should include an intent requirement. The document requests are also proportional to the needs of the case, as discussed further below, and Plaintiff has significantly narrowed the proposed search terms based on the number of reported hits that prior proposals generated—even as Defendants have been unable to provide accurate numbers due to their refusal to use the services of an ESI vendor. Finally, the information sought by the

10

interrogatories is undeniably non-privileged.

Below, Plaintiff explains the relevance of each document request; the proportionality of the search terms; the invalidity of Defendants' wholesale objection to engaging in any ESI discovery; and the non-privileged nature of the information sought by its interrogatories.

**(1) Plaintiff's requests for production of documents are undeniably relevant**

This Court has asked that Plaintiff make a reasonable request for relief that takes into account compromises already offered. To that end, Plaintiff now moves to compel production by Defendants of documents responsive to only Request Nos.4, 6, 7, and 8.[1]  A brief description of the relevance of each follows.

<u>**Request No. 4**</u>

Request No. 4 seeks, "[d]ocuments sufficient to identify all officers, agents, servants, employees, and attorneys of Red Rose Rescue," and included seven subcategories, intended to comprehensively identify such individuals. *See* Pullman Decl. Ex. B (Plaintiff's Document Demands). To further limit the scope of its requests, Plaintiff moves to compel Defendants' response to Request number 4 without reference to the listed sub-parts.[2]

This demand is clearly relevant to remedies. The preliminary injunction applies to Red

---

[1] Plaintiff is not currently moving to compel a response to request number 5, which asks for documents regarding Defendants' fundraising activities. However, if Defendants raise a defense to civil penalties that is based in whole or in part on their claimed financial status, Plaintiff will move to compel information regarding their funding.

[2] Subsections (a) through (g) of Request No. 4 were simply intended to elaborate on the meaning of the categories listed in Rule 65 and sought in the proposed injunction. Typically, in response to a document request with illustrative examples listed as subparts, the responding party would describe which of those categories existed and were readily available, and the parties would endeavor to negotiate a reasonable discovery protocol. Since Defendants have refused to negotiate such a protocol, Plaintiff moves to compel their response to Request number 4 without reference to the listed sub-parts.

Rose Rescue as an organization, as will any permanent injunction that Plaintiff requests, based on the finding that Defendant Red Rose Rescue repeatedly violated the FACE Act. And the document request tracks the precise categories of people who will be covered by such an injunction: Rule 65(2)(b) of the Federal Rules of Civil Procedure states that "officers, agents, servants, employees and attorneys" are bound by an injunction that binds an organization.

This demand is not relevant to liability, as Defendants have tried to argue; Plaintiff met its burden to prove that Defendant Red Rose Rescue was liable for violating the FACE Act without identifying every person who has been meaningfully involved in the group's unlawful activities targeting abortion clinics. Nor is it an attempt to argue that those individuals have themselves violated the FACE Act, or to add them as named parties to this case, as Defendants continue to suggest. Plaintiff has never made such arguments, which would expose those individuals to liability for damages and monetary penalties, not solely injunctive relief. It is simply an attempt to obtain information needed to know who is likely to be covered by a permanent injunction binding Defendant Red Rose Rescue as an organization. Documents related to this subject are particularly necessary because Defendants' counsel have insisted again and again that the group has no "members," *per se*.

The undeniable relevance of this information has already become clear during the protracted proceedings around Plaintiff's motion for contempt. After a self-described "member" of Red Rose Rescue was observed repeatedly entering the buffer zone created by the preliminary injunction, Plaintiff sought contempt for these apparent violations of the court's order. *See* Dkt. No. 96. One of two hotly contested issues was whether the alleged contemnor was acting in her role with Red Rose Rescue when she entered the buffer zone. Plaintiff did not take any discovery on this issue, given the posture of the proceedings, and so Defendant Red Rose Rescue

12

produced selective emails during the briefing and evidentiary hearing related to the individual's affiliation with numerous other groups (but notably did not produce nor purport to look for any documents related to her involvement with Red Rose Rescue).  The District Court ultimately found that the individual did not appear to possess the requisite intent to violate the injunction and so didn't reach the issue of whether she was bound by the injunction because she was acting within her role as an agent or servant of Red Rose Rescue.  *See* Pullman Decl. Ex. A (Contempt Hearing Tr).  In the future, enforcement of a permanent injunction need not be such a close call, nor should Plaintiff have to enter into enforcement proceedings blind to all information about individuals' involvement in the organization (other than what Defendants selectively produce).  To be clear, Defendants will retain the full ability to argue about the weight that should be given to any of this information, or how the Court should rule on the basis of this evidence.  But to claim that Plaintiff is not entitled to this information is simply wrong.

Indeed, in addition to being relevant, the names of people who will be bound by the injunction against Red Rose Rescue are in no way privileged.  To hold otherwise would create a bizarre and self-defeating rule: anyone who was properly bound by an injunction against an organization due to their role in it could avoid being identified to the party who obtained the injunction—not to mention the court enforcing it—precisely because of their role in it.  Defendants' claim of privilege is simply an effort to erase Defendant Red Rose Rescue from the injunction, such that only the individually named Defendants are bound by it—as they have baldly asserted on numerous occasions to this Court.  *See* Ex. E.  The plain text of the order belies this attempt as it makes clear it applies to Red Rose Rescue, not just the named individual Defendants.

Nor do the cases cited by Defendants in support of their privilege claim support it.  Those

cases simply prohibit wholesale collection of membership lists by a government agency under the guise of an investigation into unlawful activities.  Plaintiff has previously discussed the inapplicability of these cases at length in its July 24, 2025 letter to the Court addressing Defendants' weak First Amendment argument. Dkt. No. 151.  In sum, none of Defendants' cases addressed standards for discovery in civil litigation.  Three cases were challenges to state statutes of general applicability that required disclosure of membership information by all covered organizations, rather than individualized discovery requests issued to a specific party in ongoing litigation: *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 602 (2021); *Buckley v. Valeo*, 424 U.S. 1, 7 (1976); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 101 (1982).  Two others addressed investigatory subpoenas, rather than discovery requests. *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 548 (1963); *Evergreen Ass'n, Inc. v. Schneiderman,* 153 A.D.3d 87, 102 (2d Dept. 2017).  And all of them reaffirmed the well-established principle that information may be sought in court to the extent that it is relevant to the violations of law alleged.  As explained above, request number four is undeniably relevant to the violations of law alleged in this case.

As Plaintiff has repeatedly explained, this is not a demand for wholesale information about every member of Red Rose Rescue, much less every person who ever received its mailing list or expressed support for the group online.  To the contrary, it is clearly relevant and proportional to the needs of the case, as it asks for the precise information the federal rules state is covered by the requested relief.

**Request No. 6**

Request No. 6 seeks "All documents and communications regarding where, when, and

how to conduct an invasion,[3] including but not limited to any documents or communications concerning internal policies, procedures, or practices for making such decisions." *See* Pullman Decl. Ex. B (Plaintiff's Document Demands).  Such documents are relevant to the damages phase of this case in that they will inform the location of the buffer zone, the size of the buffer zone, and whether there should be an intent requirement in the permanent injunction.

First, responsive documents will inform what regions of the State the permanent injunction will cover.  Plaintiff requested a statewide injunction; however, at the preliminary injunction phase, the District Court instead ordered a buffer zone at reproductive health clinics in the Southern and Eastern Districts of New York.  Judge Karas reasoned that these two districts were the only locations in which Defendants had so far conducted their unlawful activities.  At the final injunction stage, Plaintiff intends to again move for a statewide injunction, because Defendant Red Rose Rescue operates nationwide—they have conducted Rescues in at least eight states, from New Jersey to Louisiana—and there is no indication that they are limited geographically within New York.  Documents and communications about how Red Rose Rescue participants decide where to conduct an invasion may well demonstrate that Defendants have planned and discussed invasions in other areas of the State, or at least that they will not be limited to the Southern and Eastern Districts.  Furthermore, documents could reveal that participants identify target clinics based on certain physical or geographic features of the clinic, the surrounding block, or the community, all of which would better inform the District Court in crafting a permanent injunction.

Second, Request No. 6 also relates to the size of a permanent buffer zone.  Plaintiff has

---

[3] Defendants counsel has at times suggested that this request does not cover the invasions in New York at issue in this case.  As is clear from the text, the request imposes no such limitation.

requested a thirty-foot buffer zone, but the District Court instead ordered a buffer zone of fifteen feet in its preliminary injunction. Documents and communications about how Red Rose Rescue conducts invasions may well bear on the appropriate size of a buffer zone. For example, documents could reveal that Red Rose Rescue participants go to clinics in advance to scope out their entrances and exits and security features, or that participants discuss positioning themselves at certain points to act as lookouts or to stop staff and patients from entering the clinic. Communications could also reveal why or how certain clinics have been chosen for invasions, features that Plaintiff could then use to argue for a larger, or more specifically crafted buffer zone to prevent future invasions.

Lastly, documents responsive to Request 6 will shed light on the implications of including an intent requirement in a permanent injunction. For example, the instructions Defendants provide to participants about how and when to conduct a Rescue, or how and when to engage in other conduct may reveal their intent in engaging in such conduct. This information is relevant because it would help the Court determine the appropriate contours of any intent requirement (or could obviate the need for it entirely).

**Request No. 7**

Document Request No. 7 seeks, "[a]ll documents and communications regarding the obligations of members, participants, officers, agents, servants, employees, and attorneys of Red Rose Rescue and individual Defendants to comply with the preliminary injunction issued on December 15, 2023 (Dkt. No. 62)."[4] Such documents are relevant to whether the permanent injunction should include the intent requirement the District Court added to the preliminary

---

[4] Again, the language of the request incorporates the definition of persons bound by an injunction against an organization in Rule 65 of the Federal Rules of Civil Procedure.

injunction.   For instance, responsive documents could reveal that Defendants have discussed complying with the letter and spirit of the injunction, or otherwise planned to escape liability for entering the buffer zone by appearing to lack the requisite intent.  Such conversations would certainly be relevant to the Court's consideration to remove that requirement from the permanent injunction.

That Defendants seek to test the limits of the existing injunction, and the intent requirement in particular, is more than mere conjecture.  As described above, after the entry of the preliminary injunction, Defendant Moscinski was recorded pacing back and forth in front of the entrances to a clinic in the Bronx, well within the buffer zone; flicking water on clinic escorts; and standing directly in front of the door.  While standing in front of the door, within inches of a clinic escort, he repeatedly stated that he wanted to go inside the clinic and feigned ignorance about why he was not welcome to do so.  To the extent that Defendants have discussed how the intent element of the injunction permits them to enter the buffer zone so long as they express ignorance about being prohibited from trespassing inside of clinics, that bears on Plaintiff's argument to remove that language.

Further, Defendants Gies's counsel has publicly advertised her view that, while her client was found to have violated the law in this case, the District Court's preliminary injunction is "toothless" because of the intent requirement.  Pullman Decl. Ex. Q.  Of course, attorney-client communications would be privileged, but any non-privileged communications among Defendants about their understanding of the intent requirement, or repeating legal advice to third parties about how they need not stay out of the buffer zone because of the nullification effect of the intent language, would be relevant to Plaintiff's proposal to remove it.

Finally, as noted above, the parties had multiple days of argument and live testimony

17

about the actions of a self-described Red Rose Rescue "member" inside the buffer zone. One of the two contested issues was whether the alleged contemnor had the requisite intent. Those proceedings were conducted without the benefit of discovery; now that Plaintiff is entitled to discovery on remedies, and documents and communications about how and whether Defendants have attempted to comply with or circumvent the preliminary injunction is relevant to the terms of a permanent injunction.

**Request No. 8**

Lastly, Document Request No. 8 seeks "All documents and communications concerning any facility that provides reproductive health services in the State of New York." *See* Pullman Decl. Ex. B (Plaintiff's Document Demands).

Defendants' communications about clinics in New York are clearly relevant to Plaintiff's request for statewide relief, as discussed above for Request No. 6. Simply put, information about Defendants' plans to conduct invasions or otherwise interfere with clinics in New York and any discussions about where, how, and whether to do so, will inform Plaintiff's requested language in a permanent injunction.

While Defendants have refused to provide this information, their objections are generic and unfounded in law. For instance, Defendant Gies has queried how she "would even conduct such a search" (Dkt. No. 143), and Defendants Hinshaw, Goodman, and Connolly have generically claimed the request is "overbroad," without ever having performed a review of potentially relevant documents, while repeatedly accusing Plaintiff of "attempt[ing] to reopen liability discovery," and claiming that any responsive documents would be protected by a "first amendment privilege." *Id.*

Defendants' claims of overbreadth cannot be evaluated without any basic information

18

about the volume of documents responsive to this request.  Moreover, Defendants have never

proposed any narrowing principles for this search, nor have they described what documents in

their possession would be responsive to this request but not necessarily relevant to Plaintiff's

request for relief.  Notably, this request asks for documents related only to *facilities in New York*

that provide reproductive health care—it does not seek a wholesale production of documents

regarding Defendants' personal or religious views on abortion.

Nor does the fact that Defendants may be expressing their views on abortion provide a

global shield to producing otherwise relevant information.  Defendants' generic claims of a First

Amendment privilege to exempt documents in discovery simply because they do not want to

produce such communications is neither explained by Defendants nor supported by any case in

any court to date.

**(2) Plaintiff's proposed search terms are proportional to the needs of the case**

In order to identify electronically stored documents that are responsive to the above

requests, Plaintiff submits proposed search terms for Defendants Gies, Moscinski, and Red Rose

Rescue, Connolly, Goodman, and Hinshaw, attached collectively as Exhibit R to the Pullman

Declaration.

Plaintiff has narrowed these terms significantly from its prior search term requests based

on the numbers of hits reported by Defendants for prior requests (to the extent Defendants

provided that information).  Plaintiff has further proposed limitations on some terms that

generated a large number of hits, such as running the terms only across communications with

active Red Rose Rescue participants for Defendants Goodman and Connolly and adding the

terms "New York" or "NY" to more generic terms like "clinic."  In order to continue to hone a

discovery protocol that is proportional to the needs of the case, Plaintiff asks that each Defendant

19

identify the number of unique[5] documents generated per term on the revised term lists. At that point, Plaintiff would be able to discuss additional modifications as needed.

Plaintiff also notes that Defendants do not appear to have searched text messages or other forms of electronic messaging that they may have used, outside of email, and therefore specifically asks that they be compelled to do so.

**(3) Defendants' wholesale refusal to engage in any ESI discovery is incompatible with their professional obligations and inconsistent with well-settled discovery protocols**

Plaintiff has made targeted requests for relevant, nonprivileged documents that happen to exist in Defendants' emails, social media, and texts, as discovery invariably does in this day and age. Defendants' overarching objection to producing any electronic documents at all—which they have asserted repeatedly and without qualification—is that they lack the skills to conduct basic searches on their own or the resources to hire a vendor to assist them in doing so.

This is not a basis upon which litigants may wholesale avoid conducting discovery. In fact, these positions are inconsistent with counsel's ethical obligation to possess the requisite competence to litigate this case. New York Rule of Professional Responsibility 1.1(a) requires attorneys to provide competent representation to clients, which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." State courts in New York have accordingly promulgated the following rule for counsel appearing in cases likely to involve e-discovery: they "must be sufficiently versed in matters relating to their clients'

---

[5] Because Defendants have not used an ESI platform or fully engaged in in a review of any documents, none of their numbers of responsive hits can be accurately considered at this time because they have not been de-duplicated. As this Court specifically advised Defendants at the September 8, 2025 conference, "it's very hard to evaluate those objections [undue burden and proportionality] without some understanding of what the universe of potentially responsive documents is." Pullman Decl. Ex. F at 34:5-7.

technological systems to discuss competently all issues relating to electronic discovery," and are encouraged to bring "a client representative or outside expert to assist in such ediscovery discussions" if need be.  N.Y. Comp. Codes R. & Regs. tit. 22, § 202.12(b).[6]

Here in the SDNY, nearly 16 years ago, Magistrate Judge Peck issued what he characterized as a "wake-up call to the Bar in this District about the need for careful thought, quality control, testing, and cooperation with opposing counsel in designing search terms or 'keywords' to be used to produce emails or other electronically stored information ('ESI')." *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.,* 256 F.R.D. 134, 134 (S.D.N.Y. 2009).   At the time, he noted that the message "had not reached many members of our Bar."  *Id.* While that may have been the case in 2009, there is certainly no excuse for it now. An attorney must possess the knowledge, skills, and preparation needed to competently conduct ESI discovery on behalf of their client or must secure the assistance of someone who can.

Given counsel's demonstrated lack of competence with ESI, their flat refusal to outsource this process is unacceptable.  Moreover, their claimed lack of resources to hire a vendor is simply not credible, given that Defendants Red Rose Rescue, Goodman, Connolly, Hinshaw and Gies, are represented by extremely well-resourced advocacy organizations, apparently on a *pro bono* basis.  Specifically, counsel for Defendants Red Rose Rescue, Goodman, Connolly, and Hinshaw—the Thomas More Society—reported total revenue of over $11 million in 2024, and

---

[6] The State Bar of California, where counsel for Defendant Gies is located, has issued an ethics opinion stating that attorney competence in litigation "requires, at a minimum, a basic understanding of, and facility with, issues relating to e-discovery."  It adds, "An attorney lacking the required competence for the e-discovery issues in the case at issue has three options: (1) acquire sufficient learning and skill before performance is required; (2) associate with or consult technical consultants or competent counsel; or (3) decline the client representation." State Bar of California Standing Committee on Professional Responsibility and Conduct, Formal Op. No. 2015- 193.  Yet she has refused to elect any of these options.

$13 million in 2023. *See* Pullman Decl. (Exs. N-O). Counsel to Defendant Gies—Life Legal Defense Foundation—reported roughly $3.4 million in revenue in FY 2024, and $2.9 million in FY 2023. *Id.* In addition to their significant financial resources, these organizations have extensive experience litigating numerous cases in federal courts across the country over the last three decades. *Id.* Their insistence that they can neither undertake basic e-discovery protocols nor afford a vendor to assist them in doing so is neither a credible excuse nor a legitimate one.

**(4) Plaintiff's interrogatories seek relevant and nonprivileged information**

Finally, Plaintiff issued two limited interrogatories on September 12, 2025, seeking (1) the names of participants in the Red Rose Rescue at All Women's Health in White Plains that is the subject of this lawsuit, and (2) the names of the two people identified by Mr. Ferrara as having participated in Red Rose Rescues but are unknown to Plaintiff. This information is relevant to who is covered by an injunction that binds Red Rose Rescue, as more fully described above under Document Request No. 4.

Defendants' objections to producing this clearly relevant information are both procedural and substantive, but neither is valid. First, Defendants object that the interrogatories are untimely. This is entirely without merit, as the parties are still in discovery and have not been prohibited from issuing additional written discovery requests. As to timing, Plaintiff notes that it was Defendants' counsel who repeatedly brought up these two individuals and then offered before the Court to provide Plaintiff with their names, only to later, via email, ostentatiously refuse.

Second, Defendants' substantive objections are that the information is constitutionally protected under the First and Fifth Amendments. Their claimed privilege based on the First Amendment fails, as described above. There is not a single case that supports their claim that the

identity of people involved in the conduct underlying a civil suit (particularly here, where those individuals are involved in unlawful activity) should be shielded merely because they acted in connection with an organization to which they belong.

Nor is Defendant Moscinski's invocation of his Fifth Amendment right supported by law. As a general matter, the Fifth Amendment privilege is personal and protects only against self-incrimination, not against incriminating others; it does not extend to identifying other people involved in a potential crime unless such identification "would furnish a link in the chain of evidence needed to prosecute the claimant." *Ohio v. Reiner*, 532 U.S. 17, 20–21 (2001) (citations omitted).  Further, the privilege's protection extends only to witnesses who have "reasonable cause to apprehend danger from a direct answer." *Id.*  "The danger of self-incrimination must be real, not remote or speculative." *OSRecovery, Inc. v. One Groupe Intern., Inc.,* 262 F. Supp. 2d 302, 306 (S.D.N.Y. 2003), quoting *Estate of Fisher v. Comm'r of Internal Revenue*, 905 F.2d 645, 648 (2d Cir. 1990).

Here, there is no reasonable cause for Defendant Moscinski to fear that providing the names of others with whom he trespassed in White Plains could lead to his prosecution.  In fact, he has already been criminally prosecuted and convicted for trespassing inside the clinic on this date.  Nor can he reasonably fear criminal FACE Act prosecution, given that the federal government has pardoned him for his past FACE Act convictions.  His claimed fear of self-incrimination is worse than remote or speculative; it lacks credibility entirely.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant an Order compelling Defendants (1) to turn over documents responsive to Request Nos. 4, 6, 7, and 8, as modified herein; (2) to perform a comprehensive ESI review, including running the proposed search terms

and de-duplicating responses; and (3) to respond to Plaintiff's September 12, 2025

interrogatories.  Plaintiffs further request that the Court set a date-certain for Defendants to

conduct their ESI review and to turn over all responsive documents, along with any other relief

the Court deems reasonable.

Dated: New York, New York
December 5, 2025

LETITIA JAMES
Attorney General of the State of New York


By:    /s/ Sandra Pullman
       Sandra Pullman
       Senior Counsel, Civil Rights Bureau
       Julia Toce, Assistant Attorney General
       Heather McKay, Assistant Attorney General
       Zoe Ridolfi-Starr, Assistant Attorney General
      Office of the New York State Attorney General
       28 Liberty St., New York, NY 10005
       (212) 416-8250

24